| | |
|---|---|
| 1 | WILLIAM C. LEWIS, ESQ., BAR NO. 77193<br>DAVID S. CAPLAN, ESQ., BAR NO. 74219 |
| 2 | LAW OFFICES OF WILLIAM C. LEWIS |
| | 510 Waverley Street |
| 3 | Palo Alto, CA 94301-2009 |
| | Telephone: (650) 322-3300 |
| 4 | Facsimile: (650) 327-9720 |
| 5 | Attorneys for Debtor, |
| | Valles & Associates LLC |
| 6 | |

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re:<br><br>VALLES & ASSOCIATES, LLC,<br><br>Debtor | Case No. 10-51813<br><br>CHAPTER 11<br><br>**SUPPLEMENT TO DEBTOR'S CHAPTER 11 PLAN DATED MARCH 11, 2011**<br><br>Disclosure Statement Hearing:<br><br>Date: April 15, 2011<br>Time: 2:00 p.m.<br>Courtroom: 3020<br>Location: U.S. Courthouse & Federal Bldg.<br>        280 South First Street<br>        San Jose, California<br>Judge: Hon. Arthur S. Weissbrodt |

Attached hereto are the following exhibits referenced in the **Debtor's Chapter 11 Plan**

**Dated March 11, 2011** filed concurrently herewith:

| Exhibit | Title |
|---|---|
| A | Restated DOT |
| B | Restated Operating Agreement |
| C | Replacement Note |
| D | Form-Post-confirmation U.S. Trustee report |
| E | List of Assumed Executory Contracts |

Dated: March 11, 2011

LAW OFFICES OF WILLIAM C. LEWIS,
Counsel for Debtor, Valles & Associates LLC

By; ___/s/ William C. Lewis_____
       William C. Lewis

SUPPLEMENT TO DEBTOR'S CHAPTER 11 PLAN

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 10-51813 |
| VALLES & ASSOCIATES, LLC, | Chapter 11 |
| Debtor | **QUARTERLY POST-CONFIRMATION REPORT OF REVESTED DEBTOR** |
| | For the quarter ending _____ [1] |

      The Revested Debtor hereby submits the following post-confirmation report for this calendar quarter:

1.    Date of Entry of Order Confirming Plan            _____

      Cash balance at beginning of quarter:
      Total receipts during quarter:
      Total disbursements during quarter:
      Cash balance at end of quarter:            _____

3.    Payments made pursuant to Plan
      Total paid this quarter:            _____

      Total payments to be made pursuant to Plan:
      Cumulative paid to date:
      Balance remaining to be made under Plan:      _____

<u>As of the end of this reporting period,</u>

| | | Yes | No |
|---|---|---|---|
| 4. | Are all payments required by the confirmed plan current at this time?  [If not, attach explanatory statement identifying payments no made (by creditor, amount and date due), reason for nonpayment, and an estimated date as to when payments will be brought current.] | ___ | ___ |
| 5. | Do you currently anticipate a circumstance/event which will cause an interruption or cessation of payments or other performance under the plan? [If so, attach an explanatory statement.] | ___ | ___ |
| 6. | Have quarterly fees due to the United States Trustee to the date of this report been paid pursuant to 28 U.S.C. §1930(a)(6) and the plan? | ___ | ___ |

---

[1] First Report shall be filed for the portion of the calendar quarter from date of confirmation to the end of the quarter, and subsequent reports shall be filed at the expiration of each calendar quarter thereafter until dismissal, conversion or entry of a final decree closing the case.  Reports shall be filed with the court and served on the UST not later than the last day of the month after expiration of the reported period.

**EXHIBIT D**

7.  Have all motions, contested matters, and adversary proceedings     ___        ___
    been finally resolved? [If not, for each such pending motion,
    contested matter or adversary proceeding, please identify the
    parties and nature of the dispute and state the anticipated date of
    resolution.]

8.  Has the order confirming the plan become nonappealable?            ___        ___

9.  Have deposits, if any, required by the plan been distributed       ___        ___
    pursuant to the plan?  [If so, please explain.]

10. Has any property proposed by the plan to be transferred been       ___        ___
    transferred pursuant to the plan?

11. Does any property remain to be transferred pursuant to the plan?   ___        ___
    [If so, please identify each such property and the anticipated
    date of transfer pursuant to the plan.]

12. Has the Revested Debtor(s) or the successor to the Debtor(s)       ___        ___
    assumed the business or the management of the property dealt
    with by the plan?

13. Anticipated date of motion for final decree:                       ___        ___

I declare under penalty of perjury that the statements set forth above are true and accurate.

Dated: _____

                                                    _____
                                                    Albert Valles, Responsible Individual.

                                                    ADDRESS
                                                    PHONE

---

**EXHIBIT D**

<u>**EXHIBIT E**</u>

**EXECUTORY CONTRACTS TO BE ASSUMED**

1. Real Estate Lease dated February 1, 2010, between the Debtor and Gold's Gym Hollister, as modified through the Effective Date.

2. Real Estate Lease dated April 1, 2010, between the Debtor and Java Express LLC.

3. Property and Liability Insurance policy number 8379489 with Golden Eagle Insurance Company.

**EXHIBIT E**

# EXHIBIT A

SPACE ABOVE THE LINE FOR RECORDER'S USE

**AMENDED AND RESTATED**
**DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES, RENTS,**
**AND PROFITS, AND FIXTURE FILING**

This AMENDED AND RESTATED DEED OF TRUST, SECURITY AGREEENT, ASSIGNMENT OF LEASES, RENTS AND PROFITS, AND FIXTURE FILING (this "Restated DOT") is entered into among Valles & Associates, a California limited liability company with an address at _____ (the "Trustor"). First American Title Company, a _____ corporation with an address at _____ (the "Trustee") for the use and benefit of Pacific Capital Bank, N.A., a national banking association doing business as San Benito Bank, with an address in care of Loan Services, P.O. box 60654, Santa Barbara, California 93160-0654 (the "Beneficiary") and the Beneficiary.

This Restated DOT amends and restates that DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES, RENTS, AND PROFITS, AND FIXTURE FILNG (the "Original Deed of Trust") entered into as of April 20, 2007, among Alron Properties & Investments, LLC, a California limited liability company, with an address of 817 Industrial Drive, Suite A, Hollister, California 95023, PCB Service Corporation, with an address of c/o Loan Services, PO Box 60654, Santa Barbara, CA 93160 and the Beneficiary. The Original Deed of Trust was recorded in the San Benito County Records on May 3, 2007, as document number 2007-0005822. For all purposes relating hereto, the term "this Deed of Trust" shall refer to the Original Deed of Trust as modified by this Restated Deed of Trust.

The purpose of this Restated DOT is to modify the terms of the Original Deed of Trust and not to affect or modify the priority of such Original Deed of Trust *vis* other interests in the Property subject to this Deed of Trust.

**A.      DEFINITIONS**

For all purposes of this Deed of Trust, the following terms shall be defined as follows:

"Chapter 11 Plan" means that Debtor's Chapter 11 Plan Dated as of February ___, 2011, or such modified form thereof, as is confirmed by the U.S. Bankruptcy Court for the Northern District of California in the case with respect to Trustor bearing case number 10-51813

"Event of Default" shall have the meaning set forth in <u>Section 4.1</u> hereof.

"Hazardous Substances" means any oil or other material or substance constituting hazardous waste or hazardous materials or substances under any applicable Federal or state law, regulation or rule.

"Leases" means any and all present and future leases and agreements relating to the Real Property, including without limitation rents, issues and profits, or the use or occupancy thereof together with any extensions and renewals thereof, specifically excluding all duties or obligations of the Trustor of any kind arising thereunder.

"Loan Documents" means, collectively, the Note and this Deed of Trust, along with all other agreements, documents, certificates and instruments delivered pursuant thereto.

"Note" means that certain Term Note dated April 20, 2007, in the original principal amount of $1,777,000, and made by Alron Properties and Investments, LLC, Ronald Klauer, Jr., and Al Valles, Jr., in favor of Beneficiary as modified by that Amended and Restated Term Promissory Note executed by Trustor pursuant to the Plan.

"Obligations" means without limitation all loans, advances, indebtedness, liabilities, liquidated or unliquidated, now or hereafter owing by the Trustor to the Beneficiary at any time, of each and every kind, nature and description, arising under this Deed of Trust or the Note, or under any future obligation incurred by the Trustor in favor of the Beneficiary, whether secured or unsecured, absolute or contingent, due or to become due, including, without limitation, payment of all amounts outstanding when due pursuant to the terms of any of the Loan Documents. The term "Obligations" shall also include all interest and other charges chargeable to the Trustor or due from the Trustor to the Beneficiary from time to time and all other advances, costs and expenses referred to in this Deed of Trust, including without limitation the costs and expenses (including reasonable attorney's fees) of enforcement of the Beneficiary's rights hereunder or pursuant to any document or instrument executed in connection herewith.

"Permitted Encumbrances" means the liens, encumbrances, leases, security interests and rights of others set forth in the Title Report plus the Leases outstanding on the date hereof between Trustor and, respectively, Gold's Gym Hollister and Java Express LLC.

"Property" means the Real Property and the fixtures, structures and improvements and all personal property constituting fixtures, as that term is defined in the UCC, now or hereafter located at the Real Property, together with: (i) all rights now or hereafter existing, belonging, pertaining or appurtenant thereto; (ii) the following categories of assets as defined in the UCC: goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes). documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all proceeds of any thereof, whether now owned or hereafter acquired, that are located on or used in connection with, or that arise in whole or in part out of the Trustor's use of or business conducted on or respecting the Property and any substitutions, replacements, accessions and proceeds of any of the foregoing; (iii) all judgments, awards of damages and settlements hereafter made as a result or in lieu of any Taking; (iv) all of the rights and benefits of the Trustor under any present or future Leases, and (v) all contracts, permits, and licenses respecting the use, operation or maintenance of the Property.

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 7 of 87

"Real Property" means those parcels of real property whose addresses are 1525, 1575, and 1605 Cushman Street, Hollister, California 95023, with Assessor's Parcel Numbers of 057-230-001, 002, 003, and 029, and which are more particularly described in Exhibit A attached hereto.

"Rents" means all rents, income, issues and profits of any of the Property.

"Taking" means any condemnation or expropriation for public use of, or any damage by reason of the action of any public or governmental entity or authority to, all or any part of the Property.

"Title Report" means that Preliminary Report dated as of June 15, 2010, at 7:35 a.m. issued to Trustor by First American Title Company under Order Number 2701-3544469.

"UCC" means the California Uniform Commercial Code.

"Value" means mean the value established by the most recent appraisal of the subject Property by a duly licensed appraiser chosen jointly by Beneficiary and Trustor, provided that such appraisal is dated less than one hundred twenty (120) days before or after the date on which Value is to be determined.

## 1.    DEED OF TRUST, OBLIGATIONS AND FUTURE ADVANCES

1.1    Deed of Trust.  For valuable consideration paid and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Trustor hereby irrevocably and unconditionally mortgages, grants, bargains, transfers, sells, conveys, sets over and assigns to the Trustee and its successors and assigns, IN TRUST, for the benefit and security of the Beneficiary forever, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION, all of Trustor's right, title and interest in and to the Property, to secure the prompt payment and performance of the Obligations, including without limitation, all amounts due and owing from the Trustor to the Beneficiary and all obligations respecting the Note; and any substitutions, modifications, extensions or amendments to any of the Loan Documents.

The principal amount of obligations outstanding and evidenced by the Loan Documents and secured by this Deed of Trust total $_____ as of the date of this Deed of Trust but this Deed of Trust shall nevertheless secure payment and performance of all Obligations.

1.2    Security Interest in Property.  As continuing security for the Obligations, the Trustor hereby pledges, assigns and grants to the Beneficiary, and its successors and assigns, a security interest in any of the Property constituting personal property or fixtures.  This Deed of Trust is and shall be deemed to be a security agreement and financing statement pursuant to the terms of the UCC as to any and all personal property and fixtures and as to all such property the Beneficiary shall have the rights and remedies of a secured party under the UCC in addition to its rights hereunder.  This Deed of Trust constitutes a financing statement filed as a fixture filing under Section 9-502(c) of the UCC covering any Property which now is or later may become a fixture.

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 8 of 87

1.3    Collateral Assignment of Leases and Rents.  The Trustor hereby irrevocably and unconditionally assigns to the Beneficiary, and its successors and assigns, as collateral security for the Obligations, all of the Trustor's rights and benefits under any and all Leases and any and all rents and other amounts now or hereafter owing with respect to the Leases or the use or occupancy of the Property.  This collateral assignment shall be absolute and effective immediately, but the Trustor shall have a license, revocable by the Beneficiary upon the occurrence of an Event of Default, to continue to collect and use rents owing under the Leases until an Event of Default occurs and the Beneficiary exercises its rights and remedies to collect such rents as set forth herein.

1.4    Conditions to Grant.    The grants herein to the Trustee, IN TRUST for the benefit of the Beneficiary, and to the Beneficiary, as the case may be, are upon the express condition that, if Trustor shall pay and perform the Obligations in full, including, without limitation, all principal, interest and premium thereon and other charges, if applicable, in accordance with the terms and conditions in the Loan Documents and this Deed of Trust, shall pay and perform all other Obligations as set forth in this Deed of Trust and shall abide by and comply with each and every covenant and condition set forth herein and in the Loan Documents, the conveyances. grants and assignments contained in this Deed of Trust shall cease, terminate and be void.

1.5    Future Advances.  It is the express intention of the Trustor that this Deed of Trust secure payment and performance of all of Obligations incurred by reason of future advances by the Beneficiary or otherwise, and regardless of whether such Obligations are or were contemplated by the parties at the time of the granting of this Deed of Trust.  Notice of the continuing grant of this Deed of Trust shall not be required to be stated on the face of any document evidencing any of the Obligations, nor shall such documents be required to otherwise specify that they are secured hereby.

## 2.    REPRESENTATIONS, WARRANTIES, COVENANTS

2.1    Representations and Warranties.  The Trustor represents and warrants that:

(a)    This Deed of Trust has been duly executed and delivered by the Trustor and is the legal, valid and binding obligation of the Trustor enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally;

(b)    The Trustor is the sole legal owner of the Property, holding good and marketable fee simple title to the Property, subject only to the Permitted Encumbrances;

(c)    The Trustor is the sole legal owner of the entire lessor's interest in Leases, if any, with full power and authority to encumber the Property in the manner set forth herein, and the Trustor has not executed any other assignment of Leases or any of the rights or rents arising thereunder;

(d)    As of the date hereof, there are no Hazardous Substances in, on or under the Property, except as disclosed in writing to the Beneficiary; and

4

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 9 of 87

(e)     Each Obligation is a commercial obligation and does not represent a loan used for personal, family or household purposes and is not a consumer transaction.

2.2     <u>Recording; Further Assurances</u>.  The Trustor covenants that it shall, at its sole cost and expense and upon the request of the Beneficiary, cause this Restated DOT, and each amendment, modification or supplement hereto, to be recorded and filed in such manner and in such places, and shall at all times comply with all such statutes and regulations as may be required by law in order to establish, preserve and protect the interest of the Beneficiary in the Property and the rights of the Beneficiary under this Deed of Trust.  Trustor will from time to time execute and deliver to the Beneficiary such documents, and take or cause to be taken, all such other further action, as the Beneficiary may reasonably request in order to effect and confirm or vest more securely in the Beneficiary all rights contemplated by this Deed of Trust (including, without limitation, to correct clerical errors) or to vest more fully in, or assure to the Beneficiary the security interest in, the Property or to comply with applicable statutes or laws. To the extent permitted by applicable law, Trustor authorizes the Beneficiary to file financing statements, continuation statements or amendments without Trustor's signature appearing thereon, and any such financing statements, continuation statements or amendments may be signed or authenticated by the Beneficiary on behalf of Trustor, if necessary, and may be filed at any time in any jurisdiction.  The Beneficiary may at any time and from time to time file financing statements, continuation statements and amendments thereto that describe the Property as "all assets of Trustor" or words of similar effect and which contain any other information required by Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Trustor is an organization, the type of organization and any organization identification number issued to Trustor; Trustor also authorizes the Beneficiary to file financing statements describing any agricultural liens or other statutory liens held by the Beneficiary.  Trustor agrees to furnish any such information to the Beneficiary promptly upon request.  In addition, Trustor shall at any time and from time to time, take such steps as the Beneficiary may reasonably request for the Beneficiary (i) to obtain an acknowledgement, in form and substance satisfactory to the Beneficiary, of any bailee having possession of any of the Property that the bailee holds such Property for the Beneficiary, (ii) to obtain "control" of any investment property, deposit accounts, letter-of-credit rights or electronic chattel paper (as such terms are defined in Article 9 of the UCC relating to what constitutes "control" for such items of Property), with any agreements establishing control to be in form and substance satisfactory to the Beneficiary, and (iii) otherwise to insure the continued perfection and priority of the Beneficiary's security interest in any of the Property and the preservation of its rights therein. Trustor hereby constitutes the Beneficiary its attorney-in-fact to execute and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Deed of Trust terminates in accordance with its terms and all Obligations are paid in full.

2.3     <u>Restrictions on the Trustor</u>. The Trustor covenants that it will not, nor will it permit any other person to, directly or indirectly, without the prior written approval of the Beneficiary in each instance:

(a)     Sell, convey, assign, transfer, mortgage, pledge, hypothecate, or dispose of all or any part of any legal or beneficial interest in the Trustor or the Property or any

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 10 of 87

part thereof or permit any of the foregoing, except as expressly permitted by the terms of this Deed of Trust;

(b)     Permit the use, generation, treatment, storage, release or disposition of Hazardous Substances, except in full compliance with applicable laws and regulations for handling, storage, release or cleanup of Hazardous Substances; or

(c)     Permit to be created or suffer to exist any mortgage, lien, security interest, attachment or other encumbrance or charge on the Property or any part thereof or interest therein (except for the Permitted Encumbrances), including, without limitation, (i) any lien arising under any Federal, state or local statute, rule, regulation or law pertaining to the release or cleanup of Hazardous Substances and (ii) any mechanics' or materialmen's lien not fully bonded against or released within sixty (60) days after the attachment thereof. The Trustor further agrees to give the Beneficiary prompt written notice of the imposition, or notice, of any lien referred to in this Section and to take any action necessary to secure the prompt discharge or release of the same. The Trustor agrees to defend its title to the Property and the Beneficiary's interest therein against the claims of all persons and, unless the Beneficiary requests otherwise, to appear in and diligently contest, at the Trustor's sole cost and expense, any action or proceeding that purports to affect the Trustor's title to the Property or the priority or validity of this Deed of Trust or the Beneficiary's interest hereunder.

2.4     Operation of Property. The Trustor covenants and agrees as follows:

(a)     The Trustor will not permit the Property to be used for any unlawful or improper purpose, will at all times comply with all Federal, state and local laws, ordinances and regulations, and the provisions of any Lease, easement or other agreement affecting all or any part of the Property, and will obtain and maintain all governmental or other approvals relating to the Trustor, the Property or the use thereof, including without limitation, any applicable zoning or building codes or regulations and any laws or regulations relating to the handling, storage, release or cleanup of Hazardous Substances, and will give prompt written notice to the Beneficiary of (i) any violation of any such law, ordinance or regulation by the Trustor or relating to the Property, (ii) receipt of notice from any Federal, state or local authority alleging any such violation and (iii) the presence or release on the Property of any Hazardous Substances;

(b)     The Trustor will at all times keep the Property insured for such losses or damage, in such amounts and by such companies as may be required by law and which the Beneficiary may reasonably require, provided that, in any case, the Trustor shall maintain: (i) physical hazard insurance on an "all risks" basis in an amount not less than 100% of the full replacement cost of the Property; (ii) flood insurance if and as required by applicable Federal law and as otherwise reasonably required by the Beneficiary; (iii) comprehensive commercial general liability insurance; (iv) rent loss and business interruption insurance; and (v) builder's risk insurance in the case any construction is being conducted on the Real Property. All policies

6

regarding such insurance shall be issued by companies licensed to do business in the state where the policy is issued and also in the state where the Property is located, be otherwise reasonably acceptable to the Beneficiary, provide deductible amounts reasonably acceptable to the Beneficiary, name the Beneficiary as mortgagee, loss payee and additional insured, and provide that no cancellation or material modification of such policies shall occur without at least thirty (30) days prior written notice to the Beneficiary. Such policies shall include (i) a "standard" mortgage endorsement so that the insurance, as to the interest of the Beneficiary, shall not be invalidated by any act or neglect of the Trustor or the owner of the Property, any foreclosure or other proceedings or notice of sale relating to the Property, any change in the title to or ownership of the Property, or the occupation or use of the Property for purposes more hazardous than are permitted at the date of inception of such insurance policies; (ii) a replacement cost endorsement; (iii) an agreed amount endorsement; and (iv) a contingent liability from operation endorsement. The Trustor will furnish to the Beneficiary upon request such original policies, certificates of insurance or other evidence of the foregoing as are reasonably acceptable to the Beneficiary. The terms of all insurance policies shall be such that no coinsurance provisions apply, or if a policy does contain a coinsurance provision, the Trustor shall insure the Property in an amount sufficient to prevent the application of the coinsurance provisions;

(c)     Trustor will at all times (i) maintain complete and accurate records and books regarding the Property in accordance with Trustor's customary accounting practices consistent with federal income tax reporting and (ii) permit the Beneficiary and the Beneficiary's agents, employees and representatives, at such reasonable times as the Beneficiary may request, to enter and inspect the Property and such books and records; and

(d)     Trustor will at all times keep the Property in good and first-rate repair and condition (damage from acts of God and other events outside of Trustor's control excepted) and will not commit or permit any strip, waste, impairment, or material deterioration of the Property or any part thereof.

2.5     <u>Payments</u>.  The Trustor covenants to pay when due: all Federal, state, municipal, real property and other taxes, betterment and improvement assessments and other governmental levies, water rates, sewer charges, insurance premiums and other charges on the Property that could, if unpaid, result in a lien on the Property or on any interest therein.  As to taxes or assessments treated under the Chapter 11 Plan, payment when due shall refer to payment when required by the Chapter 11 Plan and not the due dates set forth in nonbankruptcy law.

The Trustor shall have the right to contest any notice, lien, encumbrance. claim, tax, charge, betterment assessment or premium filed or asserted against or relating to the Property; provided that it contests the same diligently and in good faith and by proper proceedings and, at the Beneficiary's request, provides the Beneficiary with adequate cash security, in the Beneficiary's reasonable judgment, against the enforcement thereof.

7

If hereafter requested by the Beneficiary in writing, the Trustor shall furnish to the Beneficiary the receipted real estate tax bills or other evidence of payment of real estate taxes for the Property assessed after the date hereof within thirty (30) days prior to the date from which interest or penalty would accrue for nonpayment thereof, and the Trustor shall also furnish to the Beneficiary evidence of all other payments referred to above within fifteen (15) days after written request therefor by the Beneficiary.

If Trustor shall fail to pay such sums, the Beneficiary may, but shall not be obligated to, advance such sums. Any sums so advanced by the Beneficiary shall be added to the Obligations, shall bear interest at the highest rate specified in any note evidencing the Obligations, and shall be secured by the lien of this Deed of Trust.

2.6 <u>Notices; Notice of Default</u>. The Trustor will deliver to the Beneficiary. promptly upon receipt of the same. copies of all notices or other documents it receives that adversely affect the Property or its use, or claim that the Trustor is in default in the performance or observance of any of the terms hereof or that the Trustor or any tenant is in default of any terms of the Leases.

2.7 <u>Takings</u>. In case of a Taking or the commencement of any proceedings or negotiations that might result in a Taking, the Trustor shall promptly give written notice to the Beneficiary, describing the nature and extent thereof. The Beneficiary may, at its option, appear in any proceeding for a Taking or any negotiations relating to a Taking and the Trustor shall promptly give to the Beneficiary copies of all notices, pleadings, determinations and other papers relating thereto. The Trustor shall in good faith and with due diligence and by proper proceedings file and prosecute its claims for any award or payment on account of any Taking. The Trustor shall not settle any such claim without the Beneficiary's prior written consent unless such settlement is in an amount sufficient to pay all Obligations then outstanding in full. The Trustor shall hold any amounts received with respect to such awards or claims, by settlement, judicial decree or otherwise, in trust for the Beneficiary and promptly pay the same to the Beneficiary up to the amount of the Obligations then outstanding. The Trustor authorizes any award or settlement due in connection with a Taking to be paid directly to the Beneficiary in amounts not exceeding the Obligations then outstanding.

2.8 <u>Insurance Proceeds</u>. The proceeds of any insurance resulting from any loss with respect to the Property shall be used to repair the Property if the Property is in reasonably reparable condition; otherwise such proceeds shall be paid to the Beneficiary.

## 3. CERTAIN RIGHTS OF THE BENEFICIARY

3.1 <u>Legal Proceedings</u>. The Beneficiary shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding that, in the Beneficiary's reasonable judgment, might affect the Property or any of the rights created or secured by this Deed of Trust. The Beneficiary shall have such right whether or not there shall have occurred an Event of Default hereunder.

3.2 <u>Appraisals/Assessments</u>. The Beneficiary shall have the right (at the Beneficiary's own cost and expense unless an Event of Default has occurred and is continuing)

8

to obtain appraisals, environmental site assessments or other inspections of the Real Property at such times as the Beneficiary deems necessary or as may be required by applicable law, or its prevailing credit or underwriting policies.

3.3     Financial Statements.  The Beneficiary shall have the right, at the Trustor's sole cost and expense, to require delivery of financial statements of the Trustor that fairly reflect the financial condition of the Trustor on the date thereof and the results of its operations for the period then ending, prepared in accordance with Trustor's customary accounting practices consistent with federal income tax reporting and the Trustor hereby agrees to deliver such financial statements when required by the Beneficiary, but not more often than one for each fiscal quarter of the Trustor.

3.4     Substitution of Trustee.  The Beneficiary may from time to time, without notice to the Trustor or Trustee and with or without cause and with or without the resignation of Trustee, substitute a successor or successors to the Trustee named herein or acting hereunder.  Upon such appointment, the successor trustee shall be vested with all title, powers and duties conferred upon the Trustee named herein or acting hereunder.  Each such appointment and substitution shall be made by a writing executed by Beneficiary and, when duly recorded in the appropriate office, shall be conclusive proof of proper appointment of such successor Trustee.  The procedure herein provided for substitution of the Trustee shall be conclusive of all other provisions for substitution, statutory or otherwise.

3.5     Leases and Rent Roll.  Not later than the thirtieth (30th) day of each January and at such other times as the Beneficiary shall reasonably request, the Trustor shall deliver to the Beneficiary a rent roll for the Property listing all tenants and occupants, stating the scheduled rents under all Leases, whether any such tenants are delinquent in any payments, and any other information that the Beneficiary reasonably requests.

## 4.     DEFAULTS AND REMEDIES

4.1     Events of Default.  An "Event of Default" shall mean the occurrence of any one or more of the following events:

(a)     Default of any liability, obligation or undertaking of the Trustor on account of the Obligations, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Trustor under any other Loan Document or any other agreement between the Trustor and the Beneficiary continuing for 10 days with respect to the payment of money or continuing for 30 days with respect to any other default;

(b)     Failure by the Trustor to perform, observe or comply with any of the covenants, agreements, terms or conditions set forth in this Deed of Trust or the Loan Documents continuing for 30 days;

(c)     The (i) occurrence of any material loss, theft, damage or destruction of the Property or any material portion thereof which is not covered by adequate

9

insurance, or (ii) issuance or making of any levy, seizure, attachment, execution or similar process on a material portion of the Property that is not bonded against or released within sixty (60) days after the issuance or attachment thereof;

(d)     If any statement, representation or warranty heretofore, now or hereafter made by the Trustor in writing in connection with this Deed of Trust or in any supporting financial statement of the Trustor shall prove to have been false in any material respect when made;

(e)     The liquidation, termination or dissolution of the Trustor, or the merger or consolidation of the Trustor into another entity, or its ceasing to carry on actively its business or the appointment of a receiver for its property;

(f)     The making by the Trustor of an assignment for the benefit of creditors or the granting by the Trustor of a trust mortgage for the benefit of creditors;

(g)     The service upon the Beneficiary of a writ in which the Beneficiary is named as trustee of the Trustor;

(h)     A judgment or judgments for the payment of money shall be rendered against the Trustor that would materially adversely affect the Value of any security for the Obligations or the Beneficiary's interest in the Property, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; or

(i)     Any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any Property which is not released within thirty (30) days after issuance or attachment thereof.

4.2     Remedies.  On the occurrence of any Event of Default and so long as such Event of Default is continuing, the Beneficiary may, at its option and, to the extent permitted by applicable law, without notice, exercise any or all of the following remedies:

(a)     Declare the Obligations due and payable, and the Obligations shall thereupon become immediately due and payable, without presentment, protest, demand or notice of any kind, all of which are hereby expressly waived by the Trustor;

(b)     Enter, take possession of, manage and operate the Property (including all personal property and all records and documents pertaining thereto) and any part thereof and exclude the Trustor therefrom, take all actions it deems necessary or proper to preserve the Property and operate the Property as a mortgagee in possession with all the powers as could be exercised by a receiver or as otherwise provided herein or by applicable law; provided, however, that entry by the Beneficiary upon the Property for any reason shall not cause the Beneficiary to be a mortgagee in possession, except upon the express written declaration of the Beneficiary;

(c)     With or without taking possession, by itself or through a receiver, receive and collect all Rents from the Property (including all real estate and personal property

10

and whether past due or thereafter accruing), including such Rents as may arise under the Leases, and the Trustor appoints the Beneficiary as its true and lawful attorney with the power for the Beneficiary in its own name and capacity to demand and collect Rents and take any action that the Trustor is authorized to take under the Leases.  The Beneficiary shall (after payment of all costs and expenses incurred) apply any Rents received by it to the Obligations in such order as is set forth in the Note, or in accordance with any applicable statute, and the Trustor agrees that exercise of such rights and disposition of such funds shall not be deemed to cure any default or constitute a waiver of any foreclosure once commenced nor preclude the later commencement of foreclosure for breach thereof.  The Beneficiary shall be liable to account only for such Rents actually received by the Beneficiary.  Lessees under the Leases are hereby authorized and directed, following notice from the Beneficiary, to pay all amounts due the Trustor under the Leases to the Beneficiary, whereupon such lessees shall be relieved of any and all duty and obligation to the Trustor with respect to such payments so made;

(d)     In addition to any other remedies, to sell the Property or any part thereof or interest therein pursuant to exercise of its power of sale or otherwise at public auction on terms and conditions as the Beneficiary may determine, or otherwise foreclose this Deed of Trust in any manner permitted by law, and upon such sale the Trustor shall execute and deliver such instruments as the Beneficiary may reasonably request in order to convey and transfer all of the Trustor's interest in the Property, and the same shall operate to divest all rights, title and interest of the Trustor in and to the Property.  In the event this Deed of Trust shall include more than one parcel of property or subdivision (each hereinafter called a "portion"), the Beneficiary shall, in its sole and exclusive discretion and to the extent permitted by applicable law, be empowered to foreclose upon any such portion without impairing its right to foreclose subsequently upon any other portion or the entirety of the Property from time to time thereafter.  In addition, the Beneficiary may in its discretion subordinate this Deed of Trust to one or more Leases for the sole purpose of preserving any such Lease in the event of a foreclosure;

(e)     Choose to dispose of some or all of the Property in any combination consisting of both real and personal property, together in one sale, public or private, to be held in accordance with law and procedures applicable to real property, as permitted by Section 9604 of the UCC.  Trustor agrees that such a sale of personal property together with real property constitutes a commercially reasonable sale of the personal property.  Before any sale, Beneficiary or Trustee shall give such notice of default and election to sell as may then be required by law.   When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Trustee may sell the property being sold at a public auction to be held at the time and place specified in the notice of sale. Neither Trustee nor Beneficiary shall have any obligation to make demand on Trustor before any sale.  From time to time in accordance with then applicable law, Trustee may, and in any event at Beneficiary's request shall, postpone any sale by public announcement at the time and place noticed for that sale.

11

Notwithstanding the foregoing, Beneficiary shall be under no obligation to consummate a sale if, in its judgment, none of the offers received by it equals the fair value of the property offered for sale. At any sale, any person including Beneficiary may bid for and acquire the property or any part thereof to the extent permitted by then applicable law. Instead of paying cash for such property, Beneficiary may settle for the purchase price by crediting the sales price of the property against the expenses of sale, costs of any action and any other sums for which Trustor is obligated to pay or reimburse Beneficiary or Trustee under this Deed of Trust and all other Obligations. The foregoing procedures do not constitute the only procedures that may be commercially reasonable and, Beneficiary and Trustee may choose, for example, if the Property consists of more than one parcel, to sell and dispose of such parcels in separate or combined sales in such order as Beneficiary may elect. The proceeds of any such disposition of Property shall not cure any Event of Default or reinstate any Obligations for purposes of Section 2924c of the California Civil Code. For purposes of this power of sale, either a sale of real property alone, or a sale of both real and personal property together in accordance with UCC Section 9604, will sometimes be referred to as a "Trustee's Sale";

(f)     In accordance with Section 736 of the California Code of Civil Procedure, Beneficiary may bring an action for breach of contract against Trustor for breach of any "environmental provision" (as such term is defined in such Section) made by Trustor herein or in any other Loan Document for the recovery of damages and/or the enforcement of the environmental provision. In accordance with the California Code of Civil Procedure, Section 726.5, Beneficiary may waive the security under this Deed of Trust with respect to any parcel of the Property that is "environmentally impaired" or is an "affected property" (as such terms are defined in such Section), and as to any personal property which is attached to such parcel, and thereafter exercise against Trustor, to the extent permitted by such Section, the rights and remedies of an unsecured creditor, including reduction of Beneficiary's claim against Trustor to judgment, and any other rights and remedies permitted by law. In the event Beneficiary elects, in accordance with the California Code of Civil Procedure, Section 726.5, to waive all or part of the security under this Deed of Trust and proceed against Trustor on an unsecured basis, then (i) the valuation of the real property, (ii) the determination of the environmentally impaired status of such security and (iii) any cause of action for money judgment shall, at the request of Beneficiary, be referred to a referee in accordance with the California Code of Civil Procedure, Section 638 *et seq*. Such referee shall be an M.A.I. appraiser selected by Beneficiary and approved by Trustor, which approval shall not be unreasonably withheld or delayed. The decision of such referee shall be binding upon both Beneficiary and Trustor and judgment upon the award rendered by such referee shall be entered in the court in which such proceeding was commenced in accordance with the California Code of Civil Procedure, Sections 644 and 645. Trustor shall pay all reasonable costs and expenses incurred by Beneficiary in connection with any proceeding under the California Code of Civil Procedure, Section 726.5;

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 17 of 87

(g) Cause one or more environmental assessments to be taken, arrange for the cleanup of any Hazardous Substances or otherwise cure the Trustor's failure to comply with any statute, regulation or ordinance relating to the presence or cleanup of Hazardous Substances, and the Trustor shall provide the Beneficiary or its agents with access to the Property for such purposes; provided that the exercise of any of such remedies shall not be deemed to have relieved the Trustor from any responsibility therefor or given the Beneficiary "control" over the Property or cause the Beneficiary to be considered to be a mortgagee in possession, "owner" or "operator" of the Property for purposes of any applicable law, rule or regulation pertaining to Hazardous Substances; and

(h) Take such other actions or proceedings as the Beneficiary deems necessary or advisable to protect its interest in the Property and ensure payment and performance of the Obligations, including, without limitation, appointment of a receiver (and the Trustor hereby waives any right to object to such appointment) and exercise of any of the Beneficiary's remedies provided herein or in any other document evidencing, securing or relating to any of the Obligations or available to a secured party under the UCC or under other applicable law.

4.3     Due on Sale or Transfer.  Beneficiary may, at it option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Beneficiary's prior written consent, of all or any part of the Property, or any interest in the Property.  A "sale or transfer" means the conveyance of the such real property or any right, title or interest therein; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, option contract, or by sale, assignment or transfer of any beneficial interest in or to any land trust holding title to such real property, or by any other method of conveyance of a real property interest.  A "sale or transfer" also includes any change in ownership, in a single or series of related transactions, of more that 50% of the voting interests of the Trustor.  This option shall not be exercised by Bank if such exercise is prohibited by applicable law.

4.4     Power of Sale.  Trustor hereby grants to the Trustee, and its successor and assigns, for the benefit and security of the Beneficiary, a power of sale under California Civil Code Section 2924, and accordingly, the Beneficiary and the Trustee shall have all of the rights and powers granted by California law to the holder of a deed of trust containing a power of sale, including the right, to the extent permitted by California law, to foreclose, by exercising the power of sale, without first commencing a foreclosure action or obtaining a foreclosure decree, and to give such notices and to do all other acts as are permitted or required by California Civil Code Section 2924 to foreclose a Deed of Trust without judicial action.

4.5     Other Remedies.  In addition, the Trustee and the Beneficiary shall have all other remedies provided by applicable law, including, without limitation, the right to pursue a judicial sale of the Property or any portion thereof by deed, assignment or otherwise.

4.6     Acceptance of Payments; Subrogation.  The Trustor agrees and acknowledges that the acceptance by the Trustee or the Beneficiary of any payments from either the Trustor or any other person after the occurrence of any Event of Default, the exercise by the Trustee or the

13

Beneficiary of any remedy set forth herein or the commencement, discontinuance or abandonment of foreclosure proceedings against the Property shall not waive the Trustee's or the Beneficiary's subsequent or concurrent right to foreclose or operate as a bar or estoppel to the exercise of any other rights or remedies of the Trustee or the Beneficiary. The Trustor agrees and acknowledges that the Trustee or the Beneficiary, by making payments or incurring costs described herein, shall be subrogated to any right of the Trustor to seek reimbursement from any third parties, including, without limitation, any predecessor in interest to the Trustor's title or other party who may be responsible under any law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances.

       4.7    <u>Advances</u>. If the Trustor fails to pay or perform any of its obligations respecting the Property, the Beneficiary may in its sole discretion do so without waiving or releasing Trustor from any such obligation. Any such payments may include, but are not limited to, payments for taxes, assessments and other governmental levies, water rates, insurance premiums, maintenance, repairs or improvements constituting part of the Property. Any amounts paid by the Beneficiary hereunder shall be, until paid, part of the Obligations and secured by this Deed of Trust, and shall be due and payable to the Beneficiary, on demand, together with interest thereon to the extent permitted by applicable law, at the highest rate permitted under the Note.

       4.8    <u>Cumulative Rights and Remedies</u>. All of the foregoing rights, remedies and options (including without limitation the right to enter and take possession of the Property, the right to manage and operate the same, and the right to collect Rents, in each case whether by a receiver or otherwise) are cumulative and in addition to any rights the Beneficiary might otherwise have, whether at law or by agreement, and may be exercised separately or concurrently and none of which shall be exclusive of any other. The Trustor further agrees that the Trustee and the Beneficiary may exercise any or all of their rights or remedies set forth herein without having to pay the Trustor any sums for use or occupancy of the Property.

       4.9    <u>Trustor's Waiver of Certain Rights</u>. To the extent permitted by applicable law, the Trustor hereby waives the benefit of all present and future laws (i) providing for any appraisal before sale of all or any portion of the Property or (ii) in any way extending the time for the enforcement of the collection of the Obligations or creating or extending a period of redemption from any sale made hereunder.

       4.10    <u>Transfer of Title</u>. Upon the completion of any sale or sales of any Property, Trustee shall execute and deliver to the accepted purchaser or purchasers a good and sufficient deed of conveyance or assignment and transfer, lawfully conveying, assigning, and transferring the Property sold, but without any covenant or warranty, express or implied.

       4.11    <u>Effect of Sale</u>. Any sale or sales made by virtue of or under this Deed of Trust, whether under any power of sale herein granted or through judicial proceedings, shall, to the fullest extent permitted by law, operate to divest all right, title, estate, interest, claim, and demand whatsoever, either at law or in equity, of the Trustor in and to the property so sold, or any part thereof from, through or under Trustor, its successors and assigns . The receipt by Trustee shall be full and sufficient discharge to any purchaser of the Property or any part thereof sold as aforesaid for the purchase money; and no purchaser or his representatives, grantees or assigns after paying such purchase money and receiving such receipt, shall be bound to see to the

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 19 of 87

application of such purchase money upon or for any trust or purpose of this Deed of Trust, or in any manner whatsoever be answerable for any loss, misapplication or non-application of any such purchase money or be bound to inquire as to the authorization, necessity, expedience or regularity of any such sale.

 4.8 <u>Reconveyance</u>. Upon written request of the Beneficiary and surrender of this Deed of Trust and any Notes to Trustee for cancellation or endorsement, and upon payment of its fees and charges, Trustee shall reconvey, without warranty, all or any part of the Property then subject to this Deed of Trust. Any reconveyance, whether full or partial, may be made in terms to "the person or persons legally entitled thereto," and the recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.

## 5. MISCELLANEOUS

 5.1 <u>Costs and Expenses</u>. To the extent permitted by applicable law, the Trustor shall pay to the Trustee and the Beneficiary, on demand. all reasonable expenses (including attorneys' fees and expenses and reasonable accounting, appraisal, brokerage and similar professional fees and charges) incurred by the Trustee and the Beneficiary in connection with the Trustee's and the Beneficiary's recordation of this Deed of Trust, exercise, preservation or enforcement of any of its rights, remedies and options set forth in this Deed of Trust and in connection with any litigation, proceeding or dispute whether arising hereunder or otherwise relating to the Obligations, together with interest thereon to the extent permitted by applicable law, until paid in full by the Trustor at the highest rate set forth in the Note. Any amounts owed by the Trustor under this Section shall be, until paid, part of the Obligations and secured by this Deed of Trust, and the Beneficiary shall be entitled, to the extent permitted by law, to receive and retain such amounts in any action for a deficiency against or redemption by the Trustor, or any accounting for the proceeds of a foreclosure sale or of insurance proceeds.

 5.2 <u>Limit on Interest</u>. If from any circumstances whatsoever, fulfillment of any provision of this Deed of Trust, the Note or any other Loan Document, at the time performance of such provision becomes due, would exceed the limit on interest then permitted by any applicable usury statute or any other applicable law, the Beneficiary may, at its option (a) reduce the Obligations to be fulfilled to such limit on interest, or (b) apply the amount in excess of such limit on interest to the reduction of the outstanding principal balance of the Obligations, and not to the payment of interest, with the same force and effect as though Trustor had specifically designated such sums to be so applied to principal and Beneficiary had agreed to accept such extra payments(s) as a premium-free prepayment, so that in no event shall any exaction be possible under this Deed of Trust or any other Loan Document that is in excess of the applicable limit on interest. It is the intention of Trustor and Beneficiary that the total liability for payments in the nature of interest shall not exceed the limits imposed by any applicable state or federal interest rate laws. The provisions of this Section shall control every other provision of this Deed of Trust, and any provision of any other Loan Document in conflict with this Section.

 5.3 <u>Indemnification Regarding Leases</u>. The Trustor hereby agrees to defend, and does hereby indemnify and hold the Beneficiary, Trustee, and each of their respective directors, officers, employees, agents and attorneys (each an "<u>Indemnitee</u>") harmless from all losses, damages, claims, costs or expenses (including attorneys' fees and expenses) resulting from the

Case: 10-51813 Doc# 49-1 Filed: 03/11/11 Entered: 03/11/11 16:33:14 Page 20 of 87

assignment of the Leases and from all demands that may be asserted against such Indemnitees arising from any undertakings on the part of the Beneficiary to perform any obligations under the Leases. It is understood that the assignment of the Leases shall not operate to place responsibility for the control or management of the Property upon the Beneficiary or any Indemnitee or make them liable for performance of any of the obligations of the Trustor under Leases, respecting any condition of the Property or any other agreement or arrangement, written or oral, or applicable law relating to the Leases.

      5.4    <u>Indemnification Regarding Hazardous Substances</u>. The Trustor hereby agrees to defend, and does hereby indemnify and hold harmless each Indemnitee from and against any and all losses, damages, claims, costs or expenses, including, without limitation, litigation costs and attorneys' fees and expenses and fees or expenses of any environmental engineering or cleanup firm incurred by such Indemnitee and arising out of or in connection with the Property or resulting from the application of any current or future law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances on or affecting the Property. The Trustor agrees its obligations hereunder shall be continuous and shall survive termination or discharge of this Deed of Trust and/or the repayment of all debts to the Beneficiary including repayment of all Obligations.

      5.5    <u>Indemnitee's Expenses</u>. If any Indemnitee is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Deed of Trust or the Property or any part thereof or therein or concerning the construction, maintenance, operation or the occupancy or use thereof by the Trustor or other person or entity, then the Trustor shall indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Beneficiary in favor of the Trustor.

      5.6    <u>Waivers</u>. No delay or omission of the Beneficiary in exercising or enforcing any of its rights, powers, privileges, remedies, immunities or discretion (all of which are hereinafter collectively referred to as "the Beneficiary's rights and remedies") hereunder shall constitute a waiver thereof; and no waiver by the Beneficiary of any default of the Trustor hereunder or of any demand shall operate as a waiver of any other default hereunder or of any other demand. No term or provision hereof shall be waived, altered or modified except with the prior written consent of the Beneficiary, which consent makes explicit reference to this Deed of Trust. Except as provided in the preceding sentence, no other agreement or transaction, of whatsoever nature, entered into between the Beneficiary and the Trustor at any time (whether before, during or after the effective date or term of this Deed of Trust) shall be construed as a waiver, modification or limitation of any of the Beneficiary's rights and remedies under this Deed of Trust and all the Beneficiary's rights and remedies under the provisions of this Deed of Trust shall be cumulative and not alternative or exclusive, and may be exercised by the Beneficiary at such time or times and in such order of preference as the Beneficiary in its sale discretion may determine.

      5.7    <u>Severability</u>. If any provision of this Deed of Trust or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 21 of 87

unenforceable, the remainder of this Deed of Trust (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

       5.8    <u>Complete Agreement</u>.  This Deed of Trust, the other Loan Documents, the Chapter 11 Plan, and any orders entered to confirm the Chapter 11 Plan constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersede all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

       5.9    <u>Binding Effect of Agreement</u>.  This Deed of Trust shall run with the land and be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Beneficiary shall be entitled to rely thereon) until all Obligations are fully and indefeasibly paid.  The Beneficiary may transfer and assign this Deed of Trust and deliver any collateral to the assignee, who shall thereupon have all of the rights of the Beneficiary; and the Beneficiary shall then be relieved and discharged of any responsibility or liability with respect to this Deed of Trust and such collateral with respect to acts, events or conditions after the date of such assignment.  Except as expressly provided herein or in the other Loan Documents, nothing expressed or implied is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Deed of Trust or the other Loan Documents.

       5.10    <u>Notices</u>.  Any notices under or pursuant to this Deed of Trust shall be deemed duly received and effective if delivered in hand to any officer of agent of the Trustor or the Beneficiary, or if mailed by registered or certified mail, return receipt requested, addressed to the Trustor or the Beneficiary at the address set forth in this Deed of Trust or at the address which any party may from time to time designate by written notice to the other party(ies).

       5.11    <u>Governing Law</u>.  Subject to applicable Federal law, this Deed of Trust shall be governed by California law without giving effect to the conflicts of laws principles thereof which would result in the application of the law of any other jurisdiction.

       5.12    <u>Reproductions</u>.  This Deed of Trust and all documents which have been or may be hereinafter furnished by the Trustor to the Beneficiary may be reproduced by the Beneficiary by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

       5.13    <u>Jurisdiction and Venue</u>.  The Trustor irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in California over any suit, action or proceeding arising out of or relating to this Deed of Trust.  The Trustor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.

EXECUTED as of the date first above written:

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 22 of 87

VALLES & ASSOCIATES, LLC,
A California limited liability company,


By: _____
       Albert Valles, Jr., Managing Member


STATE OF CALIFORNIA

COUNTYOF SAN BENITO

ss

On _____, 2010, before me, _____, Notary Public,
personally appeared Albert Valles, Jr., personally known to me or proved to me on the basis of
satisfactory evidence to be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacity, and that by his
signature on the instrument, the entity upon behalf of which he acted, executed the instrument.

WITNESS my hand and official seal.


_____

Print Name: _____

18

## EXHIBIT A

LEGAL DESCRIPTION

# EXHIBIT B

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# FOR

# VALLES & ASSOCIATES, LLC

# A California Limited Liability Company

# TABLE OF CONTENTS

I.    **RECITALS** ................................................................................ **1**

II.   **DEFINITIONS** ........................................................................ **1**

   2.1   Act ..................................................................................... 2

   2.2   Additional Members ......................................................... 2

   2.3   Affiliate ............................................................................ 2

   2.4   Agreement ........................................................................ 2

   2.5   Articles ............................................................................. 2

   2.6   Assignee ........................................................................... 2

   2.7   Bankruptcy Court ............................................................. 2

   2.8   Capital Account ................................................................ 2

   2.9   Capital Contribution ........................................................ 2

   2.10  Cash Flow from Operations ............................................. 3

   2.11  Chapter 11 Case ............................................................... 3

   2.12  Code ................................................................................. 3

   2.13  Company Property ............................................................ 3

   2.14  Disassociation Event ....................................................... 3

   2.15  Economic Interest ............................................................ 3

   2.16  Effective Date .................................................................. 3

   2.17  Electronic Transmission .................................................. 3

   2.18  Event of Divorce ............................................................. 4

   2.19  Give ................................................................................. 4

   2.20  Gross Asset Value ........................................................... 4

   2.21  Initial Capital Contribution ............................................. 5

   2.22  Initial Members ............................................................... 5

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 27 of 87

2.23    Majority in Interest ................................................................................ 5

2.24    Membership Interest ............................................................................. 5

2.25    Notice ................................................................................................... 5

2.26    Notice Address ..................................................................................... 5

2.27    Offer ..................................................................................................... 5

2.28    Original Operating Agreement ............................................................. 6

2.29    Participating Member ........................................................................... 6

2.30    Percentage Interest .............................................................................. 6

2.31    Permitted Transfer ............................................................................... 6

2.32    Permitted Transferee ........................................................................... 6

2.33    Person ................................................................................................... 6

2.34    Plan ...................................................................................................... 6

2.35    Sale or Refinancing Proceeds .............................................................. 6

2.36    Spouse .................................................................................................. 6

2.37    Transfer ................................................................................................ 7

2.38    Treasury Regulations ........................................................................... 7

2.39    Units ..................................................................................................... 7

**III. ORGANIZATIONAL MATTERS** ............................................................ 7

3.1    Name .................................................................................................... 7

3.2    Duration of Company Existence ........................................................... 7

3.3    Office and Agent .................................................................................. 7

3.4    Authorized Purpose of the Company .................................................... 7

**IV. MEMBERS AND MEMBERSHIP INTERESTS** ..................................... 7

4.1    Classes of Membership Interests ......................................................... 7

(a)   Class 1-A ...................................................................................... 8

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 28
of 87

   (b)   Class 1-B ................................................................................................................... 8

4.2   Fractional Units ............................................................................................................. 8

4.3   Conversion of Pre-Existing Membership Interests ....................................................... 8

4.4   Admission of Additional Members................................................................................. 8

4.5   Adjustments of Percentage Interests ............................................................................. 9

4.6   Adjustments of Capital Accounts .................................................................................. 9

4.7   No Personal Liability ..................................................................................................... 9

4.8   Withdrawals ................................................................................................................... 9

4.9   Payments To Members ................................................................................................... 9

4.10   Members Not Agents .................................................................................................. 10

4.11   Competing Activities ................................................................................................. 10

4.12   Expulsion of Members .............................................................................................. 10

4.13   Voting Rights ............................................................................................................. 11

4.14   Meetings of Members ................................................................................................ 11

   (a)   Requirement for and Call of Meetings ............................................................ 11

   (b)   Location and Method of Conducting Meetings................................................ 11

   (c)   Proxies and Participation by Electronic Transmission .................................... 11

   (d)   Notice of Meetings ......................................................................................... 11

   (e)   Waiver of Notice ............................................................................................ 12

   (f)   Actions without Meetings ............................................................................... 12

4.15   Certificate of Membership Interest ............................................................................ 12

**V.   MANAGEMENT AND CONTROL OF THE COMPANY........................12**

5.1   Manager-Managed ........................................................................................................ 12

5.2   Time Commitment ........................................................................................................ 12

5.3   Actions Requiring Majority Approval .......................................................................... 13

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 29 of 87

(a)    Organizational and Membership Actions ................................................................ 13

(b)    Financial Actions ................................................................................................ 14

(c)    Litigation-Related Actions .................................................................................. 15

(d)    Catch-all ............................................................................................................. 15

5.4    Procedure for Obtaining Majority Approval ................................................................ 15

5.5    Manner of Exercise of Duties and Powers ................................................................ 15

5.6    Agency Authority of Manager ...................................................................................... 15

5.7    Reliance by Third Parties ............................................................................................ 15

5.8    Resignation ................................................................................................................. 16

5.9    Removal ...................................................................................................................... 16

5.10    No Personal Liability of Manager ............................................................................... 16

5.11    Competing Activities: Manager ................................................................................... 16

5.12    Interested Party Transactions ...................................................................................... 17

5.13    Payments to Manager ................................................................................................. 17

**VI.   CAPITAL CONTRIBUTIONS AND ACCOUNTS ................................. 17**

6.1    Capital Accounts ........................................................................................................ 17

6.2    Carryover of Pre-existing Capital Accounts of Class 1-A Members ............................. 19

6.3    Initial Capital Contributions of Class 1-B Members ..................................................... 19

6.4    Initial Capital Contributions of Additional Members ................................................... 19

6.5    No Other Capital Contributions Required ................................................................... 19

6.6    Default ........................................................................................................................ 20

6.7    Member Loans ............................................................................................................ 20

6.8    Withdrawals of Capital ................................................................................................ 20

6.9    No Interest ................................................................................................................... 21

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 30 of 87

# VII. ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

## VII. ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS .................................................................21

7.1    Definitions ...................................................................................... 21

7.2    Distributions .................................................................................. 21

   (a)   Non-liquidating Distributions ....................................................... 21

     (i)   Required Distribution of Cash Flow from Operations ................. 21

     (ii)   Discretionary Distributions of Cash Flow from Operations ........ 22

     (iii)   Sale and Refinance Proceeds .................................................. 22

   (b)   Liquidating Distributions ............................................................. 22

   (c)   Special Distribution Rules ........................................................... 22

     (i)   Pre-distribution Reserves ........................................................ 22

     (ii)   Limit on Reserves and Discretionary Payments ...................... 23

     (iii)   Curative Distributions ............................................................. 23

     (iv)   Installment Sales .................................................................... 23

     (v)   Limitation ............................................................................... 23

     (vi)   Distributions in Kind ............................................................... 23

7.3    Allocations of Net Profits and Net Losses .................................... 24

7.4    Special Rules and Definitions As Used In This Agreement ........... 24

   (a)   Nonrecourse Deductions ............................................................. 24

   (b)   Special Loss Allocation Rule ....................................................... 24

   (c)   Qualified Income Offset .............................................................. 24

   (d)   Limited Deficit Capital Account Makeup Provision ...................... 25

   (e)   Installment Sales ........................................................................ 25

   (f)   Code Section 704(c) Allocations ................................................. 25

   (g)   Compliance with Code and Regulations ...................................... 25

7.5    Special Allocations ...................................................................... 25

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 31 of 87

7.6    Adjustment to Percentage Interests .................................................................. 26

7.7    Partnership Tax Treatment ............................................................................. 26

## VIII.   TRANSFER AND ASSIGNMENT OF INTERESTS ............................ 26

8.1    Transfer and Assignment of Interests ........................................................... 26

8.2    Further Restrictions on Transfer of Interests ................................................ 26

8.3    Substitution of Members .............................................................................. 26

8.4    Permitted Transfers ...................................................................................... 27

8.5    Effective Date of Authorized Transfers ....................................................... 27

8.6    Rights of Legal Representatives .................................................................... 27

8.7    Transfers in Violation of Agreement; Option to Purchase ........................... 28

8.8    Right of First Refusal ................................................................................... 28

   (a)    Offer to Purchase ........................................................................................ 28

   (b)    Acceptance of Offer ..................................................................................... 28

   (c)    Terms of Purchase ....................................................................................... 29

8.9    Closing of Purchase ..................................................................................... 29

8.10   Consummation of Original Sale ................................................................... 30

8.11   Dissolution of Marriage ............................................................................... 30

## IX.   DISSOCIATION AND TERMINATION OF MEMBERSHIP INTERESTS 31

9.1    Dissociation Event Defined .......................................................................... 31

9.2    Consequences of Dissociation Event ........................................................... 32

9.3    Disposition of Dissociated Member's Membership Interest .......................... 32

9.4    Purchase Price .............................................................................................. 32

9.5    Payment of Purchase Price ........................................................................... 33

9.6    Closing of Purchase of Dissociated Member's Interest ................................. 34

9.7    Purchase Terms Varied by Agreement ......................................................... 34

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 32 of 87

**X.  ACCOUNTING, RECORDS, REPORTING** ..........................................**34**

    10.1   Books and Records ................................................. 34

    10.2   Reports ................................................................ 35

    10.3   Bank Accounts .................................................... 35

    10.4   Tax Matters Member ........................................... 35

**XI.  DISSOLUTION AND WINDING UP** .....................................**35**

    11.1   Conditions of Dissolution .................................... 35

    11.2   Winding Up ......................................................... 36

    11.3   Control of Winding Up ........................................ 36

    11.4   Distributions upon Dissolution ............................ 36

    11.5   Limitations on Payments Made in Dissolution ..... 36

    11.6   Certificates ......................................................... 36

**XII. INDEMNIFICATION** ...............................................................**36**

    12.1   Indemnification of Members and Agents .............. 36

**XIII.  MISCELLANEOUS** ...............................................................**37**

    13.1   Complete Agreement ........................................... 37

    13.2   Binding Effect .................................................... 37

    13.3   Usage; Headings; Construction ............................ 37

    13.4   Governing Law; Jurisdiction ............................... 37

    13.5   Severability ........................................................ 38

    13.6   Notices ............................................................... 38

    13.7   Amendments ....................................................... 38

    13.8   No Interest in Company Property: Waiver of Action for Partition............... 38

    13.9   Counterparts ....................................................... 39

    13.10   No Effect on Pre-existing Transactions ............... 39

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 33
of 87

13.11   Effectiveness and Adoption of Agreement ................................................................. 39

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 34
of 87

# AMENDED AND RESTATED OPERATING AGREEMENT

## FOR

## VALLES & ASSOCIATES, LLC
### A California Limited Liability Company

THIS AMENDED AND RESTATED OPERATING AGREEMENT for VALLES & ASSOCIATES, LLC, a California limited liability company ("Company"), is made as of Effective Date (as hereafter defined) by and among the Company and the Members (as hereafter defined).

## I.    RECITALS

A.    On October 29, 2007, the Company was formed by filing of its Articles of Organization with the California Secretary of State.

B.    Various Members ("Initial Members") were admitted to membership in the Company pursuant to the Operating Agreement made as of November 6, 2007 ("Original Operating Agreement"). The Initial Members and their percentage interests in the Company as of and after the Effective Date of this Agreement (hereafter defined) are listed in Exhibit A hereto.

C.    Thereafter, the Company experienced financial difficulties and commenced a case under Chapter 11 of the U.S. Bankruptcy Code (the "Chapter 11 Case") on February ___, 2010, in the U.S. Bankruptcy Court for the Northern District of California ("Bankruptcy Court").

D.    During the Chapter 11 Case, the Company reorganized its financial affairs and a Debtor's Chapter 11 Plan Dated as of _____, 2010 (the "Plan") was confirmed by the Bankruptcy Court by an order entered in the docket of the Chapter 11 Case on _____, 2010.

E.    Pursuant to the Plan, this Agreement was approved by the Members as required by the Original Operating Agreement and certain other parties ("Additional Members") were admitted as additional Members of the Company. The Additional Members and their percentage interests in the Company as of and after the Effective Date of this Agreement (hereafter defined) are listed in Exhibit A hereto.

NOW, in consideration of the Plan, the foregoing recitals, and for other valuable consideration, the Members hereby adopt this Agreement as the operating agreement of the Company within the meaning of the Act (as hereafter defined) and agree as follows:

## II.    DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below:

1

### 2.1    Act

"Act" means the Beverly-Killea Limited Liability Act contained in Title 2.5 of the California Corporations Code, as amended from time to time.

### 2.2    Additional Members

"Additional Member(s)" shall have the meaning identified in Recital E hereof.

### 2.3    Affiliate

An "Affiliate" of a Person shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Person, as applicable. The term "control," as used in the immediately preceding sentence, shall mean with respect to an entity the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled entity, and, with respect to any individual shall mean any of the Person's relatives to the third degree.

### 2.4    Agreement

This "Agreement" shall mean this Amended and Restated Operating Agreement of Valles & Associates, LLC, as in effect on the Effective Date and as it may be amended from time to time in accordance with its terms.

### 2.5    Articles

"Articles" shall mean the Articles of Organization of the Company identified in Recital A hereto, as amended from time to time.

### 2.6    Assignee

"Assignee" shall mean the assignee of Economic Interest of a Member who has not been admitted as a substitute Member in accordance with Section 8.3. Unless admitted as a substitute Member, an Assignee shall only hold an Economic Interest.

### 2.7    Bankruptcy Court

"Bankruptcy Court" shall mean the U.S Bankruptcy Court identified in Recital C hereto.

### 2.8    Capital Account

"Capital Account" means the account established for each Member pursuant to Section 6.1 hereof.

### 2.9    Capital Contribution

"Capital Contribution" means the Initial Capital Contribution plus any additional capital contributions of a Member.

2

### 2.10    Cash Flow from Operations

"Cash Flow from Operations" means all cash received by the Company in the ordinary course of business (including proceeds of sale of assets, such as sale of individual condominium units hereafter constructed on the Company Property, other than sale of all or substantially all of the Company Property in a single or related group of transactions), less all expenditures in the ordinary course of business (including operational expenses, debt service, and capital expenditures).

### 2.11    Chapter 11 Case

"Chapter 11 Case" shall mean the case identified in Recital C hereto.

### 2.12    Code

"Code" means Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

### 2.13    Company Property

"Company Property" means the real property (and improvements now or hereafter located thereon) owned by the Company and located at the intersection of Nash Road and Cushman Street, Hollister, California, a legal description of which is attached hereto as Exhibit B.

### 2.14    Disassociation Event

"Disassociation Event" shall have the meaning set forth in Section 9.1.

### 2.15    Economic Interest

"Economic Interest" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, and, except as provided in Corporations Code section 17106, any right to information concerning the business and affairs of the Company.

### 2.16    Effective Date

"Effective Date" shall mean the 'Effective Date' of and as defined in the Plan.

### 2.17    Electronic Transmission

"Electronic Transmission" means communication by facsimile, electronic mail or other form of electronic communication (including electronic video screen communication) that is sent by or to the Company by or to a Member or Members as long as the requirements of Section

3

17001(o) of the Act, have been fulfilled and, with respect to such transmissions relating to meetings of Members, the requirements of Section 600 of the Law have been fulfilled.

**2.18** **Event of Divorce**

"Event of Divorce" shall have the meaning set forth in Section 8.11 hereof.

**2.19** **Give**

"Give" shall have the meaning set forth in Section 13.7.

**2.20** **Gross Asset Value**

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Tax Matters Member;

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code §7701(g) into account), as determined by the Tax Matters Member as of the following times:

(i)     The acquisition of an additional Membership Interest in the Company by any Person in exchange for more than a de minimis capital contribution or upon the exercise of an option;

(ii)     The distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; and

(iii)     The liquidation of the Company within the meaning of Regs §1.704-1(b)(2)(ii)(g);

(c)     The Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value [taking Code §7701 (g) into account] of such asset on the date of distribution as determined by the Tax Matters Member; and

(d)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code §734(b) or 743(c), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regs §1.704-1 (b)(2)(iv)(m) and subparagraph (f) of the definition of "Net Profits" and "Net Losses" or Section 4.11; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (d) to the extent that an adjustment pursuant to subsection (b) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d).

4

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (b) or (d), such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset, for purposes of computing Net Profits and Net Losses.

### 2.21    Initial Capital Contribution

"Initial Capital Contribution" means the capital originally contributed to the Company by each Member, including contributions (a) upon the Company's original organization with respect to the Initial Members or (b) as of the Effective Date with respect to the Additional Members admitted under the Plan.

### 2.22    Initial Members

"Initial Member(s)" shall have the meaning identified in Recital B hereof.

### 2.23    Majority in Interest

"Majority in Interest" shall mean the majority of all Percentage Interests of Members, excluding Percentage Interests controlled by holders of only Economic Interests.

### 2.24    Membership Interest

"Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote or participate in management, and the right to receive information concerning the business and affairs of the Company.

### 2.25    Notice

"Notice" shall mean communications required or permitted to be Given to the Company, the Manager, Members and/or holders of Economic Interests in accordance with Section 13.7 hereof.

### 2.26    Notice Address

The "Notice Address" of a Member shall be the physical address, facsimile number, and/or electronic mail address of that Member set forth in Exhibit A hereto, as such Exhibit A shall be amended from time to time, or such an address as is Given to the Company by the Member according to the procedure set forth in Section 13.7.  The "Notice Address" of the Company shall be the physical address of its principal place of business, or the facsimile number or electronic mail address of the Manager set forth in Exhibit A hereto, as such Exhibit A shall be amended from time to time, or such an address as is Given to all Members by the Manager according to the procedure set forth in Section 13.7

### 2.27    Offer

"Offer" shall have the meaning set forth in Section 8.8(a).

5

### 2.28    Original Operating Agreement

 "Original Operating Agreement" or "Original Agreement" shall mean the initial operating agreement of the Company identified in Recital B hereto.

### 2.29    Participating Member

"Participating Member" shall have the meaning set forth in Section 8.11 hereof.

### 2.30    Percentage Interest

"Percentage Interest" shall mean the percentage interest in the capital of the Company held by a Member, as set forth opposite the name of such Member under the column "Member's Percentage Interest" on Exhibit A hereto or as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

### 2.31    Permitted Transfer

"Permitted Transfer" shall mean a Transfer of the Membership Interest or Economic Interest of any Member that may be made without the consent of Members pursuant to Section 8.4.

### 2.32    Permitted Transferee

"Permitted Transferee" shall mean any individual or entity to whom a Transfer may be made by a Member without the consent of Members pursuant to Section 8.4.

### 2.33    Person

"Person" shall mean an individual, corporation, partnership, limited liability company, trust, or other entity.

### 2.34    Plan

"Plan" means the Chapter 11 plan of the Company identified in Recital D hereto.

### 2.35    Sale or Refinancing Proceeds

"Sale and Refinance Proceeds" means (a) cash received from all sources other than Cash Flow from Operations, including, without limitation, (i) cash proceeds from sale or exchange of all or substantially all of the Company Property in a single or related group of transactions and (ii) proceeds of loans or grants, insurance claims, condemnation and similar events to the extent that such proceeds are not used to (A) refinance or repay other obligations of the Company, or (B) repair, replace, improve or develop the Company Property or any other assets of the Company less (b) the compensation payable to the Manager pursuant to Section 5.13 hereof.

### 2.36    Spouse

"Spouse" shall have the meaning set forth in Section 8.11 hereof.

6

### 2.37 Transfer

"Transfer" means, with respect to a transfer of a Membership Interest or a Person's Economic Interest in the Company, a sale, assignment, conveyance, encumbrance, or any other form of alienation of all or part of the Member's Interest.

### 2.38 Treasury Regulations

"Treasury Regulations" means the final or temporary regulations that have been issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

### 2.39 Units

"Units" means the portions into which all Membership Interests are divided as provided in Section 4.1 hereof.

## III. ORGANIZATIONAL MATTERS

### 3.1 Name

The name of the Company is VALLES & ASSOCIATES, LLC. The Company may conduct business under that name or any other name approved by a Majority in Interest.

### 3.2 Duration of Company Existence

The term of the Company commenced as of the date of the filing of the Articles and shall last in perpetuity, unless sooner terminated under Article XI hereof.

### 3.3 Office and Agent

The Company will continuously maintain a registered office and registered agent in the State of California as required by the Act. The principal office of the Company is at 817 Industrial Drive, Hollister, California, 95023, or such location as the Manager may determine. The registered agent will be as stated in the Articles or as otherwise determined by the Manager.

### 3.4 Authorized Purpose of the Company

The authorized purpose of the Company shall be the ownership, improvement, development, leasing and sale of commercial, retail, industrial and/or residential facilities at the Company Property and any other purpose for which a limited liability company may be formed pursuant to applicable law.

## IV. MEMBERS AND MEMBERSHIP INTERESTS

### 4.1 Classes of Membership Interests

As of and after the Effective Date of this Agreement, the Membership Interests in the Company shall be divided into two classes, as follows:

7

### (a)     Class 1-A

The Company shall be authorized to issue 1,000 Units of Class 1-A Membership Interests.  The names and numbers of Units issued to holders of Class 1-A Membership Interests in accordance with Section 4.3 hereof shall be set forth in Exhibit A hereto.  No other Class 1-A Units may be issued.

### (b)     Class 1-B

The Company shall be authorized to issue up to 3,000 Units of Class 1-B Membership Interests.  The names and numbers of Units issued to holders of Class 1-B Membership Interests of this Agreement shall be set forth in Exhibit A hereto.

### 4.2     Fractional Units

The Company shall not issue fractional Units.  In the event that a Member would otherwise be entitled to a fractional Unit, the number of Units issued to a Member shall be rounded down to the next full Unit.

### 4.3     Conversion of Pre-Existing Membership Interests

As of the Effective Date of this Agreement, all Units of Membership Interests issued prior to such Effective Date shall be converted to the number of Class 1-A Units set forth next to each such Person's name in Exhibit A hereto.  All classes of Membership Interests specified by the Original Operating Agreement shall be converted into Class 1-A Membership Interests as of the Effective Date.

### 4.4     Admission of Additional Members

As of the Effective Date, the Company shall issue Class 1-B Membership Interests to the holders of "Allowed Claims" in "Class B-3" and, if applicable, "Class B-2" under and as defined in the Plan at the rate of one Unit for each $10,000 of such Allowed Claims."  If the amount of such a holder's Allowed Claim is in an amount that would result in the issuance of a fractional Unit, the Company shall pay the holder cash on the Effective Date in such amount as is necessary to reduce its Unit percentage to the next lowest whole Unit.

The Company may issue additional Class 1-B Membership Interests, but only when (and on terms and conditions) approved by the Majority in Interest in accordance with Section 5.3 hereof.  A Person to whom Membership Interests are to be issued shall not become a Member or acquire any of the rights and privileges associated therewith until such Person executes a written acknowledgement (in a form approved by the Manager) agreeing to be a party to this Agreement and be bound by its terms.  Upon the admission of an additional Member, the Manager shall prepare an amendment to Exhibit A hereto to add the name, contact information, Capital Contribution, Percentage Interest and Units issued to the additional Member and Give a copy thereof to all Members; however, the failure of the Manager to prepare an amended Exhibit A and Give it to all Members shall not affect the rights and obligations of the newly admitted Member.

Case: 10-51813     Doc# 49-1     Filed: 03/11/11     Entered: 03/11/11 16:33:14     Page 42 of 87

### 4.5　Adjustments of Percentage Interests

The Percentage Interests of all Members shall be adjusted *pro rata* on the basis of the then-existing Membership Interests upon the occurrence of any of the following events to reflect the effect thereof: (i) any additional Capital Contributions, (ii) the issuance of additional Membership Interests, (iii) the redemption or repurchase of any Membership Interests, (iv) the forfeiture of any Membership Interests, or (v) any similar transaction. Upon any adjustment of Percentage Interests, the Manager shall prepare an amendment to Exhibit A hereto to reflect such adjustment and Give a copy thereof to all Members; however, the failure of the Manager to prepare an amended Exhibit A and Give it to all Members shall not affect the rights and obligations of the Members.

### 4.6　Adjustments of Capital Accounts

Upon the issuance of Membership Interests, the making of additional Capital Contributions, or at such other times as are permitted by Regs §1.704-1(b)(2)(iv), the Tax Matters Member may adjust the book value of the Company's assets pursuant to Regs §1.704-1(b)(2)(iv)(f) to reflect their then fair market value, and in such event, the Capital Account of each Member shall be adjusted to reflect that Member's share of unrealized gain or loss, as provided in Articles VI and VII, as if the property had been sold for its then fair market value as determined by the Tax Matters Member.

### 4.7　No Personal Liability

No Member shall be personally liable for the debts, obligations, losses, liabilities, or expenses of the Company by reason of being a Member or by participating in the management or control of the Company. Any provision of this Agreement stating circumstances under which a Member may be required to return a distribution from the Company is intended only to state the current law, not to create additional obligations. No allocation of losses or any item thereof to a Member shall create any implication that a Member is liable for anything other than the Member's Capital Contribution.

### 4.8　Withdrawals

A Member may not withdraw, retire or resign from the Company without the written consent of The Manager. If a Member withdraws, retires or resigns from the Company in violation of this Agreement, that Member's Membership Interest will terminate and that Member will only have an Economic Interest, which is subject to the purchase options under Article IX.

### 4.9　Payments To Members

No Member or Affiliate of a Member shall be entitled to payment for services rendered to the Company unless such payment or the terms of ongoing payments shall be approved by a Majority in Interest. Notwithstanding the preceding sentence, the Manager may be reimbursed for reasonable expenses incurred by him in the ordinary course of the Company's business, and the Manager may reimburse any Member who incurs a reasonable expense of the Company in the ordinary course if the Manager has authorized the Member to incur such expense.

9

**4.10    Members Not Agents**

No Member, acting solely in the capacity of a Member, is an agent of the Company. No Member has any power or authority to bind or act on behalf of the Company in any way.

**4.11    Competing Activities**

Subject to the terms of Section 5.12 hereof with respect to interested party transactions, the Members and their Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  The Company shall not have any right in such other business activities, or to the income or proceeds derived therefrom.  The Members are not obligated to present any opportunity to the Company.

**4.12    Expulsion of Members**

Any Member may be expelled from the Company upon the affirmative unanimous vote of the remaining Members holding Percentage Interests (determined without regard to any Membership Interest held by the Member being expelled) to terminate such Member's Membership Interest at a meeting duly called expressly for that purpose if the Member to be expelled:

> (a)    has committed an act of gross negligence, fraud, deceit or intentional misconduct which had a material adverse effect on the Company;

> (b)    is convicted of a felony in the nature of fraud, theft, embezzlement or the like or involving the commission of a violent act;

> (c)    has committed an act which is in breach of his fiduciary duty to the Company and which had a material adverse effect on the Company;

> (d)    has committed a willful breach of this Agreement;

> (e)    is guilty of such conduct tending to affect prejudicially the carrying on of the Company's business, including, but not limited to, drug, alcohol or gambling addiction; or

> (f)    has conducted himself or herself in matters relating to the Company's business as to render it not reasonably practicable to carry on such business in the Company with him or her.

Upon such vote, the Member shall be expelled from the Company by the service on him or her of a written notice stating the effective date of such expulsion, which shall be no earlier than the date of the notice. Service of the notice of expulsion shall constitute an exercise of the option to purchase the Member's Membership Interest as provided in Article IX hereof; provided that, in making such purchase, the Company or the purchasing Members, as applicable, shall be entitled to offset against the purchase price any reasonably calculable damages incurred by the

10

purchasing part(ies) as a result of the conduct of the Member that formed the ground for expulsion.

### 4.13    Voting Rights

Except as expressly provided in this Agreement or the Articles, Members have no voting, approval or consent rights, and Members, in such capacity, do not have any rights to participate in the management of the Company or its affairs.

### 4.14    Meetings of Members

#### (a)    Requirement for and Call of Meetings

No annual or regular member meetings are required.  Meetings of the Members may be called at any time by the Manager or Members holding at least 10% of the Percentage Interests.

#### (b)    Location and Method of Conducting Meetings

Meetings of members may be held at any place reasonably convenient to the Members, either within or without this state, and/or by Electronic Transmission, selected by the Person or Persons calling the meeting.  If no other place is selected, all meetings shall be held at the principal executive office of the Company.

#### (c)    Proxies and Participation by Electronic Transmission

Subject to any limitations in the Act, Members may designate one Person to serve as the Member's proxy, and any participation or vote by such proxy shall be deemed the participation or vote of the Member if the proxy is in writing and the original or a copy thereof is filed with the record of the meeting in the business records of the Company.

Any Member not physically present in person or by proxy at a meeting of Members may participate and vote in a meeting by Electronic Transmission, and such Member or his or her proxy shall be deemed present in person or by proxy, as long as the requirements of Section 17104(l) of the Act are met with respect to such participation.

#### (d)    Notice of Meetings

Any Person or Persons calling a meeting of Members shall Give Notice to all Members, not less than ten (10) nor more than sixty (60) days prior to the meeting, of the time, place, and hour thereof, any means of Electronic Transmission to be used and the general purpose of the meeting.  No business may be conducted at such a meeting other than as set forth in the Notice. If a meeting is adjourned to a new time or place, Notice thereof need not be given if the time and place of the adjourned meeting and any means of Electronic Transmission to be used are announced at the original meeting before its adjournment, except that a new Notice shall be Given if the meeting is adjourned for more than forty-five (45) days.

11

### (e) Waiver of Notice

Any Member may waive Notice of a meeting by delivering a written statement of such waiver to the Company for inclusion in the Company records or by appearance at the meeting without objection to the lack of Notice at the beginning of the meeting.

### (f) Actions without Meetings

Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, Given to the Company within sixty (60) days after the record date for that action and is signed by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote thereon were present and voted.

Unless the consents of all Members entitled to vote have been solicited in writing, (i) with respect to an amendment to the Articles or this Agreement, a dissolution of the Company, or a merger of the Company as into another entity, Notice of any Member approval, without a meeting, by less than unanimous written consent shall be given at least ten (10) days before the consummation of the action authorized by the approval, and (ii) prompt Notice shall be Given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

### 4.15 Certificate of Membership Interest

A Membership Interest may be represented by a certificate of membership if the Manager so elects. The exact contents of a certificate of membership may be determined by the Manager, provided that it contains all information regarding transfer restrictions and all other notices and information required by the Law, applicable securities laws, and/or other applicable law. Subject to applicable law, the Manager may establish such polices as he deems necessary or appropriate regarding the issuance, cancellation, and replacement of certificates of membership.

## V. MANAGEMENT AND CONTROL OF THE COMPANY

### 5.1 Manager-Managed

The Company's business, property, and affairs shall be managed and all Company powers shall be exercised by or under the direction of the Manager identified in Exhibit A hereto, as such Exhibit A is amended from time to time under authority granted pursuant to Section 5.3 hereof. Subject to the reservation to the Members the power to vote on certain matters set forth in Section 5.3, such Manager shall have all necessary powers to manage and carry out the purposes, business, and affairs of the Company, including the power to exercise on behalf and in the name of the Company all of the powers described in Section 17003 of the Act.

### 5.2 Time Commitment

It is understood that the Manager will not be devoting full-time to the business of the Company, but he shall devote to the Company business such time as he believes to be reasonably required in his reasonable good faith business judgment.

12

**5.3**     **Actions Requiring Majority Approval**

The following actions may not be taken by or on behalf of the Company without the approval of the Majority in Interest:

*(a)*     *Organizational and Membership Actions*

1.     The amendment of this Agreement (except for amendments changing Exhibit A to reflect Transfers permitted by Section 8.4) or the Articles;

2.     The creation, authorization, designation, reclassification, modification, issuance or sale of any Membership Interests, classes or series thereof, or rights, options, warrants or other securities convertible into or exchangeable for any Membership Interests, or any "phantom" equity or equity appreciation rights;

3.     The withdrawal of a Member from the Company or the admission of any Person as a Member of the Company;

4.     A transfer of all or any part of any Membership Interest for which approval of the Members is required under Article XIII hereof;

5.     Changing the Persons designated on Exhibit A as the Manager of the Company or the Person designated in Section 10.4 as the "Tax Matters Member;"

6.     Changing the purpose of the business of the Company, materially changing the scope thereof, or operation of the Company out of material compliance therewith;

7.     The voluntary dissolution and winding up of the Company, or the establishment of any procedures for winding up the Company's affairs, or the modification of the powers and duties of the Manager with respect to such winding up;

8.     The consolidation or merger of the Company into or with any other Person; the conversion of the Company into another form of business entity or into a limited liability company organized under a jurisdiction other than California;

9.     The sale, lease, transfer, assignment or other disposition of all or substantially all of the assets of the Company, or the acquisition of a material amount of assets, securities or other property on behalf of the Company, in each case outside the ordinary course of business of the Company;

10.     Entering into contracts with Members or their Affiliates, and the consummation of any material transaction (except as expressly permitted by this Agreement) between the Company and any "affiliate" or "associate" (as such terms are defined under Rule 12b-2 under the Securities Exchange Act of 1934, as amended) of the Company;

11.     Entering into any compromise of a claim by the Company against any Member on account of a default by such Member on its obligation to make capital contributions to the

13

Company, in which case unanimous approval is not required, notwithstanding the provisions of Section 17201(b) of the Act.

### *(b)*    *Financial Actions*

1.    Changing or permitting to be changed the capitalization of the Company by Capital Contributions;

2.    The making of any private or public offering of securities;

3.    The creation, incurrence or assumption of any indebtedness by the Company (which shall include for purposes hereof capitalized lease obligations and guarantees or other contingent obligations for indebtedness for borrowed money) other than trade payables and accrued expenses incurred in the ordinary course of business;

4.    The repayment of any outstanding indebtedness of the Company except (i) when due in accordance with its terms or (ii) in connection with any refinancing, extension, renewal or refunding of such indebtedness on terms that are at least as favorable to the Company as the terms of the indebtedness being refinanced;

5.    The making of capital expenditures in excess of $10,000 in any 12 month period;

6.    The settlement of any claim against the Company the original amount of which exceeds $10,000;

7.    The mortgage, encumbrance of any asset of the Company or the creation or incurrence of any liens other than: (i) liens imposed by operation of law (such as liens of carriers, warehousemen, mechanics, materialmen and landlords) and other similar liens that are (A) incurred in the ordinary course of the Company's business and (B) are for sums not constituting borrowed money and that are not overdue for a period of more than 30 days; (ii) liens for taxes, assessments or other governmental charges or statutory obligations that are not delinquent or remain payable without penalty; and (iii) purchase money security interests with respect to equipment and other personal property acquired in the ordinary course of the Company's business, provided that the Company complies with the other provisions of this Section 5.3;

8.    The making of any agreement, contract, obligation, promise or undertaking (whether oral or written and whether express or implied and including any contract for employment or for engagement of any consultant, independent contractor or other Person or the modification of any such contract) on behalf of the Company that (i) is outside its ordinary course of business, (ii) requires it to pay an amount in excess of $10,000 in any 12-month period, (iii) has a term of greater than 12 months; or (iv) is not terminable by the Company on 30 days' or less prior written notice;

9.    Payment of any compensation to a Member for services rendered to the Company, or the adoption of (or increase in the payments or benefits payable under) any profit-sharing, bonus, deferred compensation, savings, insurance, pension, retirement or other benefit plan for or with any Members, employees or other service providers of the Company;

14

### (c) Litigation-Related Actions

1.      The commencement of any case by the Company under the U.S. Bankruptcy Code or any similar state law or the consent to (or failure or default in defending against) the commencement of such a case against the Company;

2.      The confession of any judgment against the Company or the failure or default in defending against any suit, action or proceeding (including administrative proceedings before any governmental agency) against the Company;

3.      Making, executing, or delivering on behalf of the Company any assignment for the benefit of creditors or any guarantee, indemnity bond, or surety bond or any equivalent thereof on behalf of any Person;

4.      The initiation of any suit, action or proceeding (including administrative proceedings before any governmental agency) by the Company;

### (d) Catch-all

The Agreement or other commitment on behalf of the Company to take any of the actions set forth in the foregoing subsections of this Section.

### 5.4    Procedure for Obtaining Majority Approval

Approval of an action or agreement required by Section 5.3 shall be obtained either at a meeting of Members or by the written consent of Members as provided in Section 4.14 hereof.

### 5.5    Manner of Exercise of Duties and Powers

The Manager when managing the business of the Company and the other Members when acting pursuant to Section 5.3 hereof shall discharge their duties in good faith, with the care an ordinary prudent person in like position would exercise under similar circumstances, and in a manner such Manager or Member, as applicable, reasonably believes to be in the best interests of the Company.

### 5.6    Agency Authority of Manager

Subject to Section 5.3, the Manager may (a) endorse checks, drafts and other evidence of indebtedness made payable to the order of the Company, (b) sign contracts, obligations, checks, drafts and other instruments obligating the Company to pay any money on behalf of the Company, and (c) execute any contract, deed, promissory note, deed of trust, lease, subordination agreement or any other agreement on behalf of the Company.

### 5.7    Reliance by Third Parties

With respect to actions of a Manager under Section 5.1, third parties shall be entitled to rely on a statement in writing signed by any other Member indicating that the Manager has the authority to act and bind the Company in connection therewith. With respect to actions requiring

15

approval pursuant to Section 5.3, third parties may rely only on a written statement signed by two Members reciting that (a) the action required the approval of the Majority in Interest, (b) the approval was duly obtained in accordance with this Agreement, and (c) the Person acting for the Company in connection with the transaction was authorized to act pursuant to such approval.

### 5.8    Resignation

A Manager may resign at any time by Giving written Notice to the Members without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party.  The resignation of such Manager shall take effect upon receipt of that Notice or at such later time as will be specified in the Notice. Unless otherwise specified in the Notice, the acceptance of the resignation is not necessary to make it effective.  The resignation of a Manager who is also a Member will not affect the Manager's rights as a Member and will not constitute a withdrawal of the Manager as a Member.

### 5.9    Removal

A Manager may be removed at any time by in accordance with Sections 5.3 and 5.4 hereof.  Any removal will not affect such Manager's rights as a Member or constitute a withdrawal of the Manager as a Member if the Manager is also a Member.

### 5.10    No Personal Liability of Manager

No person who is a Manager of the Company is personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager of the Company.

### 5.11    Competing Activities: Manager

The Manager, and if applicable, the Manager's officers, directors, shareholders, partners, members, managers, agents, employee and Affiliates, may engage or invest in, independently or with others, any business activity of any type or description, including, without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any Member has any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  The Manager is not obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  The Members acknowledge that the Manager and his or her Affiliates may own and manage other businesses, including businesses that may compete with the Company and compete for the Manager's time.  The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and his or her officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any of such activities.

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 50 of 87

### 5.12 Interested Party Transactions

Each of the Manager and the Members shall be entitled to engage in and/or benefit from transactions between the Company and the Member or Manager and/or its Affiliates, directly or indirectly, if (a) the material facts of the transaction and the Manager's or Member's direct or indirect interest therein are disclosed in writing to the Members and the Members holding a Majority in Interests (excluding the Membership Interest of the interested Member) approve the transaction under the procedures set forth in Section 4.14 hereof or (b) the interested Person proves that the transaction is fair to the Company. For this purpose, the fairness of a transaction to the Company is intended to be determined in a manner similar to determining the fairness of a transaction to a corporation under Section 315 of the California Corporations Code with respect to transactions in which directors have an interest.

### 5.13 Payments to Manager

The Manager shall not be entitled to payment for services rendered to the Company unless such payment or the terms of ongoing payments shall be approved by a Majority in Interest. Notwithstanding the preceding sentence:

(a) The Manager may be reimbursed for reasonable expenses incurred by him in the ordinary course of the Company's business;

(b) A one-time construction management fee equal to ten percent (10%) of the total Construction Costs for improvements to the Company Property, which shall be payable to Manager upon the earlier of (i) sale of all or substantially all of the Company Property in a single or series of related transactions or (ii) sale of at least 75% of residential condominium units constructed on the Company Property.

(c) For purposes of this Section 5.13, the term "Construction Costs" shall mean all out-of-pocket expenditures made by the Company for construction of improvements to the Company Property, including but not limited to expenditures for (i) designs, plans, and drawings, (ii) architectural, engineering and other professional fees related to construction of improvements, (iii) permits, licenses and other governmental fees, (iv) environmental, soil, traffic and similar studies, (v) purchase and/or rental of equipment and tools, (vi) bonds and insurance covering construction activities, (vii) direct and subcontract labor, including onsite and offsite project management (not including any compensation to the Manager or any of his Affiliates), and (viii) materials and supplies purchased in connection with construction of improvements.

## VI. CAPITAL CONTRIBUTIONS AND ACCOUNTS

### 6.1 Capital Accounts

The Company shall maintain at all times a Capital Account for each Member in its books and records, and such Capital Account shall be calculated as follows:

17

(a)     The following shall be credited to the Member's Capital Account:

(i)     All Capital Contributions by the Member;

(ii)    Such Member's distributable share of all Net Profits and other items of income and gain allocated to the Member pursuant to Article VII; and

(iii)   All liabilities of the Company assumed by such Member or which are secured by property distributed to the Member.

(b)     The following shall be debited against the Member's Capital Account:

(i)     The amount of money distributed to a Member,

(ii)    The Gross Asset Value of any property distributed to the Member by the Company (net of liabilities secured by the property or to which the property is subject);

(iii)   Such Member's distributable share of all Net Losses and other items of loss and deduction allocated to the Member pursuant to Article VII; and

(iv)    The amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed to the Company by such Member.

(c)     All Capital Contributions in the form of property other than cash contributed by a Member shall be credited to the Member's Capital Account in an amount equal to its fair market value on the date of contribution, as determined by the Manager.

(d)     The principal amount of a promissory note that is not readily tradable on an established securities market and is contributed to the Company by the Maker of the note [or a Member related to the maker of the note within the meaning of Treasury Regulation §1.704-1(b)(2)(ii)(c)] shall not be included in the Capital Account of the Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(d)(2).

(e)     In the event a Membership Interest is assigned in accordance with this Agreement, the assignee shall succeed to the Capital Account of the assignor to the extent it relates to the assigned Membership Interest as provided in Article VIII hereof.

18

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 52 of 87

(f)     Code §752(c) and any other applicable provisions of the Code and the Treasury Regulations shall be taken into account in determining the amount of any liability for purposes of subsections (a) and (b).

(g)     The foregoing provisions and all provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation §1.704(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event that the Tax Matters Member determines that it is prudent to modify the manner in which the Capital Accounts and debits and credits thereto are computed in order to comply with such Treasury Regulation, the Tax Matters Member may make such modification, provided that it is not likely to have a material effect on amounts distributed to any Person pursuant to Section 11.4 upon the dissolution of the Company.

The Tax Matters Member shall also (i) make any adjustments that are necessary or appropriate to maintain equality between Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(g), and (ii) make any appropriate adjustments in the event unanticipated events might otherwise cause this Agreement to not comply with Treasury Regulation §1.704-1(b).

### 6.2     Carryover of Pre-existing Capital Accounts of Class 1-A Members

The Capital Account of each Class 1-A Member held by the Member immediately prior to the Effective Date of this Agreement, regardless of the membership class previously designated for such Member, shall continue to be held by such Member, unaffected by any reclassifications or other changes to the Original Operating Agreement made by this Agreement except for the dilution of the interests of such Member by the issuance of Units to the Additional Members under this Agreement and the Plan.

### 6.3     Initial Capital Contributions of Class 1-B Members

Each Member to whom Units of Class 1-B Membership Interests are issued under this Agreement and the Plan shall be deemed to have made a Capital Contribution equal to the value of its Membership Interest calculated under Section 4.4 hereof.

### 6.4     Initial Capital Contributions of Additional Members

The Capital Contribution required from any Member added after the Effective Date of this Agreement shall be in the amount, and payable on the terms, agreed upon between the Member and the Company.

### 6.5     No Other Capital Contributions Required

No Member shall be required to make any additional Capital Contributions. Additional Capital Contributions can be accepted by the Company only with the consent of Members given in accordance with Section 5.3 hereof.

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 53 of 87

**6.6**     **Default**

If a Member fails to make any required Capital Contribution, the Manager may take any combination of one or more of the following actions until such time as the defaulting Member has met that Member's obligation in full:

        (a)    Arrange for loans (including by Members) to the Company on the defaulting Member's behalf and allocate the costs of those loans to the defaulting Member;

        (b)    Allocate to the defaulting Member all damages and costs that the Company incurs on account of the default, including attorneys' fees;

        (c)    Apply all distributions otherwise payable to the defaulting Member to reducing the loans referred to above, and paying the costs and other damages incurred by the Company on account of the default;

        (d)    Make suitable payment arrangements with the defaulting Member, including interest charges and reimbursement to the Company of related costs; and

        (e)    Take appropriate legal action to enforce collection.

**6.7**     **Member Loans**

Unless otherwise specified by the Company and the applicable Members in writing, all funds paid to the Company by a Member in excess of the Capital Contributions specifically required of the Member under this Agreement are deemed a loan repayable to the Member.

Any such loan shall be on terms agreed upon in writing by the Member and the Company, and may be secured by assets of the Company to the extent agreed upon between the Member and the Company. The Company's agreement to receive such a loan, its terms, and any grant of security for its repayment are subject to approval pursuant to Section 5.3 hereof. Such loans shall not alter that Member's Capital Account, Membership Interest, or the share of Company profits, losses or distributions.

If such a loan is made and no agreement is duly entered into between the Member and the Company, the loan shall be repayable on demand made not less than thirty (30) days after the date the Member Gives Notice demanding repayment, and it shall bear simple interest at a rate which is one percent (1%) above the average of the prime rates published in the money rates column of the *Wall Street Journal* on the last publication date prior to the date the loan is made, but in no event a rate that exceeds the maximum interest permitted by law.

**6.8**     **Withdrawals of Capital**

No Member shall be entitled to withdraw any part of the Member's Capital Account, to the return of any of the Member's Capital Contributions, or to receive any distribution from the Company except as expressly provided in this Agreement.

20

**6.9**    **No Interest**

The Company shall not be obligated to pay any interest on any Capital Contribution or any balance in a Member's Capital Account.

## VII. ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

**7.1**    **Definitions**

When used in this Agreement, the following terms have the meanings set forth below:

> (a)    "Company Minimum Gain" has the meaning ascribed to the term "Partnership Minimum Gain" in Treasury Regulation 1.704-2(d).

> (b)    "Member Nonrecourse Debt" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulation 1.704-2(b)(4).

> (c)    "Member Nonrecourse Deductions" means items of Company loss, deduction or Code section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt.

> (d)    "Net Profits" and "Net Losses" means the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting employed in preparation of the Company's information tax return filed for federal income tax purposes for the applicable fiscal year of the Company.

> (e)    "Nonrecourse Liability" has the meaning set forth in Treasury Regulations section 1.752-1(a)(2).

**7.2**    **Distributions**

> *(a)*    *Non-liquidating Distributions*

Subject to the provisions of <u>Section 7.2(c)</u>, money and other property available for distribution (other than on liquidation of the Company or redemption of any Member's Membership Interest) shall be distributed from time to time as follows:

> **(i)**    **Required Distribution of Cash Flow from Operations**

Not later than each April 1 following the Effective Date of this Agreement, the Company shall make distributions from Cash Flow from Operations as follows:

> (a)    The Company shall first determine the highest combined state and federal tax rate payable for ordinary income earned in the preceding tax year by residents of California;

21

(b)     The Company shall then make a distribution to each Member equal to the Member's Percentage Interest of (1) all income earned by the Company in such preceding year reportable by the Members as taxable income times (2) the rate determined according to the preceding sentence, provided that the aggregate distributions shall not exceed the Cash Flow from Operations of the Company for such preceding year.

### (ii)     Discretionary Distributions of Cash Flow from Operations

In addition to the distribution required by the preceding section, distributions of Cash Flow from Operations may be made to the Members at such times and in such amounts as the Manager shall determine.  Such distributions shall be made to the Members in proportion to their Percentage Interests at the time of the distribution.

### (iii)     Sale and Refinance Proceeds

Within a reasonable time following (A) the sale of all or substantially all of the Company Property in a single transaction or related group of transactions (not including sale of individual condominium units hereafter constructed on the Company Property) or (B) replacement or refinancing of an obligation secured by all or substantially all of the Company Property, the Sale and Refinance Proceeds shall be distributed in the following order of priority:

(A)     First, to all Members who have positive Capital Accounts in proportion to their Capital Account balances immediately prior to the distribution, until their Capital Account balances reach zero; then

(B)     To all Members, in proportion to their Percentage Interests.

### (b)     *Liquidating Distributions*

On liquidation of the Company, after paying or providing for the payment of all debts of the Company, the Company's assets shall be distributed in the following order of priority:

(A)     First, to all Members who have positive Capital Accounts in proportion to their Capital Account balances immediately prior to the distribution, until their Capital Account balances reach zero; then

(B)     To all Members, in proportion to their Percentage Interests.

### (c)     *Special Distribution Rules*

### (i)     Pre-distribution Reserves

In calculating Cash Flow from Operations and Sale or Refinancing Proceeds available for distribution to Members, the Manager shall deduct from funds otherwise available an amount that the Manager determines to be adequate as a reserve for the Company to meet its current and

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 56 of 87

future obligations, including operating expenses, capital expenditures, debt service, investments, and other expenditures in such amounts as the Manager reasonably considers to be appropriate.

### (ii)    Limit on Reserves and Discretionary Payments

The Company shall not make any non-mandatory payments on obligations secured by Company Property or other long term liabilities unless and until the Company has made all distributions to Members from Cash Flow from Operations required by Section 7.2(a)(i) and has established adequate reserves for future distributions required by such section.

### (iii)    Curative Distributions

Distributions will be made first as necessary as a curative allocation to rectify any anomalous distribution that may have previously occurred, including inadvertent distributions, until such differences have been cured.

### (iv)    Installment Sales

Distributions related to an installment sale shall be governed by Section 7.4(e).

### (v)    Limitation

Notwithstanding any other provision of Section 7.2(a), no amount shall be distributed to a Member in a nonliquidating distribution if distribution of such amount would result in the Member receiving more distributions through the date of that distribution than the distributions the Member would have received if the Company's assets were liquidated as of the date of the distribution.

### (vi)    Distributions in Kind

(A)    No Member shall have any right to demand or receive a distribution in a form other than cash. The Managers shall have the authority to distribute assets other than cash to the Members so long as (i) each Member receives an undivided interest in such assets in proportion to its Percentage Interest or (ii) each Member receives a combination of cash and assets with a value at the time of distribution equal to the value of its Percentage of the total assets to be distributed.

(B)    Any assets of the Company distributed in kind shall be valued at their fair market value at the time of distribution, which shall be determined by the Manager. The Net Profits or Net Losses for each distributed asset shall be determined as if the asset had been sold at its fair market value, and such Net Profits or Net Losses shall be allocated among the Members as provided in Article 5 and shall be properly credited or charged to the Capital Accounts of the Members prior to the distribution of the assets.

23

**7.3     Allocations of Net Profits and Net Losses**

Subject to the requirements of Section 7.4, for tax and financial accounting purposes, Net Profits and Net Losses for each fiscal year shall be allocated to the Members in proportion to their respective Interests at the end of such fiscal year.  Such allocations shall be made among the Persons who hold Membership Interests as of the end of such fiscal year, except that, in the event a Membership Interest is transferred during a year, Net Profits or Net Losses for the year shall be allocated between the transferor and transferee to reflect their respective interests during the year in a manner selected by Tax Matters Member at the end of the year that is permissible under federal income tax law, taking into account any extraordinary non-recurring items of profit or loss of the Company.

**7.4     Special Rules and Definitions As Used In This Agreement**

**(a)     *Nonrecourse Deductions***

Nonrecourse deductions shall be allocated to the Members in proportion to their Percentage Interests.

**(b)     *Special Loss Allocation Rule***

Items of Company losses other than nonrecourse deductions shall be allocated in the following order:

(i)     First, to those Members with positive Capital Accounts in proportion to their Percentage Interests as long as any Member has a Capital Account balance greater than zero;

(ii)     Second, to the Members who are personally liable concerning such loss items, in proportion to their Percentage Interests;

(iii)     Third, to all Members in proportion to their Percentage Interests.

**(c)     *Qualified Income Offset***

The Company shall maintain the Members' capital by reducing the Members' Capital Accounts as provided in Treasury Regulations 1.704-1 (b)(2)(ii)(d)(4), (5), and (6).  If a Member unexpectedly receives any adjustment, allocation, or distribution described in such Treasury Regulations, and such adjustment, allocation, or distribution creates a deficit balance in that Member's Capital Account exceeding that which the Member is required to contribute under Article IV, then items of gross income and gain shall be allocated to that Member in an amount and manner sufficient to eliminate such deficit balance in the Member's Capital Account as quickly as possible.  If allocations of items of income or gain are made under this Section 7.5(d), such allocations shall be accounted for in computing subsequent profit allocations so that the total items allocated to each Member are, to the extent possible, equal to the profits that would have been allocated to each Member under this Agreement excluding this section.

24

### (d)    Limited Deficit Capital Account Makeup Provision

If, as a result of a distribution of Sale and Refinance Proceeds, any Member would be deemed to have a deficit balance (after giving effect to all contributions, distributions, and allocations for all taxable years, including the taxable year during which such distribution occurs), such Member shall be obligated to contribute to the capital of the Company the amount necessary to restore such deficit balance to zero.

### (e)    Installment Sales

If Company Property is sold on an installment sale basis, the gain to be recognized by the Company shall be calculated as of the date of the sale.  However, such gain shall be recognized ratably in the tax years during which the various installments are received from the purchaser of such Company Property in the same proportion as the installments are received in any one year bear to the total installments to be received over the course of the deferral period.  Such gain (and any interest received on deferred payments) shall be allocated to the Members in proportion to their Percentage Interests as of the date of the sale.

### (f)    Code Section 704(c) Allocations

Notwithstanding any other provision in this Article 7, in accordance with Code section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company will be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.

### (g)    Compliance with Code and Regulations

It is the intent of the Members that each Member's allocation of profits, losses, income, gain, loss, deduction and credit be determined in accordance with this Agreement to the fullest extent permitted by the sections 704(b) and 704(c) of the Code and the corresponding Treasury Regulations.  Notwithstanding anything to the contrary contained in this Agreement, if the Company is advised that, as a result of the adoption of new or amended Treasury Regulations pursuant to sections 704(b) and 704(c) of the Code or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Manager may amend the allocation provisions of this Agreement, on advice of accountants and legal counsel to the Company, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes.

### 7.5    Special Allocations

The Members expect and intend that upon the liquidation of the Company and after giving effect to all contributions and all allocations for all periods, the Members' Capital Accounts will have positive balances in proportion to their Percentage of Membership Interests. If the Tax Matters Member determines that this would not be the result, then the allocations provided for in this Article 7 shall be modified in a manner consistent with Treasury Regulations

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 59 of 87

§§1.704-1(b) and 1.704-2 to the extent necessary to cause the Members' Capital Accounts to be in such proportions.

### 7.6    Adjustment to Percentage Interests

If the Percentage Interests of the Members are adjusted during a fiscal year, all allocations of Net Profits and other items of income and gain and Net Losses and other items of loss and deduction shall be made by the Tax Matters Member in accordance with the terms of this Agreement, by use of any method prescribed by the Treasury Regulations which takes into account the varying Membership Interests in the Company during such fiscal year.

### 7.7    Partnership Tax Treatment

The Members intend the Company to be treated as a partnership for federal income tax purposes and for state income tax purposes in all states that follow federal tax classifications. Accordingly, this Agreement shall be construed at all times in a manner that is consistent with the Company's classification as a partnership for federal income tax purposes.

## VIII.  TRANSFER AND ASSIGNMENT OF INTERESTS

### 8.1    Transfer and Assignment of Interests

Except as provided in Section 8.4, no Member shall be entitled to Transfer all or any part of his or her Membership Interest except with the prior written consent of a Majority in Interest (without counting in any way the Interest of the transferring Member), which consent may be given or withheld, conditioned or delayed as the Majority in Interest may determine in their sole discretion (subject to any other requirements of this Agreement or the Act).  Transfers in violation of this Article 8 shall only be effective to the extent set forth in Section 8.7.

After the consummation of any Transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further Transfers shall be required to comply with all the terms and provisions of this Agreement.

### 8.2    Further Restrictions on Transfer of Interests

In addition to other restrictions set forth in this Agreement, no Member may Transfer all or any part of his or her Membership Interest: (a) without compliance with all federal and state securities law, and (b) if the Membership Interest to be Transferred, when added to the total of all other Membership Interests Transferred in the preceding twelve (12) consecutive months prior thereto, would cause the tax termination of the Company under Code section 708(b)(I)(B).

### 8.3    Substitution of Members

An Assignee of a Membership Interest shall have the right to become a substitute Member only if: (a) the requirements of Section 8.2 and, if applicable to the Transfer, Section 8.1 hereof are met, (b) the Assignee executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement (including having the Assignee's

26

spouse, if any, sign a Consent of Spouse form acceptable to the Company), and (c) the Assignee pays any reasonable expenses in connection with his or her admission as a new Member. The admission of an Assignee as a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

### 8.4    Permitted Transfers

Subject to the restrictions set forth in Section 8.2 and the requirements of Section 8.3, the Membership Interest, any portion thereof, or an Economic Interest of any Member may be Transferred to the following persons without the prior written consent of the Members,

      (a)     To any other Member;

      (b)     To any spouse, parent, sibling, child or grandchild of the Member;

      (c)     By *inter vivos* gift or by testamentary transfer to any spouse, parent, sibling, child or grandchild of the Member, or to a trust for the benefit of the Member or such spouse, parent, sibling, child or grandchild of the Member; or

      (d)     To any Affiliate of the Member.

### 8.5    Effective Date of Authorized Transfers

Any Transfer of all or any portion of a Membership Interest or an Economic Interest that is authorized by this Agreement shall be effective as of the date upon which the last of the applicable requirements of Sections 8.1 (if applicable), 8.2 and 8.3 have been met. The Manager shall Give the Members Notice of such Transfer as promptly as possible after its effective date. Any transferee of a Membership Interest or an Economic Interest shall take subject to the restrictions on transfer imposed by this Agreement.

### 8.6    Rights of Legal Representatives

If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to vote on actions of the Company under Section 5.3. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by its legal representative or, subject to Section 8.8 regarding the right of first refusal granted to the Company, its successor.

27

**8.7    Transfers in Violation of Agreement; Option to Purchase**

No purported Transfer of a Membership Interest in violation of this Article VIII or any other provision of this Agreement shall be effective, and the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to receive the Economic Interest to which the purported transferring Member would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VIII would cause the tax termination of the Company under Code section 708(b)(1)(B), the Transfer shall be null and void and the purported transferee shall not become either a Member or an Assignee.

Upon and contemporaneously with any Transfer (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest (other than in accordance with Section 8.4) which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company, in the sole discretion of the Manager, may purchase from the Member, and the Member agrees to sell to Company for a purchase price of One Hundred Dollars ($100.00), all remaining rights and interests retained by the Member that, immediately before the Transfer, were associated with the transferred Economic Interest.  Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member existing on the date the Company acquires such remaining rights and interests retained.  Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member is reasonable under the circumstances existing as of the date hereof.

**8.8    Right of First Refusal**

   *(a)    Offer to Purchase*

If any Member desires to Transfer (whether voluntarily, involuntarily or by operation of law) all or any part of his or her Membership or Economic Interest other than pursuant to Section 8.1 or Section 8.4, such Member shall first Give Notice to the Company and the other Members of such desire not less that sixty (60) days prior to the proposed effective date of such Transfer.  Such Notice shall identify the proposed transferee and contain a statement of all the material terms of the proposed Transfer and/or a copy of any agreement entered into between the transferring Member and the proposed transferee.  Such Notice shall constitute an offer ("Offer") to the Company and the other Members to purchase the Membership Interest or Economic Interest proposed to be Transferred.

   *(b)    Acceptance of Offer*

     (i)    For thirty (30) days after receipt of the Offer, the Company shall have the right, but not the obligation, to elect to purchase all or any part of the Interest upon the price and terms of payment designated in the Notice.  If the Offer provides for

the payment of non-cash consideration, the Company may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Manager.

(ii)     If the Company timely elects to purchase some or all of the Interest offered, the Manager shall Give Notice within such 30-day period of that fact to the transferring and non-transferring Members.  Such Notice shall state the portion of the Interest that the Company elects to purchase.

(iii)     If the Company fails to timely elect to purchase the entire Interest proposed to be transferred, each non-transferring Member shall have the right, but not the obligation, for a period of fifteen (15) days after the expiration of the thirty (30) day period afforded to the Company under Section 8.8(b)(1) to elect to purchase his or her pro rata portion of such Interest not to be purchased by the Company (in proportion to all Percentage Interests of nontransferring Members).  To exercise such right, the Member shall Give Notice of his or her election within such fifteen (15) day period to the Company and all Members, including the transferring Member.

(iv)     If all of the offered Interest has not been purchased by the end of the fifteen (15) day period described in Section 8.8(b)(3), each Member who elected to purchase during such fifteen (15) day period shall have the right, but not the obligation, to purchase all or a portion of the Interest not already purchased.  To exercise such right, the electing Member(s) shall Give Notice of his or her election and the portion of the unpurchased Interest he or she elects to purchase to the Company and all other Members before the expiration of such fifteen (15) day period.

(v)     If the elections exercised under Section 8.8(b)(5) attempt to purchase more that the Interest remaining to be purchased, such elections shall be proportionately reduced to match the Interest remaining available for purchase.

(vi)     Neither the Company nor any Member shall be entitled to withdraw its election to purchase any portion of the offered Interest, and the Company and all electing Members shall be bound to purchase the portions of the offered Interest that they elected to purchase.

### *(c)     Terms of Purchase*

Any acceptance of the Offer to purchase an Interest proposed to be transferred under Section 8.8(b) hereof shall be upon the same price and terms of payment designated in the Offer.  If the Offer provides for the payment of non-cash consideration, the Company or purchasing Members, as applicable, shall pay consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered, as determined by the Manager.

### 8.9     Closing of Purchase

If the Company and/or other Members elect to purchase or obtain any or all of the Interest designated in the Notice, then the closing of such purchase shall occur at such time and place as is agreed between the selling Member and the purchasers, but in any event within sixty

29

(60) days after receipt of the Offer, and the transferring Member, the Company and/or the other Members shall execute such documents and instruments and make such deliveries as may be reasonably necessary to consummate such purchase.

### 8.10    Consummation of Original Sale

If the Company and/or the other Members elect not to purchase, or default in their obligation to purchase, all of the Interest designated in the Offer, then the transferring Member may transfer the portion of the Interest described in the Offer not so purchased, to the proposed transferee, providing such transfer (i) is completed within sixty (60) days after the expiration of the Company's and the other Members' right to purchase such Interest, (ii) is made on terms no less favorable to the transferring Member than the terms designated in the Offer, and (iii) complies with Sections 8.1, 8.2 and 8.3 relating to consent of the Members, securities and tax requirements.  The foregoing authority shall remain subject to compliance with all of the transfer restrictions in this Article VIII.  If such Interest is not so transferred, the transferring Member must Give Notice in accordance with this Section 8.8 prior to any other or subsequent transfer of all or any portion of such Interest.

### 8.11    Dissolution of Marriage

For purposes of this Section 8.11, "Participating Member," if a Member is a natural person, means that Member named on Exhibit A hereto and, if the Participating Member is or becomes married, his or her spouse shall be referred to herein as the "Spouse."

In the event of any dissolution of marriage of any Participating Member decreed by a court of competent jurisdiction, the Membership Interest may be allocated and distributed between the Participating Member and his or her Spouse as provided in the court order or an agreement, assignment, stipulation or similar document approved by the court ("Event of Divorce"); provided, however, that

> (a)     No Spouse may become a Member of the Company by virtue of an Event of Divorce;

> (b)     The Spouse shall only receive an Economic Interest;

> (c)     As between the Participating Member and the Spouse, if the Participating Member retains a Membership Interest in the Company following the transfer of an Economic Interest to the Spouse, the Participating Member will, under Section 17301(a)(4) of the Act, continue to have the exclusive right and authority to act as Member with respect to the Economic Interest allocated or distributed to the Spouse;

> (d)     If the Participating Member transfers the entire Membership Interest in the Company to the Spouse, then neither the Participating Member nor the Spouse has any rights or authority to act as a Member and all rights of the Participating Member to vote or participate in the management of the business, property and affairs of the Company shall terminate; and

Case: 10-51813    Doc# 49-1    Filed: 03/11/11    Entered: 03/11/11 16:33:14    Page 64 of 87

(e)     Any action, consent or approval taken or given, or any document or instrument executed by the Participating Member on his or her own behalf (and on behalf of the Spouse as the holder of the Economic Interest), is binding on such Member and the Spouse, and the other Members and third parties can rely on that action.

(f)     Notwithstanding anything to the contrary, an Event of Divorce is a transfer for purposes of Section 8.8 of that portion of the Participating Member's Membership Interest allocated and distributed to the Spouse, and the Company and the non-transferring Members have the right to purchase the Membership Interest and all terms and conditions of Section 8.8 apply, except that (i) the purchase price is the value of the Membership Interest stipulated, agreed to or established in the documents evidencing the Event of Divorce, or if none, determined in accordance with Section 9.4, and (ii) the purchase price will be paid as provided in Sections 9.5 and 9.6.

## IX.  DISSOCIATION AND TERMINATION OF MEMBERSHIP INTERESTS

### 9.1  Dissociation Event Defined

The occurrence of any of the following shall constitute a "Dissociation Event:"

(a)     The filing of an application by a Member for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets;

(b)     The entry of an order for relief with respect to a Member in a case under the United States Bankruptcy Code, as amended or superseded from time to time;

(c)     The making by a Member of a general assignment for the benefit of creditors;

(d)     The entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member, or the issuance of a charging order against a Member's Membership Interest, unless the proceedings and the person appointed are dismissed within ninety (90) days; or

(e)     The failure by Member generally to pay his or her debts as the debts become due within the meaning of section 303(h)(1) of the United States Bankruptcy Code or the admission in writing of his or her inability to pay his or her debts as they become due.

(f)     In the case of a Member that is a corporation, partnership, limited liability company, limited liability partnership, limited partnership or similar entity, the filing of a certificate of dissolution by such entity;

31

(g)     The attempted transfer of the Member's Interest (including the Member's Economic Interest) in violation of Article VIII;

(h)     The withdrawal of a Member in violation of this Agreement;

(i)     A Member's material breach of this Agreement;

(j)     In the case of a Member who is a natural person, the Member's death; the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person or estate; or

(k)     In the case of a Member that is an estate or a trust, the distribution by the fiduciary of the estate's or trust's entire interest in the Company, except in the case of where such distribution constitutes a Permitted Transfer under Section 8.4.

**9.2     Consequences of Dissociation Event**

The occurrence of a Dissociation Event does not dissolve the Company, and the business of the Company will continue without further vote or act of the Members. A Person shall cease to be a Member upon the happening of any Dissociation Event with respect to such Person.

**9.3     Disposition of Dissociated Member's Membership Interest**

When a Person succeeds to a Member's Membership Interest upon the happening of a Dissociation Event, the successor shall hold the Membership Interest of the Dissociated Member as a substitute Member only if the successor is a Permitted Transferee. If the successor to the Dissociated Member is not a Permitted Transferee and the Members do not agree to admit the successor as a substitute Member pursuant to Section 5.3, the successor shall hold the Membership Interest as an Assignee subject to the option of the Company and the remaining Members to elect to purchase the dissociated Member's Membership Interest pursuant to Section 9.4 through 9.7 and according to the procedures set forth in Section 8.8. For purposes of measuring the time limits in Section 8.8 with respect to the option under this Section 9.3, the Company and the remaining Members shall be deemed to have been given an Offer triggering the option to purchase a dissociated Member's Membership Interest on the date the Company receives actual notice of the occurrence of the Dissociation Event.

**9.4     Purchase Price**

(a)     The purchase price for the dissociated Member's Interest shall be the fair market value of the dissociated Member's Membership Interest determined by agreement between the dissociated Member (or the Assignee of the dissociated Member's Membership Interest, as the case may be) and the Company, which agreement is subject to approval by a Majority in Interest (without counting the Interest of the dissociated Member). For this purpose, the fair market value of the dissociated Member's Membership Interest shall be

32

computed as the amount which could reasonably be expected to be realized by such Member upon the sale of the Company Property in the ordinary course of business and dissolution of the Company at the time of the Dissociation Event.

(b)     If the dissociated Member (or the Assignee of the dissociated Member's Membership Interest, as the case may be) and the Company cannot agree upon the fair market value of such Membership Interest within thirty (30) days following the Dissociation Event, the fair market value thereof shall be determined by appraisal.  If the parties cannot agree on a single appraiser within twenty (20) days after expiration of said 30-day period, either party may petition the Superior Court of California, County of Monterey, for appointment of a qualified appraiser.  The appraiser shall conduct an independent appraisal of the dissociated Member's interest as of the date of the Dissociation Event and submit the results of the appraisal to the Company and the dissociated Member within sixty (60) days after the appointment.  The fair market value shall be the appraised value determined on the basis set forth in Section 9.4(a).  The costs and expenses of the appraiser will be shared equally between the Company and the dissociated Member.  The determination of the appraiser shall be binding on the parties and shall have the same effect as a binding arbitration award.  Notwithstanding the foregoing, if the Dissociation Event results from a breach of this Agreement by the dissociated Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company and/or the Members as a result of such breach.

**9.5     Payment of Purchase Price**

The purchase price shall be paid by the Company or any purchasing Members, as the case may be, by either of the following methods, each of which may be selected separately by the Company or any purchasing Members:

(a)     The total purchase price shall be paid in cash at the closing; or

(b)     One-fifth (l/5) of the purchase price shall be paid at the closing and the balance of the purchase price shall be paid in four (4) equal annual principal installments, plus accrued interest, payable on each anniversary date of the closing.  Interest shall accrue on the unpaid principal balance at a rate of one percent (1%) above the average of the prime rates of interest published in the money rates column of the *Wall Street Journal* on last publication date prior to the closing date, but in no event a rate that exceeds the maximum interest permitted by law.  Any unpaid balance of the purchase price may be prepaid in full or in part at any time without penalty. The obligation of each purchasing Member and the Company, as applicable, to pay its portion of the balance due shall be evidenced by a separate promissory note executed by the respective purchasing Member or the Company, as applicable.  Each such promissory note shall be in an original principal amount equal to the portion owed by the respective purchasing Member or the Company, as applicable. The promissory note executed by each

33

purchasing Member shall be secured by a pledge of that portion of the Member's Interest purchased by such Member.  In no event shall the Company or any particular purchasing Member be liable for the obligations of another Member to pay his or her portion of the purchase price.

### 9.6    Closing of Purchase of Dissociated Member's Interest

The closing for the sale of a dissociated Member's Interest shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day.  At the closing, the dissociated Member or such dissociated Member's legal representative shall deliver to the Company and/or the purchasing Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the dissociated Member's Interest.  The dissociated Member or such dissociated Member's legal representative, the Company and the purchasing Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

### 9.7    Purchase Terms Varied by Agreement

Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

## X.    ACCOUNTING, RECORDS, REPORTING

### 10.1    Books and Records

The books and records of the Company shall be kept in accordance with the accounting methods followed for federal income tax purposes. The Company shall maintain at its principal office in California all of the following:

(a)    A current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the capital contributions, capital account and  Membership Interest of each Member;

(b)    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

(c)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

34

(d)     Copies of the Original Agreement, this Agreement and any and all amendments thereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(e)     Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

(f)     The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) fiscal years.

### 10.2     Reports

The Company shall file, in accordance with the Act, all reports and documents required to be filed with any governmental agency.  The Company shall prepare at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns.  The Company will send or cause to be sent to each Member within ninety (90) days after the end of each taxable year: (a) such information as is necessary to complete the Members' federal and state income tax or information returns, and (b) a copy of the Company's federal, state and local income tax or information returns for the year.

### 10.3     Bank Accounts

The Manager will maintain the funds of the Company in one (1) or more separate bank accounts in the name of the Company, and will not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

### 10.4     Tax Matters Member

The Manager is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

## XI.     DISSOLUTION AND WINDING UP

### 11.1     Conditions of Dissolution

The Company shall be deemed dissolved upon the occurrence of any of the following events:

(a)     Upon the happening of any event of dissolution specified in the Articles;

(b)     Upon the vote of a Majority in Interest in the Company under Section 5.3 hereof; or

35

(c)     The entry of a decree of judicial dissolution pursuant to the Act.

### 11.2     Winding Up

Upon the dissolution of the Company, the Company· shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors pursuant to the appropriate provisions of the Act and the procedures set forth in this Article XI.

### 11.3     Control of Winding Up

The Manager shall have all the rights, duties and responsibilities associated with winding up the Company's affairs.  The Manager shall determine the time, manner, and terms of the sale of the Company assets, consistent with his fiduciary responsibilities and having due regard to the activity and conditions of the relevant market and general financial and economic conditions.

### 11.4     Distributions upon Dissolution

After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets will be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income, gain and loss allocations (in accordance with the provisions of Article VII, the Code and the Treasury Regulations) for the Company's taxable year during which liquidation occurs.

### 11.5     Limitations on Payments Made in Dissolution

Except as otherwise specifically provided in this Agreement, each Member will be entitled to look only to the assets of the Company for the return of his or her positive Capital Account balance and will have no recourse for his or her Capital Contribution and/or share of Net Profits against the Manager or any other Member except as provided in Article XII.

### 11.6     Certificates

The Manager shall file with the California Secretary of State a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

## XII.   INDEMNIFICATION

### 12.1     Indemnification of Members and Agents

The Company shall defend, indemnify and hold harmless the Manager and any Member for all acts and omissions taken in such capacity against all judgments, settlements, penalties, fines, or expenses and other liabilities of any kind to the fullest extent permitted by applicable law (collectively, "Liabilities") incurred as a result of acting in that capacity arising because such Manager or Member was or is a party, or is threatened to be made a party, to any threatened, pending, or completed action, suit, proceeding or administrative or regulatory action.

36

In addition, the Company is authorized to defend, indemnify and hold harmless any person who is or was a Manager, officer, employee or agent of the Company or who is or was serving, at the request of the Company, as a manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise ("Agent") against all Liabilities arising because such Agent was or is a party, or is threatened to be made a party, to any threatened, pending, or completed action, suit, proceeding or administrative or regulatory action with respect to any acts or omissions of such Agent while acting in that capacity. This indemnity shall only be granted in each specific incidence upon the approval of the Majority in Interest pursuant to Section 5.3 hereof.

The foregoing indemnities shall apply to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

# XIII. MISCELLANEOUS

### 13.1    Complete Agreement

This Agreement, the Articles, and the Plan constitute the complete and exclusive statement of agreement among the Members and the Company with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements among the parties. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control. To the extent that any provision of the Plan conflicts with any provision of this Agreement, this Agreement shall control.

### 13.2    Binding Effect

Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

### 13.3    Usage; Headings; Construction

All pronouns are deemed to refer to the masculine, feminine or neuter, singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Person relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion is to be implied by virtue of the fact that this Agreement was prepared by or at the request of the Company or a particular Member or his or her counsel.

### 13.4    Governing Law; Jurisdiction

This Agreement and all matters relating to its execution, interpretation, performance and enforcement shall be governed by the laws of the State of California relating to contracts made

37

and to be performed within such State, without giving effect to any conflicts of laws principles that would result in the application of the law of any other jurisdiction.

The Company and each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California with respect to any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement.  Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 13.9 of this Agreement, and that when so made will be as if served upon him or her personally within the State of California.  The Company and each Member agrees that venue for any action shall be in the Superior Court of California, County of Monterey, and nowhere else.

### 13.5   Severability

If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, such finding shall not affect the other terms or provisions hereof or the whole of this Agreement.  Further, the parties expressly request that the court modify the term or provision to the extent necessary in the court's opinion to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreements of the parties set forth herein.

### 13.6   Notices

Whenever "Notice" is required or permitted to be given under this Agreement, the Notice shall be in writing and delivered to the intended recipient either personally, by a nationally recognized courier service, an electronic mail message or facsimile transmission to the recipient's Notice Address.  Notice shall be deemed to be effectively "Given" only if addressed to such Notice Address and (a) when a paper copy is physically delivered to the intended recipient, (b) if a Notice is transmitted by facsimile transmission, at the time shown on a confirmation of successful transmission of all pages sent generated by the sender's facsimile equipment, (c) if a Notice is sent by messenger or express courier service, at the time shown on the delivery receipt generated by the service, or (d) if a Notice is sent by electronic mail, at the time of transmission shown in the sender's electronic mail program unless the recipient demonstrates that the transmission was received by its equipment at a different time.

### 13.7   Amendments

This Agreement shall not be amended except in a writing approved in accordance with Section 5.3 hereof

### 13.8   No Interest in Company Property: Waiver of Action for Partition

No Member or Assignee has any interest in specific property of the Company. Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 72 of 87

### 13.9     Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which will constitute one and the same instrument. Any signature page of any counterpart, or any electronically transmitted version thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement.

### 13.10     No Effect on Pre-existing Transactions

The omission in this Agreement of provisions that were contained in the Original Operating Agreement or the modification of any such provisions by this Agreement shall not affect the validity of any actions taken prior to the Effective Date pursuant to the Original Operating Agreement.

### 13.11     Effectiveness and Adoption of Agreement

This Amended and Restated Operating Agreement shall be binding on all Members when the Bankruptcy Court enters its order confirming the Plan under Section 1129 of the Bankruptcy Code as provided by Section 1141(a) of the Bankruptcy Code, regardless of whether any Original Member or Additional Member accepted or objected to the Plan, and shall become effective on the Effective Date.

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 73 of 87

## EXHIBIT A

| Name | No. of Units | Percentage Interest | Effective Date Capital Acct. Bal. |
|---|---|---|---|
| **Class 1-A Interests** | | | |
| Al Valles Investments, LLC | 510 | 72.28% | $6,147,186 |
| Douglas & Terry Hogeman Trust | 17 | 1.79% | 151,976 |
| James Knoth | 10 | 1.38% | 117,669 |
| Kraig T. Klaur Family Ltd. Partnership | 200 | 14.09% | 1,198,250 |
| Kraig T. Klaur IRA | 50 | 3.60% | 305,812 |
| Kurt Nicholson | 10 | 1.38% | 117,669 |
| **Class 1-B Interests** | | | |
| Jason Noble | 24 | 2.87% | 244,437 |
| MAB, LLC | 12 | 1.44% | 122,213 |
| John L. and Jean Barrett | 10 | 1.18% | 100,000 |
| Totals | 845 | 100.00% | $8,505,202 |

## MEMBER NOTICE ADDRESSES

| Member Name | Notice Address |
|---|---|

**Class 1-A Interests**

Al Valles Investments, LLC

Douglas & Terry Hogeman Trust

James Knoth

Kraig T. Klaur Family Ltd. Partnership

Kraig T. Klaur IRA

Kurt Nicholson

**Class 1-B Interests**

Jason Noble

40

Jason Noble

MAB, LLC

Joe Bowman

John L. and Jean Barrett

# EXHIBIT B

## Legal Description of Company Real Property

# EXHIBIT C

# AMENDED AND RESTATED TERM PROMISSORY NOTE

**[Effective Date of Plan]**

**[Claim Amount as of Effective Date]**

For value received, the undersigned Valles & Associates, LLC, a California limited liability company, with an address of 817 Industrial Drive, Suite A, Hollister, California 95023, ("Borrower"), promises to pay to the order of Pacific Capital Bank, N.A., a national banking association, doing business as San Benito Bank with an address of c/o Loan Services, PO Box 60654, Santa Barbara, California 93160-0654 (together with its successors and assigns, the "Bank"), the principal amount of [CLAIM AMOUNT ON EFFECTIVE DATE] on or before [20TH DAY OF 60th MONTH AFTER EFFECTIVE DATE] (the "Maturity Date"), as set forth below, together with interest from the date hereof on the unpaid principal balance from time to time outstanding until paid in full. The Borrower shall pay consecutive monthly installments of principal and interest, as follows:: $13,131.87 on [TWENTIETH OF MONTH AFTER EFFECTIVE DATE], and the same amount (except the last installment which shall be the unpaid balance) on the 20th day of each month thereafter. The aggregate principal balance outstanding shall bear interest thereon at a per annum rate equal to Seven and One-Half Percent (7.50%).

Principal and interest shall be payable at the Bank's main office or at such other place as the Bank may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated monthly on the basis of a 360-day year based on twelve (12) thirty (30) day months except that interest due and payable for a period of less than a full month shall be calculated by multiplying the actual number of days elapsed in such period by a daily rate based on said 360-day year.

At the option of the Bank, this Note shall become immediately due and payable without notice or demand upon the occurrence at any time of any of the following events of default (each, an "Event of Default"): (1) default of any liability, obligation or undertaking of the Borrower to the Bank hereunder, including, without limitation, failure to pay in full and when due any installment of principal or interest in connection with the loan evidenced by this Note continuing for 10 days with respect to the payment of money or continuing for 30 days with respect to any other default; (2) failure of the Borrower to maintain aggregate collateral security with a Value (as hereafter defined) of at least 25% greater than the total of principal and interest outstanding under this Note at any particular time (calculated as hereafter set forth), which failure continues for 30 days; (3) if any statement, representation or warranty hereafter made by the Borrower in connection with the loan evidenced by this Note or in any supporting financial statement of the Borrower shall prove to have been false in any material respect when made; (4) the liquidation, termination or dissolution of Borrower, or the merger or consolidation of Borrower into another entity, or its ceasing to carry on actively its business or the appointment of a receiver for its property; (5) the making by the Borrower of an assignment for the benefit of creditors or the granting by the Borrower of a trust mortgage for the benefit of creditors; (6) the service upon the Bank of a writ in which the Bank is named as trustee of the Borrower; (7) a judgment or judgments for the payment of money shall be rendered against the Borrower that would materially adversely affect the Value of any security for this Note or the Bank's interest therein, and

any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; or (8) any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any property which is security for the loan evidenced by this Note which is not released within thirty (30) days after issuance or attachment thereof.

For all purposes of this Note and any related Loan Documents, "Value" shall mean the value established by the most recent appraisal of the subject collateral by HOW TO SPECIFY APPRAISER, provided that such appraisal is dated less than one hundred twenty (120) days before or after the date on which Value is to be determined.

Any payments received by the Bank on account of this Note shall be applied, first, to accrued and unpaid interest; second, to the unpaid principal balance hereof; third to any costs, expenses or charges then owed to the Bank by the Borrower. At any time that an Event of Default has occurred and is continuing, the Borrower hereby authorizes the Bank to charge any deposit account which the Borrower may maintain with the Bank for any payment required hereunder without prior notice to the Borrower.

If, pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. More specifically, if from any circumstances whatsoever, fulfillment of any provision of this Note or any other Loan Document executed and delivered in connection with this Note, at the time performance of such provision becomes due, would exceed the limit on interest then permitted by any applicable usury statute or any other applicable law, the Bank may, at its option (a) reduce the obligations to be fulfilled to such limit on interest, or (b) apply the amount in excess of such limit on interest to the reduction of the outstanding principal balance of the obligations, and not to the payment of interest. with the same force and effect as though Borrower had specifically designated such sums to be so applied to principal and Bank had agreed to accept such extra payments(s) as a prepayment, so that in no event shall any exaction be possible under this Note or any other loan document that is in excess of the applicable limit on interest. It is the intention of Borrower and Bank that the total liability for payments in the nature of interest shall not exceed the limits imposed by any applicable state or federal interest-rate laws. The provisions of this paragraph shall control every other provision of this Note, and any provision of any other loan document in conflict with this paragraph.

The Borrower represents to the Bank that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.

The Borrower grants to the Bank a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Bank (or any of its banking or lending affiliates, or any bank acting as a participant under any loan arrangement between the Bank and the Borrower, or any third party acting on the Bank's behalf (collectively, the "Bank Affiliates") to the Borrower and any cash, securities" instruments or other property of the Borrower in the possession of

2

Case: 10-51813   Doc# 49-1   Filed: 03/11/11   Entered: 03/11/11 16:33:14   Page 79 of 87

the Bank or any Bank Affiliate, whether for safekeeping or otherwise, or in transit to or from the Bank or any Bank Affiliate (regardless of the reason the Bank or Bank Affiliate had received the same or whether the Bank or Bank Affiliate has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower to the Bank or any Bank Affiliate hereunder and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower to the Bank or any Bank Affiliate at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank or any Bank Affiliate.

No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Bank, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower, regardless of the time, order or place of signing, waives presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral.

The Borrower agrees to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 3.0% plus the rate provided for herein. If any payment due under this Note (other than the balance due on maturity or any accelerated balance of this Note) is unpaid for 15 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Bank's other remedies on account thereof), a late charge equal to the greater of $10.00 or 10.0% of such unpaid amount.

This Note shall be binding upon the Borrower and upon its successors, assigns and legal representatives, and shall inure to the benefit of the Bank and its successors, endorsees and assigns. The Borrower waives presentment, demand, protest, notice of dishonor, notice of protest and all other notices and demands of every kind, and all suretyship defenses of any kind, in each case that would otherwise be available in connection with this Note including, without limitation, any right (whether now or hereafter existing) to require the holder hereof to first proceed against the Borrower, or any guarantor, or any security.

The Borrower further waives, to the extent permitted by law, any and all rights and defenses that it may have because the debt evidenced by this Note is secured by real property: this means, among other things, that: (i) the Bank may collect from the Borrower, without first foreclosing on any real or personal property collateral pledged by the Borrower; and (2) if the Bank forecloses on any real property collateral pledged by the Borrower, then the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price. The foregoing sentence is an unconditional and irrevocable waiver of any rights and defenses the Borrower may have because the underlying debt is secured by real property. These rights and defenses being waived by the Borrower include, but are not limited to, any rights or defenses based

3

upon Sections 580a, 580b, 580d or 726 of the California Code of Civil Procedure. Without limiting the generality of the foregoing or any other provision hereof, the Borrower further expressly waives to the extent permitted by law any and all rights and defenses, including without limitation any rights of subrogation, reimbursement, indemnification and contribution, which might otherwise be available to the Borrower under California Civil Code Sections 2822, 2787 to 2855, inclusive, 2899 and 3433, or under California Code of Civil Procedure Sections 580a, 580b, 580d and 726, or any such section.

In the event that, at any time, a surety is liable upon only a portion of the Borrower's obligations under this Note and the Borrower provides partial satisfaction of any such obligation(s), the Borrower hereby waives any right it would otherwise have, under Section 2822 of the California Civil Code, to designate the portion of the obligations to be satisfied. The designation of the portion of the obligation to be satisfied shall, to the extent not expressly made by the terms of this Note, be made by the Bank rather than Borrower.

The liabilities of the Borrower and any guarantor of this Note are joint and several; provided, however, the release by the Bank of the Borrower or anyone or more guarantors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any guarantor of this Note are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Bank. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Bank of the person from whom contribution is sought have been satisfied in full. The release or compromise by the Bank of any collateral shall not release the Borrower on account of this Note.

A photographic or other reproduction of this Note may be made by the Bank, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

The Borrower will from time to time execute and deliver to the Bank such documents, and take or cause to be taken, all such other further action, as the Bank may reasonably request in order to effect and confirm or vest more securely in the Bank all rights contemplated by this Note or any other loan documents related hereto (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in any collateral securing this Note or to comply with applicable statute or law.

This Note is delivered to the Bank at one of its offices in California and shall be governed by the laws of the State of California.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer of agent of the Borrower or the Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or the Bank at the address set forth in this Note or at the address which any party may from time to time designate by written notice to the other party.

The Borrower acknowledges that the Bank is entitled to a minimum interest charge of $75.00. The Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in California, over any suit, action or proceeding arising out of or relating to this Note. The Borrower

4

irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.

<u>Due on Sale or Transfer</u>. Bank may, at it option, declare immediately due and payable all sums secured by one or more deed of trusts provided by Borrower to secure this Note upon the sale or transfer, without the Bank's prior written consent, of all or any part of the real property covered by any such deed of trust, or any interest in such real property. A "sale or transfer" means the conveyance of the such real property or any right, title or interest therein; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, option contract, or by sale, assignment or transfer of any beneficial interest in or to any land trust holding title to such real property, or by any other method of conveyance of a real property interest. A "sale or transfer" also includes any change in ownership, in a single or series of related transactions, of more that 50% of the voting interests of Borrower. This option shall not be exercised by Bank if such exercise is prohibited by applicable law.

IN WITNESS WHEREOF, this Note executed and delivered as of the date written in the caption of this Note.

VALLES & ASSOCIATES, LLC,
A California limited liability company,


By: _____
_____

Al Valles,
Manager

5

# EXHIBIT D

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 10-51813 |
| VALLES & ASSOCIATES, LLC, | Chapter 11 |
| Debtor | **QUARTERLY POST-CONFIRMATION REPORT OF REVESTED DEBTOR** |
| | For the quarter ending _____ [1] |

The Revested Debtor hereby submits the following post-confirmation report for this calendar quarter:

1.  Date of Entry of Order Confirming Plan                                    _____

    Cash balance at beginning of quarter:
    Total receipts during quarter:
    Total disbursements during quarter:
    Cash balance at end of quarter:                                           _____

3.  Payments made pursuant to Plan
    Total paid this quarter:                                                  _____

    Total payments to be made pursuant to Plan:
    Cumulative paid to date:
    Balance remaining to be made under Plan:                                  _____

    <u>As of the end of this reporting period,</u>                            Yes          No

4.  Are all payments required by the confirmed plan current at this           ____         ____
    time?  [If not, attach explanatory statement identifying payments
    no made (by creditor, amount and date due), reason for
    nonpayment, and an estimated date as to when payments will be
    brought current.]

5.  Do you currently anticipate a circumstance/event which will               ____         ____
    cause an interruption or cessation of payments or other
    performance under the plan? [If so, attach an explanatory
    statement.]

6.  Have quarterly fees due to the United States Trustee to the date          ____         ____
    of this report been paid pursuant to 28 U.S.C. §1930(a)(6) and
    the plan?

---

[1] First Report shall be filed for the portion of the calendar quarter from date of confirmation to the end of the quarter, and subsequent reports shall be filed at the expiration of each calendar quarter thereafter until dismissal, conversion or entry of a final decree closing the case.  Reports shall be filed with the court and served on the UST not later than the last day of the month after expiration of the reported period.

**EXHIBIT D**

7.    Have all motions, contested matters, and adversary proceedings been finally resolved? [If not, for each such pending motion, contested matter or adversary proceeding, please identify the parties and nature of the dispute and state the anticipated date of resolution.]   ____   ____

8.    Has the order confirming the plan become nonappealable?   ____   ____

9.    Have deposits, if any, required by the plan been distributed pursuant to the plan?  [If so, please explain.]   ____   ____

10.    Has any property proposed by the plan to be transferred been transferred pursuant to the plan?   ____   ____

11.    Does any property remain to be transferred pursuant to the plan? [If so, please identify each such property and the anticipated date of transfer pursuant to the plan.]   ____   ____

12.    Has the Revested Debtor(s) or the successor to the Debtor(s) assumed the business or the management of the property dealt with by the plan?   ____   ____

13.    Anticipated date of motion for final decree:   ____   ____

I declare under penalty of perjury that the statements set forth above are true and accurate.

Dated: _____

_____
Albert Valles, Responsible Individual.

ADDRESS
PHONE

---

**EXHIBIT D**

# EXHIBIT E

## EXHIBIT E

### EXECUTORY CONTRACTS TO BE ASSUMED

1. Real Estate Lease dated February 1, 2010, between the Debtor and Gold's Gym Hollister, as modified through the Effective Date.

2. Real Estate Lease dated April 1, 2010, between the Debtor and Java Express LLC.

3. Property and Liability Insurance policy number 8379489 with Golden Eagle Insurance Company.

**EXHIBIT E**