1　WILLIAM C. LEWIS, ESQ., BAR NO. 77193
　　DAVID S. CAPLAN, ESQ., BAR NO. 74219
2　LAW OFFICES OF WILLIAM C. LEWIS
　　510 Waverley Street
3　Palo Alto, CA 94301-2009
　　Telephone: (650) 322-3300
4　Facsimile: (650) 327-9720

5　Attorneys for Debtor,
　　Valles & Associates, LLC

6

7　　　　　　　　UNITED STATES BANKRUPTCY COURT

8　　　　　　　　NORTHERN DISTRICT OF CALIFORNIA

9　　　　　　　　　　　SAN JOSE DIVISION

10

11　　　　　　　　　　　　　　　　　Case No. 10-51813

　　In re:　　　　　　　　　　　　　CHAPTER 11
12
　　　　VALLES & ASSOCIATES, LLC,　　**DECLARATION OF DAVID S. CAPLAN**
13　　　　　　　　　　　　　　　　　**RE POST-HEARING MODIFICATIONS OF**
　　　　　　　　　　　　　Debtor　　**PLAN AND DISCLOSURE STATEMENT**
14
　　　　　　　　　　　　　　　　　Disclosure Statement Hearing:
15
　　　　　　　　　　　　　　　　　Date:　　　　April 15, 2011
16　　　　　　　　　　　　　　　　Time:　　　　2:00 p.m.
　　　　　　　　　　　　　　　　　Courtroom:　 3020
17　　　　　　　　　　　　　　　　Location:　　U.S. Courthouse & Federal Bldg.
　　　　　　　　　　　　　　　　　　　　　　　280 South First Street
18　　　　　　　　　　　　　　　　　　　　　　San Jose, California
　　　　　　　　　　　　　　　　　Judge:　　　Hon. Arthur S. Weissbrodt
19

20　　　　　I, David S. Caplan, hereby declare:

21　　　　　1.　　I am Of Counsel to the Law Offices of William C. Lewis, counsel for the Debtor in

22　this case.

23　　　　　2.　　Concurrently with this declaration, the Debtor has filed its **Debtor's Amended**

24　**Chapter 11 Plan Dated as of April 15, 2011** ("Plan") and the related **Disclosure Statement** and

25　**Plan Supplement** (collectively, "Final Plan Documents").

26　　　　　3.　　The Final Plan Documents contain modifications to the forms of the Plan and related

27　documents that were attached to my declaration filed April 12, 2011 [Docket No. 57] and were

**DECLARATION OF DAVID S. CAPLAN RE POST-HEARING**
**MODIFICATIONS OF PLAN AND DISCLOSURE STATEMENT**

1 before the Court at the hearing on April 15, 2011 at which the Court approved the Debtor's

2 disclosure statement, subject to filing of the approved forms and a proposed form of order.

3      4.     Attached hereto are comparison (redline) copies of the Final Plan Documents

4 showing the changes from the forms attached to my April 12, 2011, declaration. Comparison copies

5 are attached only of those documents that were changed since the hearing on the Disclosure

6 Statement. Specifically, comparisons of the following documents are attached:

7     Exhibit                        Document

8        A     Plan
       B     Disclosure Statement

9        C     Plan Exhibit A – new Pacific Capital deed of trust
       D     Plan Exhibit C – new Pacific Capital note

10        E     Plan Exhibit D – form of personal guaranty of Pacific Capital loan

11      5.     The modifications reflected in the attached comparisons are the results of further

12 review of the documents by the Debtor's management and discussions with certain creditors

13 regarding the treatment of their claims. None of the creditors has made a formal commitment to

14 accept the Plan based on the latest changes, but the Debtor believes that substantially all creditors

15 will consent to confirmation of the Plan as modified by the attached. In addition, the Debtor

16 believes that the changes in treatment of claims make the Plan more favorable to the affected

17 creditors than the earlier version. The Debtor also believes that none of the changes affecting one

18 creditor have any impact on other creditors or parties in interest.

19     I declare under penalty of perjury that the foregoing is true of my own knowledge and that

20 this declaration was executed in Chapel Hill, North Carolina, on May 19, 2011.

21

22                      /s/ David S. Caplan
                     David S. Caplan

23

24

25

26

**DECLARATION OF DAVID S. CAPLAN RE POST-HEARING
MODIFICATIONS OF PLAN AND DISCLOSURE STATEMENT**        2

# EXHIBIT A

WILLIAM C. LEWIS, ESQ., BAR NO. 77193
DAVID S. CAPLAN, ESQ., BAR NO. 74219
LAW OFFICES OF WILLIAM C. LEWIS
510 Waverley Street
Palo Alto, CA 94301-2009
Telephone: (650) 322-3300
Facsimile: (650) 327-9720

Attorneys for Debtor,
Valles & Associates, LLC

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

In re:

VALLES & ASSOCIATES, LLC,

Debtor

Case No. 10-51813

CHAPTER 11

**DEBTOR'S AMENDED CHAPTER 11 PLAN DATED AS OF APRIL ——,15, 2011**

     Valles & Associates, LLC, a California limited liability company, and the debtor and debtor in possession in this Chapter 11 case, hereby proposes the following plan for restructuring of its financial affairs:

# TABLE OF CONTENTS

1. DEFINITIONS ................................................................. 11

   1.1 Defined Terms ......................................................... 11

   1.2 Undefined Terms ..................................................... 44

2. CLASSIFICATION OF CLAIMS AND INTERESTS ............... 44

   2.1 Secured Claims ......................................................... 44

     (a) Class A-1 (Pacific Capital) ......................................... 44

     (b) Class A-2 (Second Lien Holders) .............................. 55

     (c) Class A-3 (Real Property Taxes) ............................... 5

   2.2 General Unsecured Claims ........................................ 5

     (a) Class B-1 (Administrative Convenience Claims) ...... 5

     (b) Class B-2 (Unsecured Guarantor Claims) ................ 5

     (c) Class B-3 (Other Unsecured Claims) ........................ 5

   2.3 Membership Interests (Class C) ............................... 66

     (a) Class C-1 (Class A Members) .................................. 6

     (b) Class C-2 (Class B Members) .................................. 6

     (c) Class C-3 (Class C Members) .................................. 6

3. TREATMENT OF UNCLASSIFIED CLAIMS ...................... 6

   3.1 Administrative Claims ............................................. 6

   3.2 Priority Governmental Claims .................................. 6

4. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS .... 6

   4.1 Secured Claims ......................................................... 7

     (a) Class A-1 (Pacific Capital) ......................................... 7

     (b) Class A-2 (Second Lien Holders) .............................. 8

     (c) Class A-3 (Real Property Taxes) ............................... 8

   4.2 Unsecured Claims ..................................................... 99

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 5 of 87

|  |  |  |
|---|---|---|
| (a) | Class B-1 (Administrative Convenience Claims) | 99 |
| (b) | Class B-2 (Guarantor Claims) | 1010 |
| (c) | Class B-3 (Other Unsecured Claims) | 1010 |
| 4.3 | Membership Interests (Class C) | 1010 |
| (a) | Class C-1 (Class A Members) | 1010 |
| (b) | Class C-2 (Class B Members) | 1111 |
| (c) | Class C-3 (Class C Members) | 1111 |
| 5. | MEANS FOR IMPLEMENTATION OF THE PLAN | 11 |
| 5.1 | Amendment of Organizational Documents | 11 |
| 5.2 | Mechanics of Issuing New Membership Interests | 11 |
| 5.3 | Disputed Claims | 12 |
| (a) | Reserve for Disputed Claims | 12 |
| (b) | Distributions on Disputed Claims | 1212 |
| 5.4 | Limitations on Unpaid Membership Interests | 1313 |
| (a) | Kraig Klauer Family Limited Partnership | 1313 |
| (b) | Douglas and Terry Hogeman Trust | 1313 |
| 5.5 | Release of Liens and Interests | 1313 |
| 5.6 | Post-confirmation U.S Trustee Reports and Fees | 1414 |
| 5.7 | Post-confirmation Notices | 1414 |
| 5.8 | Bar Date for Administrative Claims | 1414 |
| 5.9 | Section 1145 Exemption | 1414 |
| 6. | EFFECTS OF CONFIRMATION | 1515 |
| 6.1 | Plan Replaces Pre-Confirmation Obligations | 1515 |
| 6.2 | Discharge of Debtor | 1515 |
| 6.3 | Creditors Restrained from Enforcement Actions | 1515 |
| 7. | DEFAULT AND REMEDIES | 1616 |
| 7.1 | Event of Default Defined | 1616 |

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 6 of 87

(a)  Monetary Default.................................................................................1616

(b)  Non-Monetary Default ........................................................................1616

(c)  Notice of Request for Court Determination ......................................1616

(d)  Remedies upon an Event of Default ...................................................1717

(e)  Effect of Conversion to Chapter 7 .....................................................1717

8.  RETENTION AND SETTLEMENT OF CLAIMS .......................................1717

8.1  Retention and Enforcement of Claims ...............................................1717

8.2  Settlement of Objections to Claims ....................................................1717

8.3  Stale Checks and Claim Waivers ........................................................1818

9.  EXECUTORY CONTRACTS AND LEASES ...............................................1818

9.1  Assumption or Rejection of Contracts ...............................................1818

9.2  Rejection Claims Bar Date ..................................................................1818

10.  REVESTING OF PROPERTY .....................................................................1818

11.  RETENTION OF JURISDICTION...............................................................1919

12.  REQUEST FOR CONFIRMATION.............................................................1919

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 7 of 87

# 1.  DEFINITIONS

## 1.1  Defined Terms

The following definitions apply in this Plan and the related Disclosure Statement, as each document may be amended from time to time, except to the extent that any of the following definitions is superseded by a revised definition in such an amendment.

"Affiliate" means an entity which is an affiliate of a party in interest within the meaning of Section 101(2) of the Bankruptcy Code and every partnership and joint venture in which such entity is a general partner or joint venturer.

"Allowed Claim" or "Allowed Interest" means a claim against, or equity interest in, the Debtor to the extent that:

A.      If the claim or interest arose or is deemed to have arisen on or before the Filing Date, (1) proof of the claim or interest either is timely filed or is deemed filed under Code §1111(a) or Rule 3003(b)(2), and (2) the claim or interest either is not the subject of a timely filed objection or is allowed by a Final Order; or

B.      If the claim arose after the Filing Date and is not deemed to have arisen on or before such date, (1) the claim is of a kind that can be voluntarily paid from the Debtor's estate without specific Bankruptcy Court approval and is so paid or (2) the claim has been allowed by a Final Order; and

C.      Such claim is not subject to disallowance pursuant to §502(d) of the Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of California.

"Bar Date" means a date fixed as the last date for filing proofs of claims.

"Cash" means cash and cash equivalents including, but not limited to, checks and other similar forms of payment or exchange.

"Claims Reserve" means the federally insured, interest bearing deposit account to be established by the Debtor and into which shall be deposited all funds being reserved until resolution

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 8 of 87

of Disputed Claims pursuant to Section 5.3(a) hereof.

"Code" means the Bankruptcy Code contained in Title 11 of the United States Code.

"Confirmation" means entry of the Confirmation Order.

"Confirmation Hearing" means the hearing conducted by the Bankruptcy Court at which the Plan is confirmed.

"Confirmation Notice" means the notice sent to creditors in compliance with Rule 2002 informing them that the Plan has been confirmed.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan.

"Debtor" means Valles & Associates, LLC, a California limited liability company.

"Disputed Claim" means a claim against the Debtor (a) as to which a proof of claim is filed which does not assert a claim to a fixed, liquidated sum, or (b) to which an objection has been filed which neither is the subject of a Final Order nor has been withdrawn.

"Distributions" means the payments of Cash to be distributed hereunder to holders of Allowed Claims.

"Effective Date" means the fifteenth day after Confirmation or such other date as the Debtor shall fix which shall be not more than thirty days following Confirmation.

"Final Order" means an order as to which (a) any appeal or petition for writ of certiorari that has been filed has been finally determined or dismissed, or (b) the time for appeal has expired and a notice of appeal has not been filed.

"First DOT" means that **Deed of Trust, Security Agreement, Assignment of Leases, Rents and Profits, and Fixture Filing** recorded on May 3, 2007, in the San Benito County real estate records as instrument number 2007-0005822 of which Pacific Capital is beneficiary.

"First Note" means that **Term Note** dated April 20, 2007, in the original principal amount of $1,777,000, and made by Alron Properties and Investments, LLC, Ronald Klauer, Jr., and Albert Valles, Jr., in favor of Pacific Capital.

"Guarantees" means personal guarantees of the Replacement Note made by Albert Valles,

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 9 of 87

Jr., and Kraig Klauer, Sr.,the Guarantors, substantially in the forms attached to the Plan Supplement as Exhibits ____ and ____.Exhibit D.

"Guarantors" means, collectively, Albert Valles, Jr., and Ronald Klauer, Jr.

"Impaired Claim" means a claim against the Debtor that arose or is deemed to have arisen prior to Confirmation that is not an Unimpaired Claim.

"LBR" means the Local Bankruptcy Rules of the Bankruptcy Court.

"New First DOT" means the **Deed of Trust, Security Agreement, Assignment of Leases, Rents and Profits, and Fixture Filing** in the form included in the Plan Supplement as Exhibit A.

"Operating Agreement" means that **Operating Agreement for Valles & Associates, LLC**, made as of November 6, 2007.

"Pacific Capital" means Pacific Capital Bank, N.A. a national banking association, dba San Benito Bank and dba South County Bank, in its capacity as holder of the First Note.

"Petition Date" means the date on which the petition to commence this case was filed.

"Plan" means this **Debtor's Amended Chapter 11 Plan Dated as of April ___,15, 2011**, together with any modifications and amendments thereto.

"Plan Interest" means interest earned on funds held on deposit in the Claims Reserve during the period for which such Plan Interest is calculated.

"Plan Supplement" means the **Supplement to Debtor's Amended Chapter 11 Plan Dated as of March 11April 15, 2011** filed concurrently herewith, together with any modifications thereto.

"Real Property" means that parcel of real property and the improvements thereon consisting of approximately 7.4 acres located in the city of Hollister, California, known by the addresses of 1525, 1575 and 1605 Cushman Road and identified the San Benito County Assessor's Offices as parcel numbers 057-230-001, 057-230-002, 057-230-003 and 057-230-019.

"Replacement Note" means the promissory note to be made by the Debtor and delivered to Pacific Capital in replacement of the Term Note pursuant to this Plan, substantially in the form attached to the Plan Supplement as Exhibit C.

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 10 of 87

"New First DOT" means the **Deed of Trust, Security Agreement, Assignment of Leases, Rents and Profits, and Fixture Filing** in the form included in the Plan Supplement as Exhibit A.

"Restated Operating Agreement" means the **Amended and Restated Operating Agreement of Valles & Associates, LLC,** in the form included in the Plan Supplement as Exhibit B

"Rules" means the Federal Rules of Bankruptcy Procedure.

"Second Lien Holders" means (a) MAB, LLC, and (b) Jason Everett Noble and Carolyn R. Cullumber Noble, as Trustees of the Noble Revocable Living Trust, UTA dated March 15, 1999, in their capacities as beneficiaries of the Second DOT.

"Second DOT" means that Deed of Trust executed by Albert Valles and Tiffany Valles, husband and wife, currently held by the Second Lien Holders and recorded on September 13, 2007, in the San Benito County real estate records as instrument number 2007-0011241.

"Second Lien Holders" means (a) MAB, LLC, and (b) Jason Everett Noble and Carolyn R. Cullumber Noble, as Trustees of the Noble Revocable Living Trust, UTA dated March 15, 1999, in their capacities as beneficiaries of the Second DOT.

"Unimpaired Claim" means a claim that is treated as not impaired under this Plan.

**1.2 Undefined Terms**

A term used, but not defined, herein and defined in the Code or the Rules has the meaning given to that term in the Code or the Rules.

## 2. CLASSIFICATION OF CLAIMS AND INTERESTS

All claims (except claims treated under Article III) and interests are placed in the following classes:

**2.1 Secured Claims**

**(a) Class A-1 (Pacific Capital)**

Class A-1 consists of the claim held by Pacific Capital to the extent that it is secured by a legally enforceable interest in the Real Property pursuant to the First DOT.

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 11 of 87

1        **(b)     Class A-2 (Second Lien Holders)**

2              (i)    Class A-2A consists of the claim held by the Jason & Carolyn Noble Trust to

3 the extent that it is secured by a legally enforceable interest in the Real Property pursuant to the

4 Second DOT.

5              (ii)   Class A-2B consists of the claim held by MAB, LLC, to the extent that it is

6 secured by a legally enforceable interest in the Real Property pursuant to the Second DOT.

7        **(c)     Class A-3 (Real Property Taxes)**

8       Class A-3 consists of all claims (whether arising before or after the Petition Date) held by

9 San Benito County on account of real property taxes to the extent that they are secured by a legally

10 enforceable interest in the Real Property.

11 **2.2    General Unsecured Claims**

12        **(a)     Class B-1 (Administrative Convenience Claims)**

13       Class B-1 consists of all Allowed Claims other than claims that are entitled to priority under

14 §507(a)(1) or (8) of the Code and/or included in another class under this Plan that are in an amount

15 of $20,000 or less or whose holders agree, prior to the Effective Date, to reduce such claims to

16 $20,000.

17        **(b)     Class B-2 (Unsecured Guarantor Claims)**

18       Class B-2 consists of all nonpriority claims held or asserted by ~~parties who are~~ Albert Valles,

19 Jr., and/or Ronald Klauer, Jr., as co-debtors on ~~debts underlying~~ the ~~claims in Class A-1 and A-2 on~~

20 ~~account of their obligations as such co-debtors~~ Term Note.

21        **(c)     Class B-3 (Other Unsecured Claims)**

22              (i)    Class B-3A consists of the Allowed Claim held by Joe Bowman, Jr. in the

23 amount of $80,000.

24              (ii)   Class B-3B consists of the Allowed Claim held by John L. and Jean Barrett in

25 the amount of $100,000.

26

**2.3**     <u>**Membership Interests (Class C)**</u>

      **(a)**     **Class C-1 (Class A Members)**

Class C-1 consists of membership interests in the Debtor that are identified in the Debtor's books and records as Class A membership interests within the meaning of the Operating Agreement.

      **(b)**     **Class C-2 (Class B Members)**

Class C-2 consists of membership interests in the Debtor that are identified in the Debtor's books and records as Class B membership interests within the meaning of the Operating Agreement.

      **(c)**     **Class C-3 (Class C Members)**

Class C-3 consists of the membership interests in the Debtor that are identified in the Debtor's books and records as Class C membership interests within the meaning of the Operating Agreement.

### 3.     <u>TREATMENT OF UNCLASSIFIED CLAIMS</u>

**3.1**     <u>**Administrative Claims**</u>

The holders of Allowed Claims entitled to priority under §507(a)(1) of the Code (administrative claims, including fees due under 28 U.S.C. §1930), other than claims included in Class A-3, shall receive Cash in the amount of such claims on the Effective Date or at such time and in such amount as the Debtor and the holder of any such claim might agree. If such a claim has not been allowed on the Effective Date, the holder shall receive such payment within thirty days after the Debtor receives notice that such claim is an Allowed Claim.

**3.2**     <u>**Priority Governmental Claims**</u>

Allowed Claims entitled to priority under §507(a)(8) of the Code (unsecured claims by governmental units), if any, shall be paid in full not later than fourteen (14) days after the Effective Date.

### 4.     <u>TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS</u>

Holders of Allowed Claims in the following classes shall receive the treatment set forth in this Article on account, and in complete satisfaction of, all such Allowed Claims.

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 13 of 87

**4.1    Secured Claims**

    (a)    **Class A-1 (Pacific Capital)**

        Class A-1 is impaired under this Plan.  On account of its Allowed Claim in Class A-1, Pacific Capital shall receive:

        (i)    In replacement of ~~any~~the Term Note and all obligations of the Debtor~~,~~ (if any), Albert Valles, Jr., and Ronald Klauer, Jr., on the Term Note, the execution and delivery to Pacific Capital of the Replacement Note and the Guarantees, plus performance thereunder;

        (ii)    Monthly installment payments on the Replacement Note of $13,131.87 each, commencing on the 20th day of the first month which begins after the Effective Date and continuing on the same day of each succeeding month until the 20th day of the 60th month which begins after the Effective Date, at which time all obligations of the Debtor under the Replacement Note shall be due and payable;

        (iii)    ~~A new~~Retention of Pacific Capital's lien on the Real Property by execution, delivery, acknowledgement and recording of the New First DOT, plus performance by the Debtor under the New First DOT, with such lien having the same effective date, validity, priority and, except as modified hereby, effect as Pacific Capital held immediately prior to the Petition Date pursuant to the First DOT.  In the event that the Debtor hereafter subdivides the Real Property into two or more parcels, the lien held by Pacific Capital pursuant to the New First Deed of Trust shall continue to encumber the entire Real Property as subdivided; and

        (iv)    A CLTA policy of title insurance issued by an issuer reasonably acceptable to Pacific Capital insuring that the lien created by the New First DOT has the same priority as the First DOT.

        Except as expressly preserved by this Plan, all other agreements, covenants and/or undertakings by the Debtor and the Guarantors pursuant or relating to the Allowed Claim in Class A-1 shall be cancelled and terminated as of the Effective Date~~.~~, including without limitation the

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 14 of 87

Term Note.  In addition, no acts, conditions or events on or prior to the Effective Date shall be grounds to declare the Debtor or the Guarantors to be in default under ~~its~~their respective obligations to Pacific Capital pursuant or relating to the Allowed Claim in Class A-1, and the Debtor ~~is~~and the Guarantors are not in default under such obligations as of the Effective Date.  From and after the Effective Date, the only obligations of the Debtor and the Guarantors to Pacific Capital ~~shall~~pursuant or relating to the Allowed Claim in Class A-1shall be those set forth herein, in the Replacement Note, the Guarantees and ~~in~~ the New First DOT.

    **(b)**    **Class A-2 (Second Lien Holders)**

    **(i)**    **Class A-2A (Jason & Carolyn Noble Trust)** – Class A-2A is impaired under this Plan.  On account of its Allowed Claim in Class A-2A, the Jason & Carolyn Noble Trust shall receive (a) a restated promissory note replacing the note previously issued to the trust in the amount of the trust's Allowed Claim as of the Effective Date, bearing interest at the rate of 6% per annum, compounded annually, being payable in a single payment due on the sixth annual anniversary of the Effective Date and (b) as security for such note, a restated deed of trust in substantially the form of the deed of trust previously granted in favor of the trust and others.  Such deed of trust shall be junior in priority to the New First DOT.

    **(ii)**    **Class A-2B (MAB, LLC)** – Class A-2B is impaired under this Plan.  On account of its Allowed Claim in Class A-2B, MAB, LLC shall receive a Class 1-B membership interest in the Debtor pursuant to the Restated Operating Agreement at a price of $10,000 of each such Allowed Claim for each Class 1-B membership interest unit, with the number of units being rounded down ~~ot~~to the next lower whole number, and with an initial capital contribution equal to the amount of MAB, LLC's Allowed Claim as of the Effective Date.

    **(c)**    **Class A-3 (Real Property Taxes)**

Class A-3 is impaired under this Plan.  On account of its Allowed Claim in Class A-3, San Benito County, California, shall receive:

    (i)    Retention ~~by~~of its lien on the Real Property;

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 15 of 87

1    (ii)    Interest on such Allowed Claim from the Effective Date of this Plan at the rate

2    provided therefor under applicable nonbankruptcy law in effect on the Effective Date;

3    (iii)    Payments on such Allowed Claim as follows:

4    (A)    A payment on such Allowed Claim in an amount equal to the

5    installment of property taxes for the 2010-2011 fiscal year that would have been due

6    on April 10, 2011 (plus any accrued interest thereon from April 10, 2011) had this

7    case not been commenced;

8    (B)    Payment of the balance of such Allowed Claim [plus interest

9    thereon as provided in subsection (ii)] in twenty (20) equal quarterly installments,

10    with such payments commencing on the last day of the first calendar quarter that

11    begins after the Effective Date and continuing on the same day of each calendar

12    quarter thereafter until paid in full; and

13    (C)    At the closing of any sale of all or substantially all of the Real

14    Property (or refinancing of the Allowed Claim in Class A-1), full payment of any

15    then-unpaid balance of such Allowed Claim and accrued but unpaid interest thereon

16    calculated in accordance with Subsection (ii). If the Real Property is hereafter

17    subdivided into two or more parcels, the Debtor shall pay a *pro rata* portion of the

18    then-unpaid balance of such Allowed Claim and accrued interest upon the closing of

19    the sale of all or substantially all of any individual parcel, with the proration based on

20    the proportion that the assessed value of the parcel sold bears to the assessed value of

21    the entire Real Property.

22  **4.2    Unsecured Claims**

23    **(a)    Class B-1 (Administrative Convenience Claims)**

24    Class B-1 is not impaired under this Plan. Each holder of an Allowed Claim in Class B-1

25  shall receive full payment of such claim on the Effective Date.

26

---

**(b) Class B-2 (Guarantor Claims)**

Class B-2 is impaired under this Plan. ~~No holder of a claim in Class B-2 shall receive any payment or other Distribution on its claim unless and until it actually makes a payment to the creditor on whose claim the holder is a co-debtor. When such a holder makes a payment on such a claim, such holder shall be subrogated to all the rights, security interests, and priorities of the creditor to whom the holder makes such payment. In the event and to the extent that, for some reason and contrary to the intent of this Plan, such holder is not subrogated with respect to the full amount of the claim paid by it, such holder shall receive Class 1-B membership interests in the Debtor pursuant to the Restated Operating Agreement in an amount equal to $10,000 of such non-subrogated amount for each Class 1-B membership interest unit~~No holder of a claim in Class B-2 shall receive any payment or other Distribution from the Debtor or its estate on account of its claim.

**(c) Class B-3 (Other Unsecured Claims)**

(i) **Class B-3A (Joe Bowman, Jr.) -** On account of his Allowed Claim in Class B-3A, Joe Bowman, Jr. shall receive Cash in the total amount of 25% of such Allowed Claim, payable not later than December 31, 2011.

(ii) **Class B-3B (John & Jean Barrett) -** On account of their Allowed Claim in Class B-3B, John and Jean Barrett shall receive Class 1-B membership interests in the Debtor pursuant to the Restated Operating Agreement in an amount equal to $10,000 of such claim for each Class 1-B membership interest unit, with the number of units being rounded down to the next lower whole number, and with an initial capital contribution equal to the amount of MAB, LLC's Allowed Claim as of the Effective Date.

**4.3   Membership Interests (Class C)**

**(a) Class C-1 (Class A Members)**

Class C-1 is impaired under this Plan. Each ~~holder~~unit of Class A Membership Interests under the Operating Agreement shall be converted into one unit of Class 1-A Membership Interests

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 17 of 87

under the Restated Operating Agreement.  Each such holder's capital account balance as of the Effective Date shall equal such holder's capital account balance as of January 1, 2011, calculated as required for federal income tax purposes.  Each holder of a Class A Membership Interest who does not reject this Plan shall be deemed to have approved the Restated Operating Agreement.

**(b)**      **Class C-2 (Class B Members)**

Class C-2 is impaired under this Plan.  Subject to <u>Section 5</u>.4 hereof, each unit of Class B Membership Interests under the Operating Agreement shall be converted into one unit of Class 1-A Membership Interests under the Restated Operating Agreement.  Each such holder's capital account balance as of the Effective Date shall equal such holder's capital account balance as of January 1, 2011, calculated as required for federal income tax purposes.  Each holder of a Class B Membership Interest who does not reject this Plan shall be deemed to have approved the Restated Operating Agreement.

**(c)**      **Class C-3 (Class C Members)**

Class C-3 is impaired under this Plan.  Each unit of Class C Membership Interests under the Operating Agreement shall be converted into one unit of Class 1-A Membership Interests under the Restated Operating Agreement.  Each such holder's capital account balance as of the Effective Date shall equal such holder's capital account balance as of January 1, 2011, calculated as required for federal income tax purposes.  Each holder of a Class C Membership Interest who does not reject this Plan shall be deemed to have approved the Restated Operating Agreement.

## 5.     <u>MEANS FOR IMPLEMENTATION OF THE PLAN</u>

**5.1**    <u>Amendment of Organizational Documents</u>

Confirmation of this Plan shall constitute approval of the Bankruptcy Court for amendment of the Operating Agreement to read as set forth in the Restated Operating Agreement.

**5.2**    <u>Mechanics of Issuing New Membership Interests</u>

The conversion of Allowed Claims in Classes A-2, B-2 and B-3B into Membership Interests in the Debtor pursuant to this Plan shall be deemed to have occurred automatically on the Effective

Date.  However, in order for each holder of such a claim to become a Member of the Debtor, such holder must execute the acknowledgement required by Section 4.4 of the Restated Operating Agreement; any such holder who does not execute such an acknowledgment shall be deemed to only have received an Economic Interest (within the meaning of the Restated Operating Agreement).

**5.3** **Disputed Claims**

    **(a)** **Reserve for Disputed Claims**

      When any Distribution is to be made to holders of claims under this Plan, the Debtor shall (i) as to Distributions payable in Cash, withhold in the Claims Reserve any amount that would be distributed to the holder of a Disputed Claim if it were an Allowed Claim and (ii) as to Distributions payable in Class 1-B membership interests in the Debtor, reserve on its organizational records the interests that would be distributed to the holder if its claim were an Allowed Claim.  The amount withheld shall be (i) an amount the Debtor and the holder of the Disputed Claim agree should be withheld, (ii) the Distribution that would have been made if the Allowed amount of the claim were (A) the amount claimed by the holder in its proof of claim filed or deemed filed in the Chapter 11 Case if such proof of claim asserts a fixed, liquidated sum or (B) the amount shown in the Debtor's Schedules filed pursuant to Fed. R. Bankr. P. 1007 if such amount is a fixed, liquidated sum and no proof of claim is filed, or (iii) the amount estimated by the Bankruptcy Court upon a motion brought on not less than fourteen days notice to the affected parties and a hearing under LBR 9014-1.  Such amount shall be retained in the Claims Reserve or reserved, as applicable, until the allowability of such claim is resolved.  After such claim is resolved, (x) any funds held in the Claims Reserve on account of such claim and not paid to the holder of the claim may be transferred to the Debtor's general accounts and used in the operation of its business and (y) any membership interests reserved on the Debtor's books and records and not allocated to such holder shall be released from reserve.

    **(b)** **Distributions on Disputed Claims**

      To the extent that a Disputed, contingent or unliquidated claim is determined to be an Allowed Claim after one or more Distributions have been made hereunder, then within 30 days after

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 19 of 87

the Debtor has notice that such a claim has become an Allowed Claim, the Debtor shall distribute to its holder consideration in an amount equal to (i) the Distribution the Debtor would have made to the holder if the claim had been an Allowed Claim at the time such distributions were made and (ii) with respect to Distributions payable in cash, Plan Interest on any distribution payable in Cash, accruing from the date each such Distribution would have been made.

**5.4**     **Limitations on Unpaid Membership Interests**

         **(a)**       **Kraig Klauer Family Limited Partnership**

In cancellation of the balance remaining due to the Debtor on the promissory note issued by the Kraig Klauer Family Limited Partnership for its membership interest in the Debtor, ~~the~~such partnership's Percentage Interest (as defined in the Restated Operating Agreement) shall be reduced from 20% to 19.6% and its number of Units shall be reduced from 200 to 196.

         **(b)**       **Douglas and Terry Hogeman Trust**

In cancellation of the balance remaining due to the Debtor on the promissory note issued by the Douglas and Terry Hogeman Trust for its membership interest in the Debtor, the trust's Percentage Interest (as defined in the Restated Operating Agreement) shall be reduced from 1.7% to 1.3%, and its number of Units shall be reduced from 17 to 13.

**5.5**     **Release of Liens and Interests**

Upon receipt of the full payment provided hereunder for any secured Allowed Claim (or upon the occurrence of any other event or condition which terminates a party's lien on or other interest in property of the Debtor), any party which has filed or recorded a notice, deed of trust, financing statement, or other public statement of a lien on or interest in assets of the Debtor shall file or record such notice, reconveyance, termination statement, or other public statement as is necessary or appropriate to evidence the termination of the lien or interest formerly held by such party. In addition, the Debtor is hereby appointed as the lawful attorney in fact for each party whose lien or interest is terminated under this Plan with full power and authority to execute, acknowledge, file and/or record on behalf of such holder any reconveyances, conveyances, notices, termination

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 20 of 87

statements, or other public statements necessary or appropriate to evidence termination of such party's lien or interest.

### 5.6     Post-confirmation U.S Trustee Reports and Fees

The Debtor shall pay any fees due pursuant to 28 U.S.C. §1930 for each quarter ~~which~~that ends after the Effective Date within 30 days following the end of each such quarter.  In addition, the Debtor shall file a report in the form attached as Exhibit ~~DE~~ to the Plan Supplement, and serve a copy thereof on the office of the United States Trustee, Region 17, not later than the last day of the month following the end of each quarter for which such fees are due.

### 5.7     Post-confirmation Notices

Except for notice of entry of the Confirmation Order, all notices required or permitted to be given to all creditors or other parties in interest pursuant to Rule 2002 shall be deemed appropriate and in compliance with such rule if given only to the Debtor, the U.S. Trustee, Pacific Capital, the Members of the Debtor, any parties who filed and served upon the Debtor requests for special notice as to matters relating to the Plan, and parties who, after Confirmation, serve upon the Debtor requests for copies of post-confirmation notices.

### 5.8     Bar Date for Administrative Claims

All parties who assert claims entitled to priority under §507(a)(1) of the Code (other than professionals employed by the Debtor) shall file requests for payment of such claims, and serve copies thereof on the Debtor, not later than sixty (60) days after the Effective Date.  Any claim by a party referred to in the preceding sentence asserting entitlement to such priority shall be forever barred and not entitled to payment unless it is filed and served on or before such date.

### 5.9     Section 1145 Exemption

To the extent provided by §1145 of the Code, issuance and conversion of Membership Interests under this Plan and the Restated Operating Agreement, and the issuance of all securities issued in exchange therefor or on conversion thereof, shall be exempt from the registration requirements of the Securities Act of 1933, as amended, and any state or local laws requiring the

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 21 of 87

registration for offer or sale of a security or registration or licensing of an issuer, underwriter or dealer.

## 6. EFFECTS OF CONFIRMATION

### 6.1 Plan Replaces Pre-Confirmation Obligations

Upon Confirmation, this Plan shall be binding on every creditor whose claim against the Debtor arose or is deemed to have arisen prior to Confirmation. Except for the Debtor's obligations with respect to Unimpaired Claims, the Debtor's obligations under this Plan supersede and replace all claims and related obligations that arose or are deemed to have arisen prior to Confirmation and only the obligations of the Debtor under this Plan may be enforced after Confirmation by any holder of a pre-Confirmation claim.

### 6.2 Discharge of Debtor

Except as otherwise provided herein or in the Confirmation Order, Confirmation shall discharge the Debtor from all debts that arose, or are treated under the Code as if they had arisen, at any time before Confirmation. The discharge shall be effective as to each debt regardless of whether a proof of claim therefor is filed or deemed filed, whether the claim is an Allowed Claim, or whether the holder thereof accepts the Plan.

### 6.3 Creditors Restrained from Enforcement Actions

After Confirmation, no creditor holding a claim against the Debtor that arose or is deemed to have arisen prior to Confirmation may take any action to enforce such a pre-Confirmation claim against the Debtor or any of its property, except for an Unimpaired Claim. In addition, regardless of whether any creditor might otherwise have the right to enforce its claims against the Debtor after Confirmation, no holder of an Impaired Claim may commence or continue any action, employ any process, or take any action against the Debtor or any of its property to enforce or collect upon its pre-Confirmation claim or any obligations due it under this Plan unless and until an Event of Default has occurred and is continuing with respect to such claim, and then only in accordance with the provisions of Article 7 hereof.

# 7.    DEFAULT AND REMEDIES

**7.1    Event of Default Defined**

**(a)    Monetary Default**

If the Debtor fails to make any payment required under the Plan to the holder of an Allowed Claim treated under this Plan within seven (7) calendar days after that due date thereof specified in this Plan, the holder of such claim may serve written notice on the Debtor at its principal place of business. An Event of Default on such claim shall be deemed to have occurred twenty-one (21) calendar days after the creditor has duly served such notice on the Debtor unless, prior to the expiration of such twenty-one (21) day period, the Debtor has (a) made the delinquent payment or (b) filed with the Bankruptcy Court a motion requesting an extension of time to cure the delinquency or a determination that no delinquency occurred.

**(b)    Non-Monetary Default**

If the Debtor fails to timely fulfill any obligation to a creditor treated under this Plan other than a payment required under the Plan, the creditor to whom such obligation is due may serve written notice on the Debtor at its principal place of business demanding cure of the delinquent obligation. An Event of Default on such obligation shall be deemed to have occurred thirty-five (35) calendar days after such notice is duly served unless, prior to the expiration of such thirty-five (35) day period, the Debtor has (a) cured the delinquency or (b) filed with the Bankruptcy Court a motion requesting an extension of time to cure the delinquency or a determination that no delinquency occurred.

**(c)    Notice of Request for Court Determination**

If the Debtor files a motion under Section 7.1(a) or (b) above, the Debtor shall request a hearing to be held not less than seven (7) nor more than twenty-one (21) days after the Debtor serves notice of such motion on the affected creditor and the United States Trustee as provided under the Rules and the LBR, except for time limits therein which conflict with the notice periods in this section.

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 23 of 87

(d)     **Remedies upon an Event of Default**

When an Event of Default has occurred and so long as it continues uncured, the affected creditor may, but is not obligated to:

(i)     Declare all payments and other performance due to the creditor under this Plan with respect to such claim to be immediately due and payable by giving written notice to the Debtor, in the manner provided in this Plan, that such declaration will become effective unless the Event of Default is cured within seven (7) calendar days after such notice is given; and either

(ii)     Take any actions permitted under applicable non-bankruptcy law to enforce the obligation due the affected creditor under this Plan with respect to such claim; or

(iii)     File a motion with the Bankruptcy Court requesting conversion of this case to a case under Chapter 7 of the Code as provided in the Code, the Rules and the LBR.

(e)     **Effect of Conversion to Chapter 7**

If, for any reason, this case is converted to a case under Chapter 7 of the Code:

(i)     All property of the Debtor as of the date of conversion, whether acquired before or after Confirmation shall vest in the Chapter 7 bankruptcy estate; and

(ii)     All creditors, whether their claims arose before or after Confirmation, are prohibited from taking action against the Chapter 7 bankruptcy estate or property of the estate to the extent provided by Section 362 of the Code.

## 8.     RETENTION AND SETTLEMENT OF CLAIMS

### 8.1     Retention and Enforcement of Claims

The Debtor shall retain and may enforce all claims held by it or its estate, including claims arising from the power, under the Code or otherwise, to avoid and recover transfers, except such claims which have been waived, relinquished, or released hereunder.

### 8.2     Settlement of Objections to Claims

If a party has timely filed an objection to a claim, the party who filed the objection and the

1 holder of the Disputed Claim may enter into a written settlement agreement to compromise such

2 claim, which agreement, when filed with the Bankruptcy Court, will have the force and effect of a

3 Final Order.

4 **8.3    Stale Checks and Claim Waivers**

5       All checks constituting disbursement of amounts due under the Plan shall be drawn so as to

6 become automatically void if not cashed or otherwise negotiated within 90 days after issuance.  If

7 any such check becomes void, the claim with respect to which the check was issued shall be deemed

8 withdrawn, and the funds corresponding to the withdrawn claim shall be disbursed according to this

9 Plan.

10 ## 9.    EXECUTORY CONTRACTS AND LEASES

11 **9.1    Assumption or Rejection of Contracts**

12       Except for the executory contracts and unexpired leases described in Exhibit ~~E~~F attached to

13 the Plan Supplement or in an amendment to Exhibit ~~E~~F which may be filed before Confirmation, the

14 Debtor hereby rejects all executory contracts and unexpired leases to which it was a party on the

15 Petition Date.  On the Effective Date, the executory contracts and unexpired leases described in such

16 Exhibit E shall be deemed assumed by the Debtor.

17 **9.2    Rejection Claims Bar Date**

18       All parties who assert claims arising from rejection of executory contracts under this Plan

19 shall file proofs of claim for any such claims, and serve copies thereof on the Debtor, not later than

20 sixty (60) days after the Effective Date.  Any party asserting such a claim shall be forever barred and

21 not entitled to payment unless proof of the claim is filed and served on or before such date.

22 ## 10.    REVESTING OF PROPERTY

23       Except as provided in this Plan or in the Confirmation Order, on the Effective Date, the

24 Debtor shall be vested with all of the property of its estate free and clear of all claims, liens, charges

25 and other interests of creditors and equity security holders in the Debtor.  Upon Confirmation, the

26 Debtor shall operate its business free of any restrictions of the Code, the Rules, or the Bankruptcy

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 25 of
87

Court.

## 11.   RETENTION OF JURISDICTION

Notwithstanding Confirmation, the Bankruptcy Court shall retain jurisdiction to enforce the provisions, purposes, and intent of this Plan including, without limitation:

A.    Determination of the allowability of claims and interests;

B.    Approval of the assumption, assignment, or rejection of any executory contract or unexpired lease of the Debtor;

C.    Determination of requests for payment entitled to priority under §507(a)(1) of the Bankruptcy Code, including compensation of parties entitled thereto;

D.    Resolution of controversies and disputes regarding interpretation of this Plan;

E.    Implementation of the provisions of this Plan and entry of orders in aid of confirmation and enforcement of this Plan, including, without limitation, appropriate orders to protect the Debtor from creditor action;

F.    Modification of the Plan;

G.    Adjudication of any causes of action, including avoiding powers actions, brought by the Debtor; and

H.    Entry of a final decree closing this case.

## 12.   REQUEST FOR CONFIRMATION

If necessary, the Debtor requests Confirmation of this Plan pursuant to §1129(b) of the Code.

Dated:  April ——,15, 2011

                           LAW OFFICES OF WILLIAM C. LEWIS,
                           Counsel for Debtor, Valles & Associates, LLC


                           By;    /s/ William C. Lewis
                                 William C. Lewis

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 26 of 87

# EXHIBIT B

1 WILLIAM C. LEWIS, ESQ., BAR NO. 77193
DAVID S. CAPLAN, ESQ., BAR NO. 74219
2 LAW OFFICES OF WILLIAM C. LEWIS
510 Waverley Street
3 Palo Alto, CA 94301-2009
Telephone: (650) 322-3300
4 Facsimile: (650) 327-9720

5 Attorneys for Debtor,
Valles & Associates, LLC
6

7 **UNITED STATES BANKRUPTCY COURT**

8 **NORTHERN DISTRICT OF CALIFORNIA**

9

10 In re:

Case No. 10-51813
CHAPTER 11

11 **DISCLOSURE STATEMENT FOR DEBTOR'S AMENDED CHAPTER 11**

12 VALLES & ASSOCIATES, LLC, **PLAN DATED AS OF APRIL ——,15, 2011**

13 Debtor ~~Disclosure Statement~~Confirmation Hearing:

14 Date: ~~April 15~~June 28, 2011
Time: 2:00 p.m.
15 Courtroom: 3020
Location: U.S. Courthouse & Federal Bldg.
16 280 South First Street
San Jose, California
17 Judge: Hon. Arthur S. Weissbrodt

18   Valles & Associates, LLC, a California limited liability company and the debtor and debtor

19 in possession in the case under Chapter 11 of the U.S. Bankruptcy Code ("Debtor" or "Company"),

20 has proposed its plan for reorganization of its financial affairs ("Plan"). A copy of the Plan is being

21 sent to you along with this Disclosure Statement. This Disclosure Statement only summarizes the

22 Plan. You should read the Plan carefully and make sure you understand its terms. If any statement

23 in this Disclosure Statement conflicts with the Plan, the terms of the Plan control.[1]

24

25

26 _____
[1] All terms capitalized, but not defined, in this Disclosure Statement and defined in the Plan shall have the same meanings in this Disclosure Statement as they have in the Plan.

_____
**DISCLOSURE STATEMENT FOR DEBTOR'S AMENDED**
**CHAPTER 11 PLAN DATED AS OF APRIL ——,15, 2011**                                        1
HD2:CLIENTS:LEWIS:VALLES:PLAN+RELATED:Disc Stmt-~~v8~~v14

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 11

VOTING ON THE PLAN ......................................................................................... 11

Special Claim Reduction Election for Class B-3 Unsecured Creditors..................... 11

Deadline for Submission of Ballots ......................................................................... 22

Requirements for Acceptance and Binding Effect of the Plan ................................ 22

BACKGROUND ...................................................................................................... 22

Current Status of the Property ................................................................................ 22

Ownership History ................................................................................................. 33

Reasons for Chapter 11 Case .................................................................................. 33

Details of the Project .............................................................................................. 44

Post-confirmation Prospects ................................................................................... 55

SUMMARY OF MOST IMPORTANT PLAN PROVISIONS .................................. 77

General Summary of the Plan .................................................................................. 77

Classes of Claims and Their Treatment under the Plan ........................................... 88

   Class A-1: Pacific Capital First Loan ................................................................. 88

   Class A-2: Second Lien Holders ......................................................................... 9

   Class A-3: Real Property Taxes ..................................................................... 1010

   Class B-1: Administrative Convenience Claims............................................... 1111

   Class B-2: Unsecured Guarantor Claims .......................................................... 1212

   Class B-3: Other Unsecured Claims ................................................................. 1313

      Class B-3A: Joe Bowman, Jr.
      ................................................................................................................. 13
      13

      Class B-3B:  John and Jean Barrett
      ................................................................................................................. 13
      13

   Membership Equity Interests ........................................................................... 1414

Unclassified (Administrative and Unsecured Priority Tax) Claims and Their Treatment ............ 15

Means for Implementation of the Plan .......................................................................... 1616

    General ....................................................................................................................... 1616

    Restated Operating Agreement .................................................................................. 1717

    Pro-forma Capitalization and Percentage Interests ................................................... 1919

Exemption from Securities Laws; Restrictions on Transfer .......................................... 1919

OTHER PLAN PROVISIONS ............................................................................................ 2020

Effect of Plan Confirmation ........................................................................................... 2020

Executory Contracts ....................................................................................................... 2020

    Assumption or Rejection of Contracts ...................................................................... 2020

    Contract Rejection Claims and Deadline for Filing Proof Thereof ........................... 2020

Retention of Debtors' Claims ......................................................................................... 2121

Important Post-Confirmation Deadlines and Special Notice Rules .............................. 2222

    Deadline for Administrative Claims ........................................................................... 2222

    Deadline for Contract Rejection Claims .................................................................... 2222

ALTERNATIVES TO THE PLAN ...................................................................................... 22

COMPARISON TO CHAPTER 7 LIQUIDATION ............................................................ 22

TAX IMPLICATIONS OF THE PLAN ............................................................................. 2323

CONCLUSION ................................................................................................................... 2424

# INTRODUCTION

Most of you who are receiving this Disclosure Statement are being asked to vote whether to accept the Plan.  The purpose of this Disclosure Statement is to provide you sufficient background information to allow you to make an informed decision whether to accept the Plan.  We hope that you will find that acceptance of the Plan is the best choice to make under the circumstances.

This Disclosure Statement contains all of the information that the Debtor believes you need to make an informed decision.  Nevertheless, you are free to consider any information known to you even if it is not in this Disclosure Statement, and you may ask questions and request additional information from the Debtor's representatives or any other person.

# VOTING ON THE PLAN

A Ballot is enclosed for voting on the Plan.  All creditors with Allowed Claims are entitled to vote on the Plan.  *See* " Classes of Claims and Their Treatment under the Plan."  Unless you are notified that the date is extended:

**IN ORDER TO BE CERTAIN OF BEING COUNTED, A BALLOT MUST BE RECEIVED BY COUNSEL FOR THE DEBTOR NOT LATER THAN 5:00 P.M. ON** ~~MAY      ,~~**JUNE 21,** 2011.

To vote on the Plan, complete the enclosed Ballot and fax it to facsimile number ~~+1~~ (650)~~-~~ 327~~–~~9720, scan it and attach it to an email to bepstein@williamclewis.com, or mail it to Law Offices of William C. Lewis, 510 Waverley Street, Palo Alto, CA 94301.

BE SURE TO CHECK THE BOX ON YOUR BALLOT INDICATING WHETHER YOU ACCEPT OR REJECT THE PLAN.  BALLOTS WHICH ARE NOT MARKED AS ACCEPTING OR REJECTING THE PLAN WILL NOT BE COUNTED IN TABULATING VOTES ON THE PLAN.

## Special Claim Reduction Election for Class B-3 Unsecured Creditors

If you hold a nonpriority unsecured claim greater than $20,000 (claims in Class B-3), you may choose to reduce your claim to $20,000 and have it treated as a Class B-1 claim.

IF YOU WANT TO CHOOSE THAT PAYMENT, BE SURE TO CHECK THE BOX MARKED "REDUCED CLAIM ELECTION" ON YOUR BALLOT.  BALLOTS RECEIVED WITHOUT THE "REDUCED CLAIM ELECTION" CHECKED WILL REMAIN AS CLASS B-3 CLAIMS.

**Deadline for Submission of Ballots**

Unless you are notified otherwise, Ballots must be received by 5:00 p.m., Pacific Time, on ~~May    ,~~ June 21, 2011. Otherwise, your Ballot may not be counted in determining whether all required classes have accepted the Plan.

**Requirements for Acceptance and Binding Effect of the Plan**

In order to be accepted by a class of claims, the holders of two-thirds in amount and more than one-half in number of Allowed Claims in that class who vote on the Plan must vote for acceptance. In order to be accepted by a class of membership interests, the holders of two-thirds of the amount of such interests held by parties who vote on the Plan must vote to accept the Plan.

Even though a creditor or member may choose not to vote or may vote against the Plan, the party will be bound by the terms and treatment set forth in the Plan if it is confirmed by the Bankruptcy Court. Parties who fail to vote will not be counted in determining acceptance or rejection of the Plan. Allowance of a claim or interest for voting purposes does not necessarily mean that the claim or interest will be allowed for purposes of distribution under the Plan.

Further, if sufficient acceptances are not received from creditors or members included in a particular class, the Debtor may elect to request Confirmation of the Plan under §1129(b) of the Code. In such case, the Bankruptcy Court may confirm the Plan if it finds that the Plan does not discriminate against holders of Allowed Claims or Allowed Interests in the rejecting class and that the Plan is fair and equitable to the class.

## BACKGROUND

**Current Status of the Property**

The Debtor's Property is a 7.4-acre parcel of real property at the corner of Nash Road and Cushman Street in Hollister, California ("Property"). The property has two good-sized buildings on it leased to a Gold's Gym franchisee and a small building leased to a Java Hut franchisee. It also has a large vacant back portion, and the Company has entitlements to build apartments or condominiums on that portion. A recent appraisal valued the property at approximately $3,900,000.

The Property is encumbered by two deeds of trust: a first deed of trust held by Pacific Capital Bank dba San Benito Bank and dba South Valley Bank ("Pacific Capital") and a second deed of trust held by two private parties ("Second Lien Holders"). Pacific Capital's claim is currently approximately $1,823,000, and the claims of the Second Lien Holders total $300,000 plus accrued interest.

**Ownership History**

In June, 2006, two men, Mr. Valles and Ronald Klauer, Jr., were the members of a limited liability company, Alron Properties & Investments, LLC ("Alron"). That LLC entered into contracts to purchase the property from its long-time owner for a total of $5,200,000. The purchase was financed in part by the loan from Pacific Capital, and the balance of the funds was obtained from private loans and equity contributions.

At the time of the initial purchase, the Real Property was improved with the Gold's Gym building, a vacant building to its rear that had housed a Salvation Army thrift store, and the Java Hut.

In early 2007, it became necessary to dissolve Alron. In connection with that dissolution, the property was temporarily conveyed to Mr. Valles and his wife in August 2007. In September 2007, they borrowed $800,000 from a group of investors and granted them a second deed of trust on the Property. Then, Valles & Associates was formed in October 2007, and Mr. & Mrs. Valles transferred the property to the Company.

In September 2009, the Company repaid certain of the investors who held the second deed of trust, so that, currently and, for this and other reasons, the principal currently outstanding is only $300,000. *See* "Class A-2 – Second Lien Holders" below.

The Company never assumed either loan, so it now holds the Property subject to the Pacific Capital and the investors' deeds of trust.

**Reasons for Chapter 11 Case**

This Chapter 11 case was commenced because the holder of the first deed of trust, Pacific

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 33 of
87

Capital, had begun foreclosure proceedings against the Property. However, the bank did not foreclose due to a monetary default by the Company. The rents from Gold's Gym and the Java Hut have consistently been sufficient to make the payments on the Pacific Capital loan.

Pacific Capital started to foreclose for, apparently, two reasons. One was the transfer of the Property from Alron Investments, which violated the "due on sale" clause in the deed of trust. The other ground for default arose from a cross-default clause in the bank's loan documents, so that a default on an unrelated loan by the bank to the co-borrowers gave it the right to foreclose on the Company's property, even though the Company itself was not behind in payments. Specifically, the Company's Manager, Albert Valles, Jr., is a guarantor of loans by the bank to other entities he partly owns. One of those other loans went "out of covenant," meaning that the value of the collateral securing it became too low to meet the debt to equity ratios required by the other loan. That borrower also had not failed to make required payments to the bank. However, the "out of covenant" situation on that loan gave the bank the right to foreclose on all of the loans where Mr. Valles was obligated to the bank.

The Company is in the rare circumstance in the current economy of having a successful project with significant equity and bright prospects. However, it must now restructure its debts and raise additional capital to be able to achieve those prospects. This is the reason for the current Chapter 11 case.

**Details of the Project**

The front portion of the Real Property currently is the location of a Gold's Gym fitness center and a Java Express coffee outlet. Gold's Gym occupies about 35,000 square feet of the building area on the site. Gold's Gym pays rent of $19,250 per month under a lease that expires at the end of January 2017. Java Express occupies approximately 288 square feet and pays $1,750 per month in rent under a lease that expires on March 31, 2013.

The rear half of the property (approximately six of the 7.4 acres) is currently unimproved. The Debtor has received entitlements from the City of Hollister to proceed with development of the

back portion as well as changes to the front commercial portion.  These entitlements include:

- Re-zoning of the property for high-density mixed-use;
- Approval for a 72 unit apartment complex;
- Recording of a condominium conversion map; and
- Approval for 72,000 square feet of retail-commercial space in the front part of the property.

This project has been well supported by the City of Hollister because it conforms to the City's expressed need for more high-density housing in the central parts of the city where this Property is located.  It is important, however, for the Plan to be confirmed quickly so that the Company can take advantage of the entitlements and the City's support.

Some City approvals are granted on a lottery basis.  The Company needs to break ground in or before 2013 or a new lottery will be conducted.  To break ground, the Company needs to secure additional construction financing.  It believes that it has sources for that financing, but they will not make any commitments until the current default situation is resolved; i.e. until the Plan is confirmed in this case.

**Post-confirmation Prospects**

The Debtor presently intends to subdivide the Property into two parcels: one would be the front commercial section, and the other would be the rear, currently unimproved portion that has entitlements for apartment or condominium development.  The Debtor estimates that mere act of subdividing would increase the value of the Property by 25% or more.

Once the Property is subdivided, if not sooner, the Debtor intends to seek investors for additional financing and/or buyers for the parcels, depending on market conditions.  Because it has substantial equity in the Property and the existing entitlements, the Debtor believes that it has good prospects to secure such an investment or a quality buyer.  The Debtor has been in discussions with prospective investors and believes that it will be able to raise at least $200,000 by SeptemberDecember 2011.  These investors have expressed serious interest in participating in the

1   project, but they have declined to publicize their interest or proceed further until the Debtor is no

2   longer subject to bankruptcy supervision.

3           HOWEVER, THERE IS NO ASSURANCE THAT THE DEBTOR WILL
        DEVELOP THE PROPERTY BEYOND ITS CURRENT USE OR THAT ANY
4       EFFORTS BY THE DEBTOR TO SECURE ADDITIONAL FINANCING,
        CONSTRUCT UNITS ON THE PROPERTY, OR SELL ALL OR A PORTION OF
5       IT WILL SUCCEED.

6           Regardless of future development, the Property is currently generating sufficient rental

7   income to pay most of ~~its~~the operating costs and debt service obligations of the Property, as

8   restructured under the Plan.  The Debtor has no information that would lead it to believe that either

9   of the commercial tenants generating that rental income will fail to renew its existing lease.  Both

10  tenants have been located on the Property since before the Debtor acquired it.  Gold's Gym just

11  extended its lease and expanded its operations to add a second, previously-vacant building located

12  on the Property behind its original building.

13          The present rental income will not quite be enough to make ongoing payments to creditors

14  for the full six-year life of the Plan.  However, the additional investment by ~~September~~December

15  2011 will provide the Debtor with sufficient reserves to meet any shortfalls during the term of the

16  Plan~~.~~, based on the current tenant base.  *See* the Cash Forecast attached hereto as <u>Exhibit A</u>.

17          Under the Plan, the only debts that will remain secured by the Property are property taxes,

18  the Pacific Capital first deed of trust, and a second deed of trust in favor of one of the original

19  Second Lien Holders.  The Plan extends the maturity of the Pacific Capital loan from 2012 until five

20  years after the Effective Date of the Plan.  *See* "Class A-1:  Pacific Capital First Loan" below.  The

21  Plan also provides for one of the Second Lien Holders, MAB, Inc, to convert its approximately

22  $122,000 claim to equity in the Debtor and for the maturity of the loan from the other Second Lien

23  Holder, the Jason and Carolyn Noble Trust ("Noble Trust~~")~~"), to be extended to six years after the

24  Effective Date of the Plan.  *See* "Class A-2A: Jason and Carolyn Noble Trust" below.

25          Based on the existing payment terms, the Debtor will have reduced the balance of the Pacific

26  Capital debt by the end of the five years to approximately $1,500,000.  Based on the current

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 36 of
87

appraisal of the Property (made in the currently depressed real estate market), the Debtor will have $2,100,000 of equity in the Property. The equity may be even greater if the Property is subdivided or the real estate market improves in the next five years. Thus, even if the Debtor does not succeed in any development efforts on the Property, it should be in an excellent position to refinance the Pacific Capital claim when it matures and continue operating the Property.

AGAIN, HOWEVER, THERE IS NO ASSURANCE OF ADDITIONAL FINANCING, THAT THE EXISTING LEASES WILL NOT BE TERMINATED, OR THAT THE DEBTOR CAN SELL ALL OR A PORTION OF THE PROPERTY.

## SUMMARY OF MOST IMPORTANT PLAN PROVISIONS

### General Summary of the Plan

The Plan provides, generally, for providing a new promissory note to Pacific Capital, creating a direct obligation from the Debtor, secured by a ~~new~~restated deed of trust to Pacific Capital. The core financial terms remain the same as the earlier original agreements executed by Alron. The key economic change will be to extend the maturity date until five years after the Effective Date. The Plan also modifies some of the loan covenants to (a) eliminate any cross default aspects so the loan will stand on its own and (b) limit the bank's unfettered discretion in the earlier documents to declare defaults without any objective standards.

The Plan also provides for one of the Second Lien Holders (MAB, LLC) and one of the Company's two large unsecured creditors to convert their claims into equity participations in ~~a~~the restructured Company, pursuant to an amended form of operating agreement for the Company to be approved through the Plan. *See* "Restated Operating Agreement" below. Small creditors (claims $\leq$ $20,000) are to be paid in cash on the Effective Date of the Plan. The other large unsecured creditor has tentatively agreed to accept partial payment in December 2011. The other Second Lien Holder, the Noble Trust, will receive a new note from the Debtor due in six years and secured by a second-priority deed of trust on the Property.

Finally, the Company had not paid its ~~last four years of~~ property taxes for 2009 and later. In addition, the Company is liable for some catch-up assessments. The Plan provides for the Company

to pay those taxes over the five years after confirmation of the Plan. *See* "Class A-3: Real Property Taxes" below.

## Classes of Claims and Their Treatment under the Plan

The Plan divides creditors into classes based on their different legal or economic positions with reference to the Debtor and its project. Each of those classes is treated differently under the Plan, and the next sections describe the classes and their treatment.

### Class A-1: Pacific Capital First Loan

As discussed above, the Property is encumbered by a first deed of trust in favor of Pacific Capital Bank (also known as San Benito Bank and South Valley Bank). That deed of trust secures a note issued by Alron Investments LLC with a balance, as of the date of this Disclosure Statement, of approximately $1,823,000 including accrued and unpaid interest. The Alron note bears interest at 7½% percent. The note is due in April 2012. Both Albert Valles, Jr., the Debtor's manager and majority owner, and his former Alron partner, Ron Klauer, Jr., are co-makers of the note and therefore also obligated to the Bank.

The Plan provides for the Debtor to execute a ~~new Term~~Replacement Note, creating its own obligation to Pacific Capital~~, and to execute and record a new~~ in replacement all obligations under the ~~deed of trust on the Property to secure that note~~original Term Note. The new Note will have a maturity date five years after the Effective Date of the Plan, but the monthly payment and interest rate are the same as in the bank's original loan agreements. The new note changes some terms of the earlier note primarily to eliminate (a) all cross-default provisions so that the affairs of guarantors or other parties do not affect the Company's rights and (b) provisions in the earlier documents that gave the bank the power to declare defaults without objective standards, such as the power to declare a default if it considered itself "insecure." ~~The Plan also provides for the earlier co-maker obligations of Mr. Valles and Ron Klauer to be replaced by guaranties of the new note by Mr. Valles and Kraig Klauer, Sr., a large member of the Debtor.~~

~~This class~~The Plan also provides for execution and recordation of a new, restated deed of

trust against the Debtor's Real Property, with many changes similar to those made to the Note.

Finally, the Plan calls for the earlier co-maker obligations of Mr. Valles and Ron Klauer to be replaced by new guaranties. These new guarantees will satisfy and replace the obligations that Mr. Valles and Mr. Klauer had as co-makers of the earlier Term Note. The new form of Limited Guaranty is attached to the Plan Supplement as Exhibit D.

The Pacific Capital claim is impaired under the Plan and, therefore, it is entitled to vote whether to accept or reject the Plan.

**Class A-2: Second Lien Holders**

This class includes the claims by the two Second Lien Holders on the Property. It is divided into two subclasses, as follows:[2]

| Class A-2A | Jason & Carolyn Noble Trust | $244,432 |
| Class A-2B | MAB, LLC | $122,213 |

The original amount of the note secured by the Second Deed of Trust was $800,000 and, in addition to Mr. Noble and MAB, the following parties were also named as lien holders under the Second Deed of Trust:

| Kraig Klauer Ltd. Ptrship | Steve Perreira |
| Kurt Nicholson | John L. and Jean Barrett |
| Douglas Hogeman Trust | |

In 2008, the deed of trust was modified to remove all of those parties, leaving only the Noble Trust and MAB, LLC. One lender (Steve Perreira) was removed because he never made his advance. The others, except for the Barretts, were paid or received membership interests for their claims. The title company inadvertently removed the Barretts as beneficiaries even though they had not been paid or provided with equity interests in the Debtor. Because of the priority of a bankruptcy estate over unperfected security interests, the Barretts now hold an unsecured claim against the Debtor. *See* "Class B-3 – Other Unsecured Claims" below.

---

[2] As a legal matter, each of the sub-classes is a separate "class" within the meaning of the Bankruptcy Code.

The Plan puts the Noble Trust into Class A-2A and provides for it to receive a new promissory note from the Debtor in the amount of its Allowed Claim as of the Effective Date of the Plan. The note will bear interest at 6% and%, be secured by a deed of trust on the Property, and be payable in a lump sum six years after the Effective Date of the Plan. This deed of trust will be junior in priority to the new Pacific Capital deed of trust.

The Plan puts the other Second Lien Holder, MAB, LLC, into a different class, Class A-1B. It further provides for the MAB, LLC, to receive equity interests in the Debtor in exchange for its Allowed Claim. Under the Plan and the Restated Operating Agreement to be implemented through the Plan, MAB, LLC, will receive one unit of a Class 1-B membership interest for each $10,000 of its Allowed Claim.[3] The relative percentage interest that MAB, LLC, will receive and the terms of the membership interests are described below under "Means for Implementation of the Plan."

This class is impaired under the Plan and, therefore, entitled to vote whether to accept or reject the Plan.

### Class A-3: Real Property Taxes

The Debtor owes real property taxes to San Benito County for the 2007 through 2010 fiscal years and a slight balance on the 2006 fiscal year. The currently unpaid taxes total approximately $195,000, plus penalties and interest of another $33,000. A current-year installment of about $22,250 is due April 10, 2011. The tax debt is secured by a statutory lien on the Property with first priority over all other liens and encumbrances on the Property.

The Plan provides for the Debtor to pay the $22,250 installment due on April 10, 2011, promptly after the Effective Date. The remaining liability (plus interest at the regular statutory rate) is to be paid in quarterly installments (estimated to be $16,674 each) over the five-year period after the Effective Date.

---

[3] Under the Restated Operating Agreement, fractional units may not be issued. Therefore, for example, if MAB's claim is $244,000, it will receive 24 units and a 2.4% "Percentage Interest." However, the $4,000 excess will be included in MAB's initial capital account balance.

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 40 of 87

1  This class is impaired under the Plan and, therefore, entitled to vote whether to accept or

2  reject the Plan.

3  **Class B-1: Administrative Convenience Claims**

4  This class consists of all general unsecured claims that are $20,000 or less or whose holders

5  elect to reduce their claims to $20,000. Since the Bar Date for filing proofs of claim passed on

6  June 22, 2010, the Debtor is confident that the only claims under $20,000 are shown in the following

7  table:

| Creditor Name | Claim Amount |
|---|---|
| Noland, Hamerly, Etienne & Ross[4] | $17,154.00 |
| San Benito Engineering & Surveying, Inc. | 2,050.00 |
| Wald, Ruhnke, Dost Architects, LLP | 6,096.25 |
| Franchise Tax Board | 84.00 |
| Total | $25,384.25 |

13  As described above under "Voting on the Plan," general unsecured creditors with claims too

14  large to be in this class (Class B-3 claims) may elect to reduce their claims to $20,000 and receive

15  $20,000 in cash. *See* "Special Claim Reduction Election for Class B-3 Unsecured Creditors" above.

16  To do so, the creditor must indicate its election in the ballot on which it votes whether to accept

17  plan.

18  ~~The Bankruptcy Code permits a Plan to separately classify small claims from claims that are~~

19  ~~otherwise similar if it makes administration of the Plan more convenient or the Debtor has other~~

20  ~~legitimate business reasons.~~

21  The Plan provides for Allowed Claims in this class to receive full payment of these smaller

22  claims, without interest, on the Effective Date. Since the Plan provides for one of its larger general

23  unsecured creditors (Class B-3B) to receive membership interest units on account of their Allowed

24  Claims at a rate of $10,000 per unit, the Debtor believes that it will simplify ongoing management of

---

[4] The Debtor disputes the validity and amount of this claim and reserves the right to object to the claim at any time.

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 41 of
87

its business to not have small trade creditors among its members. In addition, the Debtor believes that it will enhance its relations with its trade creditors to provide them with cash payment, rather than requiring them to accept equity interests in the Debtor.

This class is not impaired under the Plan and, therefore, holders of Allowed Claims in this class are not entitled to vote whether to accept or reject the Plan.

**Class B-2: Unsecured Guarantor Claims**

This class consists of parties who are co-debtors with the Debtor on claims against the estate. To the best of the Debtor's knowledge, only the co-makers of the original note to Pacific Capital, Mr. Valles and Ron Klauer, Jr., hold claims in this class. If Pacific Capital agrees to release them from their existing obligations in exchange for the new guarantees discussed above, there will not be any claims in this class.

However, in case there are creditors in this class, the Plan provides that a creditor in this class will not receive anything under the Plan unless he has to make payments to the creditor whose claims he guaranteed. Then, the guarantor/co-debtor will probably be subrogated to the claim of the creditor whom he or she pays. For example, if Mr. Valles had to pay off the claim held by Pacific Capital because he was a co-maker on the original note given to the bank, then Mr. Valles would be subrogated to Pacific Capital's claim and take over all of its rights, including its lien on the Property.

However, while the Debtor is not aware of one, a legal impediment might exist to the subrogation provided for in the Plan. Therefore, the Plan provides that, if subrogation is impossible, a co-debtor who has to pay another creditor's claim will receive Class 1-B Membership Interests at a rate of one unit for each $10,000 paid by the co-debtor.

As noted above, Albert Valles, Jr., and Ronald Klauer, Jr., were co-makers of the Term Note (along with the now-dissolved Alron Investments). Class B-2 consists of all nonpriority claims held or asserted by Albert Valles, Jr., and/or Ronald Klauer, Jr., as such co-makers.

Because the Plan provides for the Replacement Note to be issued in satisfaction of the Term Note and cancellation of that note, the liability of the two co-makers is extinguished. Accordingly,

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 42 of 87

the Plan provides that neither co-maker will receive any distributions on these claims.

This class is impaired under the Plan and, therefore, entitled to vote whether to accept or reject the Plan.

### Class B-3: Other Unsecured Claims

Based on the court's file and the Debtor's records, the Debtor believes that there are only two general unsecured claims greater than $20,000:

| Creditor Name[5] | Claim Amount |
|---|---|
| Joe Bowman, Jr. | $ 80,000.00 |
| John L. and Jean Barrett | $100,000.00 |

Class B-3 is divided into two sub-classes, one for each of these two creditors, because they are similarly situated but are to receive different treatments.

#### Class B-3A: Joe Bowman, Jr.

This class consists of the $80,000 claim held by Joe Bowman, Jr., on account of a loan he made for advances to the Debtor's counsel before commencement of this case.   The Plan provides for Mr. Bowman to receive 25% of his claim, without interest, in December 2011.

#### Class B-3B:  John and Jean Barrett

This class consists of the $100,000 claim held by the Barretts on account of their previously secured loan.  *See* "Ownership History" above.  The Plan provides for the Barretts to receive one unit of Class 1-B Membership Interests for each $10,000 of their Allowed Claim.  The relative percentage interests that ~~these creditors~~the Barretts will receive and the terms of the membership interests are described below under "Means for Implementation of the Plan."

These classes are impaired under the Plan and, therefore, entitled to vote whether to accept or reject the Plan.

---

[5]    In its Schedules filed at commencement of this case, the Debtor included a claim from Al Valles Investments, LLC, of $282,643.15.  However, the Debtor has since determined that such claim was, in fact, a contribution to the capital of the Debtor.  The Schedules have been amended to reflect this.

**DISCLOSURE STATEMENT FOR DEBTOR'S AMENDED CHAPTER 11 PLAN DATED AS OF APRIL ——,15, 2011**                13

## Membership Equity Interests

Under the Company's original operating agreement, it divided its members into three classes: A, B and C. These classes are identified under the Plan as Classes C-1, C-2 and C-3. Under the Plan, all of these classes will be reclassified and combined into a single class: Class 1-A. These interests will carry forward the capital account balances of their holders as of January 1, 2011, as calculated under federal tax law. Because the Plan makes substantial changes to the rights of the existing members through adoption of the Restated Operating Agreement, this class is impaired under the Plan and, therefore, entitled to vote whether to accept or reject the Plan.

According to the Debtor's records, the holders of the Debtor's present percentage interests in profits and losses are shown in the following table:

| Name | Approx. Pct. Interest |
|---|---|
| **Class A Interests (Plan Class C-1)** | |
| Douglas & Terry Hogeman Trust | 1.70% |
| James Knoth | 1.00% |
| Kurt Nicholson | 1.00% |
| **Class B Interests (Plan Class C-2)** | |
| Kraig T. Klauer Family Ltd. Ptrshp. | 20.00% |
| Kraig T. Klauer IRA | 5.00% |
| **Class C Interests (Plan Class C-3)** | |
| Al Valles Investments LLC | 71.30% |

The interest of All Valles Investments LLC is derived from its contribution of the Property to the Company on its formation and payment of various expenses in connection with the initial development work on the Property. The other interests arose from cash contributions by their holders.

The Hogeman Trust did not make its full initial capital contribution; it committed to contribute $200,000, but it only contributed $150,000, and ~~its trustees have indicated that they are unable~~it has opted not to make the remaining contribution. Therefore, under the Plan, the "Percentage Interest" of the Hogeman Trust will be reduced from 1.7% to 1.3%.

The Klauer Family Limited Partnership also did not make its full initial capital contribution;

it committed to contribute $1,500,000, but it opted to contribute only contributed $1,475,000, and it has indicated that it is unwilling to make the remaining contribution. Therefore, under the Plan, the "Percentage Interest" of the Klauer partnership will be reduced proportionately, from 20% to 19.6%.

Under California law, all of the holders of interests in a limited liability company must approve an amendment to the company's operating agreement, unless the existing operating agreement provides otherwise. No such alternative exists in the Debtor's original Operating Agreement. Therefore, the Plan provides that any of the above members who fail to reject the Plan during the voting period will be deemed to have approved the Restated Operating Agreement.

**Unclassified (Administrative and Unsecured Priority Tax) Claims and Their Treatment**

The Bankruptcy Code requires certain types of claims to receive specific forms of treatment. Two of these may not be put into a "class" under a plan. These are (a) "administrative claims" that arise during the Chapter 11 case for the ordinary and necessary expenses of operating in Chapter 11 and (b) priority governmental claims, mostly unsecured tax claims that arose within three years before commencement of the Chapter 11 case.

Only one priority governmental claim was filed against the Debtor, a tax claim filed by the Franchise Tax Board for $1,634.10. The Plan provides for this claim to be paid in full within 14 days after the Effective Date.

The Debtor believes that the only material administrative claims that will be outstanding on the Effective Date of the Plan will be the fees of the Debtor's Chapter 11 attorneys beyond amounts deposited in advance of the case (estimated to be approximately $40,000). As required by the Bankruptcy Code, administrative Allowed Claims must be paid in full on the Effective Date of the Plan.

However, the fees of the Debtor's attorneys may not be Allowed under the Code and the Rules until the attorneys apply to the Bankruptcy Court for their allowance and the court allows the

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 45 of
87

fees after a hearing.[6]  The attorneys for the Debtor will not apply for final allowance of their fees and costs until after the Plan is confirmed.  Therefore, the Debtor is not likely to have to pay the balance described above until approximately 30 to 60 days after Confirmation.

The Debtor is confident that it will have the funds to pay all of these unclassified claims. *See* "General" in the next section and <u>Exhibit A</u> to this Disclosure Statement.

## Means for Implementation of the Plan

### General

Upon Confirmation, the Debtor will generally be solvent and capable of meeting its ongoing obligations, as restructured under the Plan.  However, the Debtor plans to bring in additional investment before the end of 2011.  The Debtor is in negotiations with parties who have expressed serious interest in providing at least $200,000 in new capital by ~~September~~December 2011.  With such an investment, along with conversion of many major claims to equity in the Debtor and the rents from existing tenants, the Debtor will be able to meet its debt service and operating expenses, with funds left over to prepare for further development of the Property.  *See* the Financial Projection attached hereto as <u>Exhibit A</u>.

As discussed above under "Post-Confirmation Prospects," the Debtor anticipates that it will be able to refinance the Pacific Capital loan when it becomes due in five years, as well as pay or refinance the Noble Trust claim before it becomes due in six years.  Meanwhile, the Debtor intends to seek additional investment to develop, at least, the rear portion of the Property into condominium or apartment units.  With that development, the Debtor expects to provide a significant return over time to its members, including the creditors who are receiving membership interests on account of their claims.  There is, of course, no assurance that the Debtor will be able to further develop the Property, but the Debtor believes that sale of all or part of the Property or continued operation will

---

[6]  Normally, notice of that hearing would be given to all creditors and equity holders of the Debtor.  However, the Plan modifies the list of persons entitled to notice of post-Confirmation hearings.  *See* "Post-Confirmation Notices" below.

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 46 of 87

generate reasonable returns to its members.

**Restated Operating Agreement**

THE RESTATED OPERATING AGREEMENT IS A COMPLEX, BUT VERY IMPORANT, DOCUMENT THAT WILL GOVERN THE RIGHTS OF MEMBERS WHO RECEIVE EQUITY INTERESTS IN EXCHANGE FOR THEIR CLAIMS AND MAY HAVE SIGNIFICANT TAX CONSEQUENCES. SUCH CREDITORS ARE URGED TO READ THE AGREEMENT CAREFULLY AND DISCUSS ITS TERMS WITH THEIR OWN LEGAL AND TAX ADVISORS. NOTHING HEREIN IS INTENDED TO BE, AND MAY NOT BE RELIED UPON AS, LEGAL OR TAX ADVICE.

THE DESCRIPTIONS HEREIN OF THE TERMS AND EFFECTS OF THE RESTATED OPERATING AGREEMENT ARE, BY NECESSITY, ONLY A SUMMARY. IF ANY DESCRIPTION HEREIN CONFLICTS WITH THE ACTUAL TERMS OF THE RESTATED OPERATING AGREEMENT, THE AGREEMENT WILL CONTROL OVER THE DESCRIPTION AND REMAIN BINDING ON ALL MEMBERS.

The operating agreement for a limited liability company is the primary organizational document that controls all the rights and responsibilities of the members and managers of the company. As noted previously, the Debtor's original Operating Agreement provided for three classes of members. It also provided for Mr. Valles to be the "Manager" responsible for all operations of the Company. He will retain that position after Confirmation under the Restated Operating Agreement.

However, the original Operating Agreement contained several overly complex and potentially unworkable provisions for management, allocations of profits and losses, and distributions to members. The Restated Operating Agreement to be adopted under the Plan is designed to simplify the Debtor's organizational structure and clarify the rights and responsibilities of the members.

Following are some of the more significant changes contained in the Restated Operating Agreement:

1. The three original classes of members are consolidated into a single class (Class 1-A), but without any change in the existing members' capital account balances.

2. A new Class 1-B is established consisting of the new members who were creditors and

any new members added to the company later.  The Restated Operating Agreement provides for converting creditors to receive one unit of membership interest for each $10,000 of the creditor's Allowed Claim.  Each converting creditor's capital account balance will be the amount of its Allowed Claim that is converted. *See* "Tax Consequences of the Plan" below.

3. The "Percentage Interests" in ongoing profits and losses will be adjusted by (a) reducing the interest of the Hogeman Trust and the Klauer Family Limited Partnership as discussed above and (b) reducing the interest of Al Valles Investments to make room for the new interests to be issued to creditors.

4. A requirement is established for the company to make a distribution to members whenever it has a profitable year with sufficient cash flow in an amount designed to provide the members the cash to pay their taxes on their shares of such profit. *See* "Tax Consequences of the Plan" below.

5. Two out of three fees that Mr. Valles would have earned under the original Operating Agreement on sale of the Property have been eliminated.[7]  Mr. Valles, as Manager of the company, will still be entitled to a "construction management fee" equal to 10% of the cost of construction of any new improvements to be paid when either (a) the entire Property is sold or (b) if the Company develops the Property with condominium units, at least 75% of the condo units have been sold.  He will also be entitled to reimbursement of all expenses he incurs on behalf of the company.  Mr Valles will not receive any ongoing compensation for management of the company.

6. Requirements have been added for approval of certain major company actions by the majority of the membership interests.  At present, this requirement will not have a

---

[7] The eliminated compensation provisions were very unclear as to the timing and basis for calculating those fees.  The fees eliminated in the Restated Operating Agreement were (a) a 5% fee for structuring and organizing the company and (b) reimbursement of a portion of the costs incurred in developing the property.

significant effect on the management powers of Mr. Valles, however, because he controls Al Valles Investments, LLC, which will hold at least 69% of the membership interests.

**Pro-forma Capitalization and Percentage Interests**

As stated above, existing members will retain their capital account balances as of January 1, 2011 as calculated for federal tax purposes. Creditors will receive their interests at a rate of $10,000 per unit. Based on this, following is the anticipated capitalization and Percentage Interests of the members upon the Effective Date:

| Name | No. of Units | Percentage Interest | Effective Date Capital Acct. Bal. |
|---|---|---|---|
| **Class 1-A Interests**[8] | | | |
| Al Valles Investments, LLC | 510 | 69.90% | $6,082,158 |
| Douglas & Terry Hogeman Trust | 13 | 1.30% | 150,426 |
| James Knoth | 10 | 1.00% | 116,757 |
| Kraig T. Klauer Family Ltd. Partnership | 196 | 19.60% | 1,180,010 |
| Kraig T. Klauer IRA | 50 | 5.00% | 301,251 |
| Kurt Nicholson | 10 | 1.00% | 116,757 |
| **Class 1-B Interests** | | | |
| MAB, LLC[9] | 12 | 1.20% | 122,213 |
| John L. and Jean Barrett | 10 | 1.00% | 100,000 |
| Totals | 811 | 100.00% | $8,169,572 |

**Exemption from Securities Laws; Restrictions on Transfer**

Under Section 1145 of the Bankruptcy Code, the issuance of the Class 1-B membership interests to creditors under the Plan will be exempt from federal and state securities law requirements for registration or qualification of the 'sale' of the membership interests. However, the Restated Operating Agreement contains several restrictions on transfer of membership interests. *See* Article VIII of the Restated Operating Agreement.

---

[8] Amounts for Class 1-A are based on the members' capital account balances at December 31, 2010 for federal tax purposes.

[9] This amount will vary depending on the amount of accrued interest that the creditor is entitled to include in its Allowed Claim.

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 49 of 87

# OTHER PLAN PROVISIONS

## Effect of Plan Confirmation

Upon Confirmation, the Plan will be binding on every creditor whose claim against the Debtor arose or is deemed to have arisen prior to Confirmation. Except as provided in the Plan or in the Confirmation Order, all debts that arose, or are deemed to have arisen before Confirmation will be discharged, and the Debtor's obligations under the Plan supersede and replace all claims and related obligations that arose or are deemed to have arisen prior to Confirmation. In other words, only the obligations of the Debtor set forth in the Plan may be enforced after Confirmation with respect to any pre-Confirmation claim.

## Executory Contracts

### Assumption or Rejection of Contracts

Certain agreements entered into by a debtor before commencement of a Chapter 11 case, but not all, are treated as "executory contracts" under the Bankruptcy Code. Very loosely stated, a contract is "executory" under the Bankruptcy Code if both parties still have material duties to perform at the commencement of the case.

All executory contracts should be either assumed (carried forward) or rejected (terminated) during a bankruptcy case. To fulfill this duty, the Plan provides that all executory contracts to which the Debtor was a party on the Petition Date are rejected, except for those listed in Exhibit A to the Plan.

IF YOU ARE A PARTY TO AN EXECUTORY CONTRACT WITH THE DEBTOR, YOU SHOULD REVIEW EXHIBIT A (LOCATED IN THE PLAN SUPPLEMENT) TO LEARN WHETHER YOUR CONTRACT IS BEING ASSUMED OR REJECTED.

### Contract Rejection Claims and Deadline for Filing Proof Thereof

If the other party to an executory contract rejected by the Debtor believes it has a claim against the Debtor because of that rejection, the party has the right to file a proof of claim for the amount it believes to be due. However, such a proof of claim must be filed by the deadline set forth

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 50 of 87

in the Plan. *See* "Important Post-confirmation Deadlines and Special Notice Rules" below.

Such a claim, if timely filed and Allowed, will be a general unsecured claim in Class B-1 or B-3B, depending on its size, and share in the distributions to be made on Class B-1 or B-3B claims, as applicable, under the Plan. *See* "Classes of Claims and Their Treatment under the Plan" above.

## Retention of Debtors' Claims

The Plan provides that the Debtor will retain and may enforce after Confirmation all claims held by it or its estate, including claims arising from the power, under the Bankruptcy Code or otherwise, to avoid and recover transfers.

The Plan is not intended to release any claims or causes of action the Debtor might hold against third parties, including creditors treated under the Plan. The Debtor and its counsel have not completed their investigation of potential claims held by the Debtor against third parties. Therefore, the Debtor retains the right to assert claims against any creditor or other interested party if they are later determined to exist or be worthy of assertion, even if the claims are not described in the Plan or this Disclosure Statement.

Accordingly, all persons asserting claims against the Debtor, its property or interests in its property, or that are otherwise subject to claims by the Debtor, **PLEASE TAKE NOTICE THAT** all claims, defenses, powers and interests of the Debtor are hereby reserved for the benefit of the Debtor and its estate for the purpose of objecting to the allowance of claims, subordinating claims, avoiding transfers of property or interests in property, determining the extent, validity, or priority of any lien, and for the purpose of recovering property, damages, or equitable relief and enforcing of any and all claims and rights held by the Debtor as of Confirmation.

Without limiting the generality of the foregoing, the Debtor has identified its ~~claim for one capital contribution described under "Preserved Claim for Capital Contribution" above and its~~ right to object to the claim filed by Noland, Hamerly, Etienne & Ross. *See* "Class B-1: Administrative Convenience Claims" above.

**Important Post-Confirmation Deadlines and Special Notice Rules**

**Deadline for Administrative Claims**

The Plan requires any party who asserts an administrative claim (other than professionals employed by the Debtor) to file a request for payment of the claim with the Bankruptcy Court and serve it on the Debtor within sixty (60) days after the Effective Date of the Plan or the claim will be permanently disallowed and the party will not receive any recovery on the claim.

**ANY PARTY WHO MISSES THAT DEADLINE WILL NOT BE ENTITLED TO PAYMENT OF ANY ADMINISTRATIVE CLAIM, REGARDLESS OF WHETHER IT IS OTHERWISE MERITORIOUS.**

**Deadline for Contract Rejection Claims**

Any party who believes it has a claim for damages from rejection of an executory contract must file a proof of claim within sixty (60) days after the Effective Date of the Plan or the claim will be permanently disallowed and the party will not receive any recovery on the claim.

**ANY PARTY WHO MISSES THAT DEADLINE WILL NOT BE ENTITLED TO ANY PAYMENT DUE TO REJECTION OF ITS CONTRACT, REGARDLESS OF WHETHER THE CLAIM IS OTHERWISE MERITORIOUS.**

**ALTERNATIVES TO THE PLAN**

**COMPARISON TO CHAPTER 7 LIQUIDATION**

The Debtor believes that the Plan represents the best possible alternative for it and its creditors, primarily because the its new capital structure provides the environment for the Debtor to maintain operations, meet its ongoing obligations, and thereby thrive as an ongoing entity. As will be shown below, the Plan compares favorably to liquidation of the Debtor's assets in a Chapter 7 case.

**COMPARISON TO CHAPTER 7 LIQUIDATION**

Creditors should not vote for a plan if they could receive more if the Chapter 11 case were converted to a Chapter 7 liquidation case. However, the Debtor estimates that creditors will receive at least as much under this Plan as in a Chapter 7 liquidation case.

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 52 of 87

The Debtor has substantial equity in its real property and positive operating cash flow. Accordingly, it is likely that most creditors will receive full payment of their claims under the Plan (except for those who voluntarily agree to lesser treatment). Because of that equity in the property, it is possible that a Chapter 7 trustee could sell the property, eventually, for the same amounts that would be received by the Debtor in a sale. However, it is also likely that the administrative cost of "starting over" with a Chapter 7 trustee and its professionals would consume more expense than will be consumed with the Debtor continuing in operation.

Further, the Debtor has the expertise and incentive to undertake development of the property so that those creditors who receive membership interests in exchange for their claims have the potential to receive even more than mere repayment of their claims.

The Debtor believes that confirmation and performance under the Plan could generate more even for Pacific Capital than in a Chapter 7 case. While it is possible that a trustee could sell the Property for enough to pay the bank in full, sale in the immediate future is not certain, especially in light of current lending and general economic conditions. Trustees who have difficulty selling encumbered real estate in a reasonable time generally will abandon the effort, leaving the secured creditor to foreclose on the property. Thus, the bank would have to incur the costs and delay of foreclosure, diminishing its recovery below the true full payment it can achieve under the Plan.

## TAX IMPLICATIONS OF THE PLAN

Following is the Debtor's general understanding of the implications of the Plan on income tax obligations of the company, its members and creditors. This explanation has not been reviewed by a tax attorney or accountant.

**CREDITORS SHOULD NOT RELY ON THIS INFORMATION BUT SHOULD DISCUSS THEIR PARTICULAR SITUATIONS WITH THEIR OWN LEGAL AND TAX ADVISORS.**

The Debtor is taxed as a partnership. Accordingly, except in unusual situations that do not apply to the present situation, the Debtor does not pay federal or state income tax. All of the Debtor's tax attributes are passed through to its owners.

Case: 10-51813    Doc# 61    Filed: 05/19/11    Entered: 05/19/11 13:58:56    Page 53 of 87

Generally speaking, the existing members of the Debtor will not incur any unusual tax effects due to the Plan. Their interests are being reclassified for internal purposes, but they will retain their same capital account balances. They will, however, receive their proportionate share of any income (such as forgiveness of indebtedness income) that the Debtor earns because claims (such as Joe Bowman's claim in Class B-3A) are reduced.

Creditors who receive equity interests for their claims will not have any immediate tax impact. The amount of a creditor's claim exchanged for the equity interest will become the creditor's tax basis of its membership interest in the Debtor.

## **CONCLUSION**

Based on the information in this Disclosure Statement, the Debtor believes that Confirmation of the Plan will be in the best interests of all constituencies. Therefore, the Debtor requests that those of you who are eligible submit your ballots accepting the Plan

Dated: as of April ——,15, 2011

VALLES AND ASSOCIATES, LLC

By: _____

Albert Valles, Jr., Managing MemberManager

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 54 of 87

# EXHIBIT C

SPACE ABOVE THE LINE FOR RECORDER'S USE

**DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES, RENTS, AND PROFITS, AND FIXTURE FILING**

This DEED OF TRUST, SECURITY AGREEENT, ASSIGNMENT OF LEASES, RENTS AND PROFITS, AND FIXTURE FILING (this "Deed of Trust") is entered into among Valles & Associates, LLC, a California limited liability company with an address at _____ (the "Trustor"). First American Title Company, a _____ corporation with an address at _____ (the "Trustee") for the use and benefit of Pacific Capital Bank, N.A., a national banking association doing business as San Benito Bank, with an address in care of Loan Services, P.O. box 60654, Santa Barbara, California 93160-0654 (the "Beneficiary") and the Beneficiary.

## A.    DEFINITIONS

For all purposes of this Deed of Trust, the following terms shall be defined as follows:

"Chapter 11 Plan" means that Debtor's Amended Chapter 11 Plan Dated as of April ___,15, 2011, or such modified form thereof, as is confirmed by the U.S. Bankruptcy Court for the Northern District of California in the case with respect to Trustor bearing case number 10-51813.

"Event of Default" shall have the meaning set forth in Section 4.1 hereof.

"Hazardous Substances" means any oil or other material or substance constituting hazardous waste or hazardous materials or substances under any applicable Federal or state law, regulation or rule.

"Leases" means any and all present and future leases and agreements relating to the Real Property, including without limitation rents, issues and profits, or the use or occupancy thereof together with any extensions and renewals thereof, specifically excluding all duties or obligations of the Trustor of any kind arising thereunder.

"Loan Documents" means, collectively, the Chapter 11 Plan, the Noteany orders entered to confirm the Chapter 11 Plan, the Note, and this Deed of Trust, along with all other agreements, documents, certificates and instruments delivered pursuant thereto.

"Note" means that certain Term Promissory Note made by Trustor in favor of Beneficiary and delivered to Beneficiary pursuant to the Chapter 11 Plan.

"Obligations" means without limitation all loans, advances, indebtedness, liabilities, liquidated or unliquidated, now or hereafter owing by the Trustor to the Beneficiary at any time, of each and every kind, nature and description, arising under this Deed of Trust or the Note, or

under any future obligation incurred by the Trustor in favor of the Beneficiary, whether secured or unsecured, absolute or contingent, due or to become due, including, without limitation, payment of all amounts outstanding when due pursuant to the terms of any of the Loan Documents. The term "Obligations" shall also include all interest and other charges chargeable to the Trustor or due from the Trustor to the Beneficiary from time to time under the Loan Documents and all other advances, costs and expenses referred to in this Deed of Trust, including without limitation the costs and expenses (including reasonable attorney's fees) of enforcement of the Beneficiary's rights hereunder or pursuant to any document or instrument executed in connection herewith.

"Permitted Encumbrances" means the liens, encumbrances, leases, security interests and rights of others set forth in the Title Report plus (a) the Leases outstanding on the date hereof between Trustor and, respectively, Gold's Gym Hollister and Java Express LLC and (b) the lien on the Property, which must be junior to the lien of this Deed of Trust, granted to the Jason and Carolyn Noble Trust pursuant to the Chapter 11 Plan.

"Property" means the Real Property and the fixtures, structures and improvements and all personal property constituting fixtures, as that term is defined in the UCC, now or hereafter located at the Real Property, together with: (i) all rights now or hereafter existing, belonging, pertaining or appurtenant thereto; (ii) the following categories of assets as defined in the UCC: goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all proceeds of any thereof, whether now owned or hereafter acquired, that are located on or used in connection with, or that arise in whole or in part out of the Trustor's use of or business conducted on or respecting the Property and any substitutions, replacements, accessions and proceeds of any of the foregoing; (iii) all judgments, awards of damages and settlements hereafter made as a result or in lieu of any Taking; (iv) all of the rights and benefits of the Trustor under any present or future Leases, and (v) all contracts, permits, and licenses respecting the use, operation or maintenance of the Property.

"Real Property" means those parcels of real property whose addresses are 1525, 1575, and 1605 Cushman Street, Hollister, California 95023, with Assessor's Parcel Numbers of 057-230-001, 002, 003, and 029, and which are more particularly described in Exhibit A attached hereto.

"Rents" means all rents, income, issues and profits of any of the Property.

"Taking" means any condemnation or expropriation for public use of, or any damage by reason of the action of any public or governmental entity or authority to, all or any part of the Property.

"Title Report" means that Preliminary Report dated as of _____ issued to Trustor by First American Title Company under Order Number _____.

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 57 of 87

"UCC" means the California Uniform Commercial Code.

"Value" means mean the value established by the most recent appraisal of the subject Property by a duly licensed appraiser chosen jointly by Beneficiary and Trustor, provided that such appraisal is dated less than one hundred twenty (120) days before or after the date on which Value is to be determined.

**B.  EFFECTIVE DATE; RESTATEMENT**

This Deed of Trust constitutes a modification and restatement of that **Deed of Trust, Security Agreement, Assignment of Leases, Rents, and Profits, and Fixture Filing** recorded in the real estate records of San Benito County on May 3, 2007, as document number 2007-0005582, and is intended to continue and not replace the lien created by such deed of trust.  For all purposes, the priority of this Deed of Trust against all persons shall be the same as the priority of such earlier deed of trust.

## 1.  DEED OF TRUST, OBLIGATIONS AND FUTURE ADVANCES

1.1  Deed of Trust.  For valuable consideration paid and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Trustor hereby irrevocably and unconditionally mortgages, grants, bargains, transfers, sells, conveys, sets over and assigns to the Trustee and its successors and assigns, IN TRUST, for the benefit and security of the Beneficiary forever, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION, all of Trustor's right, title and interest in and to the Property, to secure the prompt payment and performance of the Obligations, including without limitation, all amounts due and owing from the Trustor to the Beneficiary and all obligations respecting the Note; and any substitutions, modifications, extensions or amendments to any of the Loan Documents.

The principal amount of obligations outstanding and evidenced by the Loan Documents and secured by this Deed of Trust total $_____ as of the date of this Deed of Trust, but this Deed of Trust shall nevertheless secure payment and performance of all Obligations.

1.2  Security Interest in Property.  As continuing security for the Obligations, the Trustor hereby pledges, assigns and grants to the Beneficiary, and its successors and assigns, a security interest in any of the Property constituting personal property or fixtures.  This Deed of Trust is and shall be deemed to be a security agreement and financing statement pursuant to the terms of the UCC as to any and all personal property and fixtures and as to all such property the Beneficiary shall have the rights and remedies of a secured party under the UCC in addition to its rights hereunder.  This Deed of Trust constitutes a financing statement filed as a fixture filing under Section 9-502(c) of the UCC covering any Property that now is or later may become a fixture.

1.3  Collateral Assignment of Leases and Rents.  The Trustor hereby irrevocably and unconditionally assigns to the Beneficiary, and its successors and assigns, as collateral security for the Obligations, all of the Trustor's rights and benefits under any and all Leases and any and all rents and other amounts now or hereafter owing with respect to the Leases or the use or occupancy of the Property.  This collateral assignment shall be absolute and effective

3

immediately, but the Trustor shall have a license, revocable by the Beneficiary upon the occurrence of an Event of Default, to continue to collect and use rents owing under the Leases until an Event of Default occurs and the Beneficiary exercises its rights and remedies to collect such rents as set forth herein.

       1.4   <u>Conditions to Grant</u>.   The grants herein to the Trustee, IN TRUST for the benefit of the Beneficiary, and to the Beneficiary, as the case may be, are upon the express condition that, if Trustor shall (a) pay and perform the Obligations in full, including, without limitation, all principal, interest and premium thereon and other charges, if applicable, in accordance with the terms and conditions in the Loan Documents and this Deed of Trust, (b) pay and perform all other Obligations as set forth in this Deed of Trust and (c) abide by and comply with each and every covenant and condition set forth herein and in the Loan Documents, the conveyances, grants and assignments contained in this Deed of Trust shall cease, terminate and be void.

       1.5   <u>Future Advances</u>.  It is the express intention of the Trustor that this Deed of Trust secure payment and performance of all of Obligations incurred by reason of future advances by the Beneficiary or otherwise, and regardless of whether such Obligations are or were contemplated by the parties at the time of the granting of this Deed of Trust.  Notice of the continuing grant of this Deed of Trust shall not be required to be stated on the face of any document evidencing any of the Obligations, nor shall such documents be required to otherwise specify that they are secured hereby.

## 2.     REPRESENTATIONS, WARRANTIES, COVENANTS

       2.1   <u>Representations and Warranties</u>.  The Trustor represents and warrants that:

(a)     This Deed of Trust has been duly executed and delivered by the Trustor and is the legal, valid and binding obligation of the Trustor enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally;

(b)     The Trustor is the sole legal owner of the Property, holding good and marketable fee simple title to the Property, subject only to the Permitted Encumbrances;

(c)     The Trustor is the sole legal owner of the entire lessor's interest in Leases, if any, with full power and authority to encumber the Property in the manner set forth herein, and the Trustor has not executed any other assignment of Leases or any of the rights or rents arising thereunder senior in priority to the lien evidenced by this Deed of Trust;

(d)     As of the date hereof, there are no Hazardous Substances in, on or under the Property, except as disclosed in writing to the Beneficiary; and

(e)     Each Obligation is a commercial obligation and does not represent a loan used for personal, family or household purposes and is not a consumer transaction.

       2.2   <u>Recording; Further Assurances</u>.  The Trustor covenants that it shall, at its sole cost and expense and upon the request of the Beneficiary, cause this Deed of Trust, and each

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 59 of 87

amendment, modification or supplement hereto, to be recorded and filed in such manner and in such places, and shall at all times comply with all such statutes and regulations as may be required by law in order to establish, preserve and protect the interest of the Beneficiary in the Property and the rights of the Beneficiary under this Deed of Trust. Trustor will from time to time execute and deliver to the Beneficiary such documents, and take or cause to be taken, all such other further action, as the Beneficiary may reasonably request in order to effect and confirm or vest more securely in the Beneficiary all rights contemplated by this Deed of Trust (including, without limitation, to correct clerical errors) or to vest more fully in, or assure to the Beneficiary the security interest in, the Property or to comply with applicable statutes or laws. To the extent permitted by applicable law, Trustor authorizes the Beneficiary to file financing statements, continuation statements or amendments without Trustor's signature appearing thereon, and any such financing statements, continuation statements or amendments may be signed or authenticated by the Beneficiary on behalf of Trustor, if necessary, and may be filed at any time in any jurisdiction. The Beneficiary may at any time and from time to time file financing statements, continuation statements and amendments thereto that describe the Property as "all assets of Trustor" or words of similar effect and which contain any other information required by Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including Trustor's type of organization and any organization identification number issued to Trustor; Trustor also authorizes the Beneficiary to file financing statements describing any agricultural liens or other statutory liens held by the Beneficiary. Trustor agrees to furnish any such information to the Beneficiary promptly upon request. In addition, Trustor shall at any time and from time to time, take such steps as the Beneficiary may reasonably request for the Beneficiary (i) to obtain an acknowledgement, in form and substance satisfactory to the Beneficiary, of any bailee having possession of any of the Property that the bailee holds such Property for the Beneficiary, (ii) to obtain "control" of any investment property, letter-of-credit rights or electronic chattel paper (as such terms are defined in Article 9 of the UCC relating to what constitutes "control" for such items of Property), with any agreements establishing control to be in form and substance satisfactory to the Beneficiary, and (iii) otherwise to insure the continued perfection and priority of the Beneficiary's security interest in any of the Property and the preservation of its rights therein. Trustor hereby constitutes the Beneficiary its attorney-in-fact to execute and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Deed of Trust terminates in accordance with its terms and all Obligations are paid in full.

2.3     <u>Restrictions on the Trustor</u>. The Trustor covenants that it will not, nor will it permit any other person to, directly or indirectly, without the prior written approval of the Beneficiary in each instance:

(a)     Sell, convey, assign, transfer, mortgage, pledge, hypothecate, or dispose of all or any part of any legal or beneficial interest in the Trustor or the Property or any part thereof or permit any of the foregoing, except as expressly permitted by the terms of this Deed of Trust;

(b)     Permit the use, generation, treatment, storage, release or disposition of Hazardous Substances, except in full compliance with applicable laws and regulations for handling, storage, release or cleanup of Hazardous Substances; or

5

(c)     Permit to be created or suffer to exist any mortgage, lien, security interest, attachment or other encumbrance or charge on the Property or any part thereof or interest therein (except for the Permitted Encumbrances), including, without limitation, (i) any lien arising under any Federal, state or local statute, rule, regulation or law pertaining to the release or cleanup of Hazardous Substances and (ii) any mechanics' or materialmen's lien not fully bonded against or released within sixty (60) days after the attachment thereof.  The Trustor further agrees to give the Beneficiary prompt written notice of the imposition, or notice, of any lien referred to in this Section and to take any action necessary to secure the prompt discharge or release of the same.  The Trustor agrees to defend its title to the Property and the Beneficiary's interest therein against the claims of all persons and, unless the Beneficiary requests otherwise, to appear in and diligently contest, at the Trustor's sole cost and expense, any action or proceeding that purports to affect the Trustor's title to the Property or the priority or validity of this Deed of Trust or the Beneficiary's interest hereunder.

2.4     Operation of Property. The Trustor covenants and agrees as follows:

(a)     The Trustor will not permit the Property to be used for any unlawful or improper purpose, will at all times comply with all Federal, state and local laws, ordinances and regulations, and the provisions of any Lease, easement or other agreement affecting all or any part of the Property, and will obtain and maintain all governmental or other approvals relating to the Trustor, the Property or the use thereof, including without limitation, any applicable zoning or building codes or regulations and any laws or regulations relating to the handling, storage, release or cleanup of Hazardous Substances, and will give prompt written notice to the Beneficiary of (i) any violation of any such law, ordinance or regulation by the Trustor or relating to the Property, (ii) receipt of notice from any Federal, state or local authority alleging any such violation and (iii) the presence or release on the Property of any Hazardous Substances.

(b)     The Trustor will at all times keep the Property insured for such losses or damage, in such amounts and by such companies as may be required by law and which the Beneficiary may reasonably require, provided that, in any case, the Trustor shall maintain: (i) physical hazard insurance on an "all risks" basis in an amount not less than 100% of the full replacement cost of the Property; (ii) flood insurance if and as required by applicable Federal law and as otherwise reasonably required by the Beneficiary; (iii) comprehensive commercial general liability insurance; (iv) rent loss and business interruption insurance; and (v) builder's risk insurance in the case any construction is being conducted on the Real Property.  All policies regarding such insurance shall be issued by companies licensed to do business in the state where the policy is issued and also in the state where the Property is located, be otherwise reasonably acceptable to the Beneficiary, provide deductible amounts reasonably acceptable to the Beneficiary, name the Beneficiary as mortgagee, loss payee and additional insured, and provide that no cancellation or material modification of such policies shall occur without at least thirty (30) days prior written notice to the Beneficiary.  Such policies shall include (i) a "standard"

6

mortgage endorsement so that the insurance, as to the interest of the Beneficiary, shall not be invalidated by any act or neglect of the Trustor or the owner of the Property, any foreclosure or other proceedings or notice of sale relating to the Property, any change in the title to or ownership of the Property, or the occupation or use of the Property for purposes more hazardous than are permitted at the date of inception of such insurance policies; (ii) a replacement cost endorsement; (iii) an agreed amount endorsement; and (iv) a contingent liability from operation endorsement. The Trustor will furnish to the Beneficiary upon request such original policies, certificates of insurance or other evidence of the foregoing as are reasonably acceptable to the Beneficiary. The terms of all insurance policies shall be such that no coinsurance provisions apply, or if a policy does contain a coinsurance provision, the Trustor shall insure the Property in an amount sufficient to prevent the application of the coinsurance provisions.

(c) The Trustor will at all times:

(i) maintain complete and accurate records and books regarding the Property in accordance with Trustor's customary accounting practices consistent with federal income tax reporting;

(ii) deliver to the Beneficiary, not later than 120 days after the end of each fiscal year of Trustor, copies of Trustor's federal income tax return for such fiscal year, a balance sheet as of the end of such fiscal year, and a statement of profit and loss covering such fiscal year, both of which shall fairly reflect the financial condition of the Trustor on the date thereof and the results of its operations for the period then ending and be prepared in accordance with Trustor's customary accounting practices consistent with federal income tax reporting; and

(iii) permit the Beneficiary and the Beneficiary's agents, employees and representatives, at such reasonable times as the Beneficiary may request, to enter and inspect the Property and such books and records.

(d) The Trustor will at all times keep the Property in good and first-rate repair and condition (damage from acts of God and other events outside of Trustor's control excepted) and will not commit or permit any strip, waste, impairment, or material deterioration of the Property or any part thereof.

2.5    Payments. The Trustor covenants to pay when due: all Federal, state, municipal, real property and other taxes, betterment and improvement assessments and other governmental levies, water rates, sewer charges, insurance premiums and other charges on the Property that could, if unpaid, result in a lien on the Property or on any interest therein. As to taxes or assessments treated under the Chapter 11 Plan, payment when due shall refer to payment when required by the Chapter 11 Plan and not the due dates set forth in nonbankruptcy law.

The Trustor shall have the right to contest any notice, lien, encumbrance, claim, tax, charge, betterment assessment or premium filed or asserted against or relating to the Property;

7

provided that it contests the same diligently and in good faith and by proper proceedings and, at the Beneficiary's request, provides the Beneficiary with adequate cash security, in the Beneficiary's reasonable judgment, against the enforcement thereof.

If hereafter requested by the Beneficiary in writing, the Trustor shall furnish to the Beneficiary the receipted real estate tax bills or other evidence of payment of real estate taxes for the Property assessed after the date hereof within thirty (30) days prior to the date from which interest or penalty would accrue for nonpayment thereof, and the Trustor shall also furnish to the Beneficiary evidence of all other payments referred to above within fifteen (15) days after written request therefor by the Beneficiary.

If Trustor shall fail to pay such sums, the Beneficiary may, but shall not be obligated to, advance such sums. Any sums so advanced by the Beneficiary shall be added to the Obligations, shall bear interest at the highest rate specified in any note evidencing the Obligations, and shall be secured by the lien of this Deed of Trust.

2.6     Notices; Notice of Default.    The Trustor will deliver to the Beneficiary, promptly upon receipt of the same, copies of all notices or other documents it receives that adversely affect the Property or its use, or claim that the Trustor is in default in the performance or observance of any of the terms hereof or that the Trustor or any tenant is in default of any terms of the Leases.

2.7     Takings.    In case of a Taking or the commencement of any proceedings or negotiations that might result in a Taking, the Trustor shall promptly give written notice to the Beneficiary, describing the nature and extent thereof. The Beneficiary may, at its option, appear in any proceeding for a Taking or any negotiations relating to a Taking and the Trustor shall promptly give to the Beneficiary copies of all notices, pleadings, determinations and other papers relating thereto. The Trustor shall in good faith and with due diligence and by proper proceedings file and prosecute its claims for any award or payment on account of any Taking. The Trustor shall not settle any such claim without the Beneficiary's prior written consent unless such settlement is in an amount sufficient to pay all Obligations then outstanding in full. The Trustor shall hold any amounts received with respect to such awards or claims, by settlement, judicial decree or otherwise, in trust for the Beneficiary and promptly pay the same to the Beneficiary up to the amount of the Obligations then outstanding. The Trustor authorizes any award or settlement due in connection with a Taking to be paid directly to the Beneficiary in amounts not exceeding the Obligations then outstanding.

2.8     Insurance Proceeds.    The proceeds of any insurance resulting from any loss with respect to the Property shall be used to repair the Property if the Property is in reasonably reparable condition; otherwise such proceeds shall be paid to the Beneficiary.

## 3.     CERTAIN RIGHTS OF THE BENEFICIARY

3.1     Legal Proceedings.    The Beneficiary shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding that, in the Beneficiary's reasonable judgment, might affect the Property or any of the rights created or secured by this

Case: 10-51813     Doc# 61     Filed: 05/19/11     Entered: 05/19/11 13:58:56     Page 63 of 87

Deed of Trust. The Beneficiary shall have such right whether or not there shall have occurred an Event of Default hereunder.

3.2     Appraisals/Assessments. The Beneficiary shall have the right (at the Beneficiary's own cost and expense unless an Event of Default has occurred and is continuing) to obtain appraisals, environmental site assessments or other inspections of the Real Property at such times as the Beneficiary deems necessary or as may be required by applicable law, or its prevailing credit or underwriting policies.

3.3     Financial Statements. The Beneficiary shall have the right, at the Trustor's sole cost and expense, to require delivery of financial statements of the Trustor that fairly reflect the financial condition of the Trustor on the date thereof and the results of its operations for the period then ending, prepared in accordance with Trustor's customary accounting practices consistent with federal income tax reporting and the Trustor hereby agrees to deliver such financial statements when required by the Beneficiary, but not more often than one for each fiscal quarter of the Trustor.

3.4     Substitution of Trustee. The Beneficiary may from time to time, without notice to the Trustor or the Trustee and with or without cause and with or without the resignation of the Trustee, substitute a successor or successors to the Trustee named herein or acting hereunder. Upon such appointment, the successor trustee shall be vested with all title, powers and duties conferred upon the Trustee named herein or acting hereunder. Each such appointment and substitution shall be made by a writing executed by Beneficiary and, when duly recorded in the appropriate office, shall be conclusive proof of proper appointment of such successor Trustee. The procedure herein provided for substitution of the Trustee shall be conclusive of all other provisions for substitution, statutory or otherwise.

3.5     Leases and Rent Roll. Not later than the thirtieth (30th) day of each January and at such other times as the Beneficiary shall reasonably request, the Trustor shall deliver to the Beneficiary a rent roll for the Property listing all tenants and occupants, stating the scheduled rents under all Leases, whether any such tenants are delinquent in any payments, and any other information that the Beneficiary reasonably requests.

## 4.     DEFAULTS AND REMEDIES

4.1     Events of Default. An "Event of Default" shall mean the occurrence of any one or more of the following events:

(a)     Default of any liability, obligation or undertaking of the Trustor on account of the Obligations, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Trustor under any other Loan Document or any other agreement between the Trustor and the Beneficiary continuing for 10 days with respect to the payment of money or continuing for 30 days with respect to any other default;

9

(b)     Failure by the Trustor to perform, observe or comply with any of the covenants, agreements, terms or conditions set forth in this Deed of Trust or the Loan Documents continuing for 30 days;

(c)     The (i) occurrence of any material loss, theft, damage or destruction of the Property or any material portion thereof which is not covered by adequate insurance, or (ii) issuance or making of any levy, seizure, attachment, execution or similar process on a material portion of the Property that is not bonded against or released within sixty (60) days after the issuance or attachment thereof;

(d)     If any statement, representation or warranty ~~heretofore,~~ now or hereafter made by the Trustor in writing in connection with this Deed of Trust or in any supporting financial statement of the Trustor shall prove to have been false in any material respect when made;

(e)     The liquidation, termination or dissolution of the Trustor, or the merger or consolidation of the Trustor into another entity, or its ceasing to carry on actively its business or the appointment of a receiver for its property;

(f)     The making by the Trustor of an assignment for the benefit of creditors or the granting by the Trustor of a trust mortgage for the benefit of creditors;

(g)     The service upon the Beneficiary of a writ in which the Beneficiary is named as trustee of the Trustor;

(h)     A judgment or judgments for the payment of money shall be rendered against the Trustor that would materially adversely affect the Value of any security for the Obligations or the Beneficiary's interest in the Property, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; or

(i)     Any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any Property which is not released within thirty (30) days after issuance or attachment thereof.

4.2     Remedies.  On the occurrence of any Event of Default and so long as such Event of Default is continuing, the Beneficiary may, at its option and, to the extent permitted by applicable law, without notice, exercise any or all of the following remedies:

(a)     Declare the Obligations due and payable, and the Obligations shall thereupon become immediately due and payable, without presentment, protest, demand or notice of any kind, all of which are hereby expressly waived by the Trustor;

(b)     Enter, take possession of, manage and operate the Property (including all personal property and all records and documents pertaining thereto) and any part thereof and exclude the Trustor therefrom, take all actions it deems necessary or proper to preserve the Property and operate the Property as a mortgagee in possession with all the powers as could be exercised by a receiver or as otherwise provided herein

10

or by applicable law; provided, however, that entry by the Beneficiary upon the Property for any reason shall not cause the Beneficiary to be a mortgagee in possession, except upon the express written declaration of the Beneficiary;

(c)    With or without taking possession, by itself or through a receiver, receive and collect all Rents from the Property (including all real estate and personal property and whether past due or thereafter accruing), including such Rents as may arise under the Leases, and the Trustor appoints the Beneficiary as its true and lawful attorney with the power for the Beneficiary in its own name and capacity to demand and collect Rents and take any action that the Trustor is authorized to take under the Leases. The Beneficiary shall (after payment of all costs and expenses incurred) apply any Rents received by it to the Obligations in such order as is set forth in the Note, or in accordance with any applicable statute, and the Trustor agrees that exercise of such rights and disposition of such funds shall not be deemed to cure any default or constitute a waiver of any foreclosure once commenced nor preclude the later commencement of foreclosure for breach thereof. The Beneficiary shall be liable to account only for such Rents actually received by the Beneficiary. Lessees under the Leases are hereby authorized and directed, following notice from the Beneficiary, to pay all amounts due the Trustor under the Leases to the Beneficiary, whereupon such lessees shall be relieved of any and all duty and obligation to the Trustor with respect to such payments so made;

(d)    In addition to any other remedies, to sell the Property or any part thereof or interest therein pursuant to exercise of its power of sale or otherwise at public auction on terms and conditions as the Beneficiary may determine, or otherwise foreclose this Deed of Trust in any manner permitted by law, and upon such sale the Trustor shall execute and deliver such instruments as the Beneficiary may reasonably request in order to convey and transfer all of the Trustor's interest in the Property, and the same shall operate to divest all rights, title and interest of the Trustor in and to the Property. In the event this Deed of Trust shall include more than one parcel of property or subdivision (each hereinafter called a "portion"), the Beneficiary shall, in its sole and exclusive discretion and to the extent permitted by applicable law, be empowered to foreclose upon any such portion without impairing its right to foreclose subsequently upon any other portion or the entirety of the Property from time to time thereafter. In addition, the Beneficiary may in its discretion subordinate this Deed of Trust to one or more Leases for the sole purpose of preserving any such Lease in the event of a foreclosure;

(e)    Choose to dispose of some or all of the Property in any combination consisting of both real and personal property, together in one sale, public or private, to be held in accordance with law and procedures applicable to real property, as permitted by Section 9604 of the UCC. Trustor agrees that such a sale of personal property together with real property constitutes a commercially reasonable sale of the personal property. Before any sale, Beneficiary or Trustee shall give such notice of default and election to sell as may then be required by law. When all time periods then legally mandated have expired, and after such notice of sale as may

11

then be legally required has been given, Trustee may sell the property being sold at a public auction to be held at the time and place specified in the notice of sale. Neither Trustee nor Beneficiary shall have any obligation to make demand on Trustor before any sale. From time to time in accordance with then applicable law, Trustee may, and in any event at Beneficiary's request shall, postpone any sale by public announcement at the time and place noticed for that sale. Notwithstanding the foregoing, Beneficiary shall be under no obligation to consummate a sale if, in its judgment, none of the offers received by it equals the fair value of the property offered for sale. At any sale, any person including Beneficiary may bid for and acquire the property or any part thereof to the extent permitted by then applicable law. Instead of paying cash for such property, Beneficiary may settle for the purchase price by crediting the sales price of the property against the expenses of sale, costs of any action and any other sums for which Trustor is obligated to pay or reimburse Beneficiary or Trustee under this Deed of Trust and all other Obligations. The foregoing procedures do not constitute the only procedures that may be commercially reasonable, and Beneficiary and Trustee may choose, for example, if the Property consists of more than one parcel, to sell and dispose of such parcels in separate or combined sales in such order as Beneficiary may elect. The proceeds of any such disposition of Property shall not cure any Event of Default or reinstate any Obligations for purposes of Section 2924c of the California Civil Code. For purposes of this power of sale, either a sale of real property alone, or a sale of both real and personal property together in accordance with UCC Section 9604, will sometimes be referred to as a "Trustee's Sale";

(f) In accordance with Section 736 of the California Code of Civil Procedure, Beneficiary may bring an action for breach of contract against Trustor for breach of any "environmental provision" (as such term is defined in such Section) made by Trustor herein or in any other Loan Document for the recovery of damages and/or the enforcement of the environmental provision. In accordance with the California Code of Civil Procedure, Section 726.5, Beneficiary may waive the security under this Deed of Trust with respect to any parcel of the Property that is "environmentally impaired" or is an "affected property" (as such terms are defined in such Section), and as to any personal property which is attached to such parcel, and thereafter exercise against Trustor, to the extent permitted by such Section, the rights and remedies of an unsecured creditor, including reduction of Beneficiary's claim against Trustor to judgment, and any other rights and remedies permitted by law. In the event Beneficiary elects, in accordance with the California Code of Civil Procedure, Section 726.5, to waive all or part of the security under this Deed of Trust and proceed against Trustor on an unsecured basis, then (i) the valuation of the real property, (ii) the determination of the environmentally impaired status of such security and (iii) any cause of action for money judgment shall, at the request of Beneficiary, be referred to a referee in accordance with the California Code of Civil Procedure, Section 638 *et seq*. Such referee shall be an M.A.I. appraiser selected by Beneficiary and approved by Trustor, which approval shall not be unreasonably withheld or delayed. The decision of such referee shall be binding upon both Beneficiary and Trustor and

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 67 of 87

judgment upon the award rendered by such referee shall be entered in the court in which such proceeding was commenced in accordance with the California Code of Civil Procedure, Sections 644 and 645. Trustor shall pay all reasonable costs and expenses incurred by Beneficiary in connection with any proceeding under the California Code of Civil Procedure, Section 726.5;

(g)     Cause one or more environmental assessments to be taken, arrange for the cleanup of any Hazardous Substances or otherwise cure the Trustor's failure to comply with any statute, regulation or ordinance relating to the presence or cleanup of Hazardous Substances, and the Trustor shall provide the Beneficiary or its agents with access to the Property for such purposes; provided that the exercise of any of such remedies shall not be deemed to have relieved the Trustor from any responsibility therefor or given the Beneficiary "control" over the Property or cause the Beneficiary to be considered to be a mortgagee in possession, "owner" or "operator" of the Property for purposes of any applicable law, rule or regulation pertaining to Hazardous Substances; and

(h)     Take such other actions or proceedings as the Beneficiary deems necessary or advisable to protect its interest in the Property and ensure payment and performance of the Obligations, including, without limitation, appointment of a receiver (and the Trustor hereby waives any right to object to such appointment) and exercise of any of the Beneficiary's remedies provided herein or in any other document evidencing, securing or relating to any of the Obligations or available to a secured party under the UCC or under other applicable law.

4.3     Due on Sale or Transfer.  Beneficiary may, at it option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Beneficiary's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of the such Real Property or any right, title or interest therein; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, option contract, or by sale, assignment or transfer of any beneficial interest in or to any land trust holding title to such real property, or by any other method of conveyance of a real property interest. A "sale or transfer" also includes any change in ownership, in a single or series of related transactions, of more that 50% of the voting interests of the Trustor or a change which results in Albert Valles, Jr., controlling less than a majority of the voting interests in the Trustor. The Beneficiary shall not exercise this option if applicable law prohibits such exercise.

4.4     Power of Sale.  Trustor hereby grants to the Trustee, and its successors and assigns, for the benefit and security of the Beneficiary, a power of sale under California Civil Code Section 2924, and accordingly, the Beneficiary and the Trustee shall have all of the rights and powers granted by California law to the holder of a deed of trust containing a power of sale, including the right, to the extent permitted by California law, to foreclose, by exercising the power of sale, without first commencing a foreclosure action or obtaining a foreclosure decree, and to give such notices and to do all other acts as are permitted or required by California Civil Code Section 2924 to foreclose this Deed of Trust without judicial action.

13

4.5     Other Remedies.  In addition, the Trustee and the Beneficiary shall have all other remedies provided by applicable law, including, without limitation, the right to pursue a judicial sale of the Property or any portion thereof by deed, assignment or otherwise.

4.6     Acceptance of Payments; Subrogation.  The Trustor agrees and acknowledges that the acceptance by the Trustee or the Beneficiary of any payments from either the Trustor or any other person after the occurrence of any Event of Default, the exercise by the Trustee or the Beneficiary of any remedy set forth herein or the commencement, discontinuance or abandonment of foreclosure proceedings against the Property shall not waive the Trustee's or the Beneficiary's subsequent or concurrent right to foreclose or operate as a bar or estoppel to the exercise of any other rights or remedies of the Trustee or the Beneficiary.   The Trustor agrees and acknowledges that the Trustee or the Beneficiary, by making payments or incurring costs described herein, shall be subrogated to any right of the Trustor to seek reimbursement from any third parties, including, without limitation, any predecessor in interest to the Trustor's title or other party who may be responsible under any law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances.

4.7     Advances.  If the Trustor fails to pay or perform any of its obligations respecting the Property, the Beneficiary may in its sole discretion do so without waiving or releasing Trustor from any such obligation.  Any such payments may include, but are not limited to, payments for taxes, assessments and other governmental levies, water rates, insurance premiums, maintenance, repairs or improvements constituting part of the Property.  Any amounts paid by the Beneficiary hereunder shall be, until paid, part of the Obligations and secured by this Deed of Trust, and shall be due and payable to the Beneficiary, on demand, together with interest thereon to the extent permitted by applicable law, at the highest rate permitted under the Note.

4.8     Cumulative Rights and Remedies.  All of the foregoing rights, remedies and options (including without limitation the right to enter and take possession of the Property, the right to manage and operate the same, and the right to collect Rents, in each case whether by a receiver or otherwise) are cumulative and in addition to any rights the Beneficiary might otherwise have, whether at law or by agreement, and may be exercised separately or concurrently and none of which shall be exclusive of any other.  The Trustor further agrees that the Trustee and the Beneficiary may exercise any or all of their rights or remedies set forth herein without having to pay the Trustor any sums for use or occupancy of the Property.

4.9     Trustor's Waiver of Certain Rights.  To the extent permitted by applicable law, the Trustor hereby waives the benefit of all present and future laws (i) providing for any appraisal before sale of all or any portion of the Property or (ii) in any way extending the time for the enforcement of the collection of the Obligations or creating or extending a period of redemption from any sale made hereunder.

4.10    Transfer of Title.  Upon the completion of any sale or sales of any Property, Trustee shall execute and deliver to the accepted purchaser or purchasers a good and sufficient deed of conveyance or assignment and transfer, lawfully conveying, assigning, and transferring the Property sold, but without any covenant or warranty, express or implied.

14

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 69 of 87

4.11    Effect of Sale. Any sale or sales made by virtue of or under this Deed of Trust, whether under any power of sale herein granted or through judicial proceedings, shall, to the fullest extent permitted by law, operate to divest all right, title, estate, interest, claim, and demand whatsoever, either at law or in equity, of the Trustor in and to the property so sold, or any part thereof from, through or under Trustor, its successors and assigns.  The receipt by Trustee shall be full and sufficient discharge to any purchaser of the Property or any part thereof sold as aforesaid for the purchase money; and no purchaser or his representatives, grantees or assigns after paying such purchase money and receiving such receipt, shall be bound to see to the application of such purchase money upon or for any trust or purpose of this Deed of Trust, or in any manner whatsoever be answerable for any loss, misapplication or non-application of any such purchase money or be bound to inquire as to the authorization, necessity, expedience or regularity of any such sale.

4.8    Reconveyance.  Upon written request of the Beneficiary and surrender of this Deed of Trust and any Notes to Trustee for cancellation or endorsement, and upon payment of its fees and charges, Trustee shall reconvey, without warranty, all or any part of the Property then subject to this Deed of Trust.  Any reconveyance, whether full or partial, may be made in terms to "the person or persons legally entitled thereto," and the recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.

5.    MISCELLANEOUS

5.1 4.9    Costs and Expenses— on Default.  To the extent permitted by applicable law, the Trustor shall pay to the Trustee and the Beneficiary, on demand, all reasonable expenses (including attorneys' fees and expenses and reasonable accounting, appraisal, brokerage and similar professional fees and charges) incurred by the Trustee and the Beneficiary in connection with the Trustee's and the Beneficiary's recordation of this Deed of Trust, exercise, preservation or enforcement of any of its rights, remedies and options set forth in this Deed of Trust arising from an Event of Default and in connection with any litigation, proceeding or dispute whether arising hereunder or otherwise relating to the Obligations, together with interest thereon to the extent permitted by applicable law, until paid in full by the Trustor at the highest rate set forth in the Note.  Any amounts owed by the Trustor under this Section shall be, until paid, part of the Obligations and secured by this Deed of Trust, and the Beneficiary shall be entitled, to the extent permitted by law, to receive and retain such amounts in any action for a deficiency against or redemption by the Trustor, or any accounting for the proceeds of a foreclosure sale or of insurance proceeds.

5.2    MISCELLANEOUS

5.1    Limit on Interest.  If from any circumstances whatsoever, fulfillment of any provision of this Deed of Trust, the Note or any other Loan Document, at the time performance of such provision becomes due, would exceed the limit on interest then permitted by any applicable usury statute or any other applicable law, the Beneficiary may, at its option (a) reduce the Obligations to be fulfilled to such limit on interest, or (b) apply the amount in excess of such limit on interest to the reduction of the outstanding principal balance of the Obligations, and not to the payment of interest, with the same force and effect as though Trustor had specifically

15

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 70 of 87

designated such sums to be so applied to principal and Beneficiary had agreed to accept such extra payments(s) as a premium-free prepayment, so that in no event shall any exaction be possible under this Deed of Trust or any other Loan Document that is in excess of the applicable limit on interest.  It is the intention of Trustor and Beneficiary that the total liability for payments in the nature of interest shall not exceed the limits imposed by any applicable state or federal interest rate laws.  The provisions of this Section shall control every other provision of this Deed of Trust, and any provision of any other Loan Document in conflict with this Section.

5.32    Indemnification Regarding Leases.  The Trustor hereby agrees to defend, and does hereby indemnify and hold the Beneficiary, Trustee, and each of their respective directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless from all losses, damages, claims, costs or expenses (including attorneys' fees and expenses) resulting from the assignment of the Leases and from all demands that may be asserted against such Indemnitees arising from any undertakings on the part of the Beneficiary to perform any obligations under the Leases.  It is understood that the assignment of the Leases shall not operate to place responsibility for the control or management of the Property upon the Beneficiary or any Indemnitee or make them liable for performance of any of the obligations of the Trustor under Leases, respecting any condition of the Property or any other agreement or arrangement, written or oral, or applicable law relating to the Leases.

5.43    Indemnification Regarding Hazardous Substances.  The Trustor hereby agrees to defend, and does hereby indemnify and hold harmless each Indemnitee from and against any and all losses, damages, claims, costs or expenses, including, without limitation, litigation costs and attorneys' fees and expenses and fees or expenses of any environmental engineering or cleanup firm incurred by such Indemnitee and arising out of or in connection with the Property or resulting from the application of any current or future law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances on or affecting the Property.  The Trustor agrees its obligations hereunder shall be continuous and shall survive termination or discharge of this Deed of Trust and/or the repayment of all debts to the Beneficiary including repayment of all Obligations.

5.54    Indemnitee's Expenses.  If any Indemnitee is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Deed of Trust or the Property or any part thereof or therein or concerning the construction, maintenance, operation or the occupancy or use thereof by the Trustor or other person or entity, then the Trustor shall indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment.  The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Beneficiary in favor of the Trustor.

5.65    Waivers.  No delay or omission of the Beneficiary in exercising or enforcing any of its rights, powers, privileges, remedies, immunities or discretion (all of which are hereinafter collectively referred to as "the Beneficiary's rights and remedies") hereunder shall constitute a waiver thereof; and no waiver by the Beneficiary of any default of the Trustor hereunder or of any demand shall operate as a waiver of any other default hereunder or of any other demand.  No

16

term or provision hereof shall be waived, altered or modified except with the prior written consent of the Beneficiary, which consent makes explicit reference to this Deed of Trust. Except as provided in the preceding sentence, no other agreement or transaction, of whatsoever nature, entered into between the Beneficiary and the Trustor at any time (whether before, during or after the effective date or term of this Deed of Trust) shall be construed as a waiver, modification or limitation of any of the Beneficiary's rights and remedies under this Deed of Trust and all the Beneficiary's rights and remedies under the provisions of this Deed of Trust shall be cumulative and not alternative or exclusive, and may be exercised by the Beneficiary at such time or times and in such order of preference as the Beneficiary in its sole discretion may determine.

5.76 <u>Severability</u>. If any provision of this Deed of Trust or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Deed of Trust (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

5.87 <u>Complete Agreement</u>. This Deed of Trust, and the other Loan Documents, the Chapter 11 Plan, and any orders entered to confirm the Chapter 11 Plan constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersede all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

5.98 <u>Binding Effect of Agreement</u>. This Deed of Trust shall run with the land and be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Beneficiary shall be entitled to rely thereon) until all Obligations are fully and indefeasibly paid. The Beneficiary may transfer and assign this Deed of Trust and deliver any collateral to the assignee, who shall thereupon have all of the rights of the Beneficiary; and the Beneficiary shall then be relieved and discharged of any responsibility or liability with respect to this Deed of Trust and such collateral with respect to acts, events or conditions after the date of such assignment. Except as expressly provided herein or in the other Loan Documents, nothing expressed or implied is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Deed of Trust or the other Loan Documents.

5.109 <u>Notices</u>. Any notices under or pursuant to this Deed of Trust shall be deemed duly received and effective if delivered in hand to any officer of agent of the Trustor or the Beneficiary, or if mailed by registered or certified mail, return receipt requested, at the time delivery is indicated on the return receipt, so long as the notice is addressed to the intended party at the address set forth in this Deed of Trust or at the address which any party may from time to time designate by written notice to the other part(ies).

5.1110 <u>Governing Law</u>. Subject to applicable Federal law, this Deed of Trust shall be governed by California law without giving effect to the conflicts of laws principles thereof that would result in the application of the law of any other jurisdiction.

5.1211 <u>Reproductions</u>. This Deed of Trust and all documents which have been or may be hereinafter furnished by the Trustor to the Beneficiary may be reproduced by the

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 72 of 87

Beneficiary by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

       5.~~13~~12       <u>Jurisdiction and Venue</u>. The Trustor irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in California over any suit, action or proceeding arising out of or relating to this Deed of Trust. The Trustor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.

EXECUTED as of the date first above written:

                           VALLES & ASSOCIATES, LLC,
                           A California limited liability company,

                           By: _____
                             Albert Valles, Jr., ~~Managing Member~~Manager

STATE OF CALIFORNIA

                       ss

COUNTYOF SAN BENITO

On _____, ~~2010~~2011, before me, _____, Notary Public, personally appeared Albert Valles, Jr., personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the entity upon behalf of which he acted, executed the instrument.

WITNESS my hand and official seal.

_____

Print Name: _____

# EXHIBIT A

LEGAL DESCRIPTION

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 74 of 87

# EXHIBIT D

# TERM PROMISSORY NOTE

**[Effective Date of Plan]**

**[Claim Amount as of Effective Date]**

For value received, the undersigned Valles & Associates, LLC, a California limited liability company, with an address of 817 Industrial Drive, Suite A, Hollister, California 95023, ("Borrower"), promises to pay to the order of Pacific Capital Bank, N.A., a national banking association, doing business as San Benito Bank with an address of c/o Loan Services, PO Box 60654, Santa Barbara, California 93160-0654 (together with its successors and assigns, the "Bank"), the principal amount of [CLAIM AMOUNT ON EFFECTIVE DATE-including accrued and unpaid interest but excluding default interest, late fees, legal fees to date, and other extraordinary charges] on or before [20TH DAY OF 60th MONTH AFTER EFFECTIVE DATE] (the "Maturity Date"), as set forth below, together with interest from the date hereof on the unpaid principal balance from time to time outstanding until paid in full.  The Borrower shall pay consecutive monthly installments of principal and interest, as follows: $13,131.87 on [TWENTIETH OF MONTH AFTER EFFECTIVE DATE], and the same amount (except the last installment which shall be the unpaid balance) on the 20th day of each month thereafter. The aggregate principal balance outstanding from time to time shall bear interest thereon at a per annum rate equal to Seven and One-Half Percent (7.50%).

Principal and interest shall be payable at the Bank's main office or at such other place as the Bank may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim.  Interest shall be calculated monthly on the basis of a 360-day year based on twelve (12) thirty (30) day months except that interest due and payable for a period of less than a full month shall be calculated by multiplying the actual number of days elapsed in such period by a daily rate based on said 360-day year.

At the option of the Bank, this Note shall become immediately due and payable without notice or demand upon the occurrence at any time of any of the following events of default (each, an "Event of Default"):

(1) default of any liability, obligation or undertaking of the Borrower to the Bank hereunder, including, without limitation, failure to pay in full and when due any installment of principal or interest in connection with the loan evidenced by this Note continuing for 10 days with respect to the payment of money or continuing for thirty (30) days with respect to any other default;

(2) failure of the Borrower to maintain aggregate collateral security with a Value (as hereafter defined) of at least 25% greater than the total of principal and interest outstanding under this Note at any particular time (calculated as herein set forth), which failure continues for 30 days;

(3) if any statement, representation or warranty hereafter made by the Borrower in connection with the loan evidenced by this Note or in any supporting financial statement of the

Borrower presented hereafter to Bank shall prove to have been false in any material respect when made;

(4) the liquidation, termination or dissolution of Borrower, or the merger or consolidation of Borrower into another entity, or its ceasing to carry on actively its business or the appointment of a receiver for its property;

(5) the making by the Borrower of an assignment for the benefit of creditors or the granting by the Borrower of a trust mortgage for the benefit of creditors;

(6) the service upon the Bank of a writ in which the Bank is named as trustee of the Borrower;

(7) a judgment or judgments for the payment of money shall be rendered against the Borrower that would materially adversely affect the Value of any security for this Note or the Bank's interest therein, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; or

(8) any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any property which is security for the loan evidenced by this Note which is not released within thirty (30) days after issuance or attachment thereof.; or

(9) an "Event of Default," as defined in Borrower's **Amended Chapter 11 Plan Dated as of April 15, 2011** (together with any modifications confirmed by the bankruptcy court having jurisdiction over Borrower's Chapter 11 case, the "Plan") with respect to Borrower's obligations under the Plan to the County of San Benito on account of its claim for real property taxes.

For all purposes of this Note and any related Loan Documents, "Value" shallmeans mean the value established by the most recent appraisal of the subject collateralProperty by a duly licensed real estate appraiser reasonably acceptable to the Bank and chosen jointly by Borrower and Bank, provided that such appraisal is dated less than one hundred twenty (120) days before or after the date on which Value is to be determined.

Any payments received by the Bank on account of this Note shall be applied, first, to accrued and unpaid interest; second, to the unpaid principal balance hereof; third to any costs, expenses or charges then owed to the Bank by the Borrower. At any time that an Event of Default has occurred and is continuing, the Borrower hereby authorizes the Bank to charge any deposit account which the Borrower may maintain with the Bank for any payment required hereunder without prior notice to the Borrower.

If, pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. More specifically, if from any circumstances whatsoever, fulfillment of any provision of this Note or any other Loan

2

Document executed and delivered in connection with this Note, at the time performance of such provision becomes due, would exceed the limit on interest then permitted by any applicable usury statute or any other applicable law, the Bank may, at its option (a) reduce the obligations to be fulfilled to such limit on interest, or (b) apply the amount in excess of such limit on interest to the reduction of the outstanding principal balance of the obligations, and not to the payment of interest with the same force and effect as though Borrower had specifically designated such sums to be so applied to principal and Bank had agreed to accept such extra payments(s) as a prepayment, so that in no event shall any exaction be possible under this Note or any other loan document that is in excess of the applicable limit on interest. It is the intention of Borrower and Bank that the total liability for payments in the nature of interest shall not exceed the limits imposed by any applicable state or federal interest-rate laws. The provisions of this paragraph shall control every other provision of this Note, and any provision of any other loan document in conflict with this paragraph.

The Borrower represents to the Bank that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.

The Borrower grants to the Bank a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Bank (or any of its banking or lending affiliates, or any bank acting as a participant under any loan arrangement between the Bank and the Borrower, or any third party acting on the Bank's behalf (collectively, the "Bank Affiliates") to the Borrower and any cash, securities" instruments or other property of the Borrower in the possession of the Bank or any Bank Affiliate, whether for safekeeping or otherwise, or in transit to or from the Bank or any Bank Affiliate (regardless of the reason the Bank or Bank Affiliate had received the same or whether the Bank or Bank Affiliate has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower to the Bank or any Bank Affiliate hereunder and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower to the Bank or any Bank Affiliate at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank or any Bank Affiliate.

Borrower's obligations under this Note shall also be secured by the liens granted in that Deed of Trust, Security Agreement, Assignment of Leases, Rents, and Profits, and Fixture Filing executed concurrently herewith (the "Deed of Trust").

No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Bank, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. Borrower waives presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral.

3

The Borrower agrees to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 3.0% plus the rate provided for herein. If any payment due under this Note (other than the balance due on maturity or any accelerated balance of this Note) is unpaid for 15 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Bank's other remedies on account thereof), a late charge equal to the greater of $10.00 or 10.0% of such unpaid amount.

This Note shall be binding upon the Borrower and upon its successors, assigns and legal representatives, and shall inure to the benefit of the Bank and its successors, endorsees and assigns. The Borrower waives presentment, demand, protest, notice of dishonor, notice of protest and all other notices and demands of every kind, and all suretyship defenses of any kind, in each case that would otherwise be available in connection with this Note including, without limitation, any right (whether now or hereafter existing) to require the holder hereof to first proceed against the Borrower, or any guarantor, or any security.

The Borrower further waives, to the extent permitted by law, any and all rights and defenses that it may have because the debt evidenced by this Note is secured by real property: this means, among other things, that: (i) the Bank may collect from the Borrower, without first foreclosing on any real or personal property collateral pledged by the Borrower; and (2) if the Bank forecloses on any real property collateral pledged by the Borrower, then the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price. The foregoing sentence is an unconditional and irrevocable waiver of any rights and defenses the Borrower may have because the underlying debt is secured by real property. These rights and defenses being waived by the Borrower include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the California Code of Civil Procedure. Without limiting the generality of the foregoing or any other provision hereof, the Borrower further expressly waives to the extent permitted by law any and all rights and defenses, including without limitation any rights of subrogation, reimbursement, indemnification and contribution, which might otherwise be available to the Borrower under California Civil Code Sections 2822, 2787 to 2855, inclusive, 2899 and 3433, or under California Code of Civil Procedure Sections 580a, 580b, 580d and 726, or any such section.

In the event that, at any time, a surety is liable upon only a portion of the Borrower's obligations under this Note and the Borrower provides partial satisfaction of any such obligation(s), the Borrower hereby waives any right it would otherwise have, under Section 2822 of the California Civil Code, to designate the portion of the obligations to be satisfied. The designation of the portion of the obligation to be satisfied shall, to the extent not expressly made by the terms of this Note, be made by the Bank rather than Borrower.

The liabilities of the Borrower and any guarantor of this Note are joint and several; provided, however, the release by the Bank of the Borrower or any one or more guarantors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any guarantor of this Note are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Bank under this Note and the Deed of Trust. No person obligated on account of this Note may seek contribution from any other person also obligated,

4

unless and until all liabilities, obligations and indebtedness to the Bank of the person from whom contribution is sought have been satisfied in full. The release or compromise by the Bank of any collateral shall not release the Borrower on account of this Note.

A photographic or other reproduction of this Note may be made by the Bank, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

The Borrower will from time to time execute and deliver to the Bank such documents, and take or cause to be taken, all such other further action, as the Bank may reasonably request in order to effect and confirm or vest more securely in the Bank all rights contemplated by this Note or any other loan documents related hereto (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in any collateral securing this Note or to comply with applicable statute or law.

This Note is delivered to the Bank at one of its offices in California and shall be governed by the laws of the State of California.

Any notices under or pursuant to this Note shall be deemed duly received and effective when delivered in hand to any officer of agent of the Borrower or the Bank, or if mailed by registered or certified mail, return receipt requested, at the time delivery is indicated on the return receipt, so long as the notice is addressed to the Borrower or the Bank at the address set forth in this Note or at the address which any party may from time to time designate by written notice to the other party.

The Borrower acknowledges that the Bank is entitled to a minimum interest charge of $75.00. The Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in California over any suit, action or proceeding arising out of or relating to this Note. The Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.

<u>Due on Sale or Transfer</u>. Bank may, at it option, declare immediately due and payable all sums secured by ~~one or more deed~~the Deed of ~~trusts~~Trust provided by Borrower to secure this Note upon the sale or transfer, without the Bank's prior written consent, of all or any material part of the real property covered by any such ~~deed~~Deed of ~~trust~~Trust, or any interest in such real property. A "sale or transfer" means the conveyance of ~~the~~ such real property or any right, title or interest therein; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, option contract, or by sale, assignment or transfer of any beneficial interest in or to any land trust holding title to such real property, or by any other method of conveyance of a real property interest. A "sale or transfer" also includes any change in ownership, in a single or series of related transactions, of more that 50% of the voting interests of Borrower or a change which results in Albert Valles, Jr., controlling less than a majority of the voting interests in Borrower. This option shall not be exercised by Bank if applicable law prohibits such exercise.

5

IN WITNESS WHEREOF, this Note is executed and delivered as of the date written in the ~~caption~~preamble of this Note.

VALLES & ASSOCIATES, LLC,
A California limited liability company,


By: _____
             Albert Valles, Jr.,
             Manager

6

# EXHIBIT E

**LIMITED GUARANTY**

TO:      Pacific Capital Bank, N.A., a national banking association, doing business as San Benito Bank (the "Bank")

RE:      **Valles & Associates, a California limited liability company** (the "Borrower")

To induce the Bank to accept that Term Promissory Note ("Note") and that Deed of Trust, Security Agreement, Assignment of Leases, Rents, and Profits, and Fixture Filing ("Deed of Trust"), both dated concurrently herewith and made by Borrower in favor of Bank, and to accept that Debtor's Amended Chapter 11 Plan Dated April 15, 2011 (together with any modifications confirmed by the bankruptcy court having jurisdiction over Borrower's Chapter 11 case, the "Plan"), in consideration thereof, the undersigned _____ (the "Guarantor") absolutely and unconditionally guarantees the full and punctual payment to the Bank of all sums which may be presently due and owing and of all sums which shall in the future become due and owing to the Bank from the Borrower pursuant to the Note or the Deed of Trust, whether direct or indirect, whether as a borrower, guarantor, surety or otherwise, including, without limitation, interest, attorneys' fees and other amounts accruing after the filing of a petition in bankruptcy by or against Borrower, notwithstanding the discharge of Borrower from such obligations, together with all costs and expenses incurred by the Bank in connection with such obligations, this Limited Guaranty (this "Guaranty") and the enforcement thereof.

The liability of the Guarantor hereunder shall be limited to the sum of all obligations due the Bank under the Note and/or Deed of Trust, up to but not exceeding **$_____** in the aggregate ("Guaranteed Obligations") plus, without limitation as to the amounts thereof, all costs and expenses, including court costs and legal expenses, incurred or expended by the Bank in connection with or as authorized by the Note and/or the Deed of Trust and other amounts recoverable under this Guaranty from the time the Guaranteed Obligations become due until payment, with interest thereon at the rate applicable to such Guaranteed Obligations. The liability of the Guarantor shall not be diminished by virtue of any payments made in reduction of the obligations guaranteed hereby by any other person, including any other guarantor or from any other source, unless and until all obligations and liabilities of Borrower to the Bank have been fully paid and performed.

Guarantor also agrees:

(1)    to indemnify and hold the Bank and its directors, officers, employees, agents and attorneys harmless from and against all claims, obligations, demands and liabilities, by whomsoever asserted, and against all losses in any way suffered, incurred or paid as a result of or in any way arising out of the transactions underlying the Note and Deed of Trust occurring on or after the date hereof, except for any claim arising out of the gross negligence or willful misconduct of the Bank. Without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits or defenses which otherwise might be available to Guarantor under California Civil Code Sections 2799, 2808, 2809, 2810, 2815, 2819, 2820, 2821,2822, 2838, 2839, 2845, 2849, 2850, 2899 and 3433. Guarantor further waives all rights and defenses Guarantor may have because the obligations guaranteed hereby are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the California Code of Civil Procedure. This means, among other things that the Bank may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower and if the Bank forecloses on any real property collateral, (i) the amount of the obligations guaranteed hereby may be reduced only by the price for which that collateral is sold at a lawfully conducted foreclosure sale, even if the collateral is worth more than the sale price and (ii) the Bank may collect from Guarantor even if the Bank, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. Guarantor further waives all rights and defenses arising out of an election of remedies by the Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of

subrogation and reimbursement against Borrower by the operation of Section 580d of the California Code of Civil Procedure or otherwise;

(2) that this Guaranty shall not be impaired by any modification, supplement, extension, renewal or amendment of any contract or agreement to which the parties thereto may hereafter agree, nor by any modification, increase, release or other alteration of any of the obligations hereby guaranteed or of any security therefor, nor by any agreements or arrangements whatsoever with Borrower or anyone else, all of which may be done without notice to or consent by the Guarantor;

(3) that the liability of the Guarantor hereunder is direct and unconditional and due immediately upon default of Borrower without demand or notice and without requiring the Bank first to resort to any other right, remedy or security;

(4) that Guarantor waives its rights of subrogation, reimbursement, indemnification and contribution, any right of recourse to security for the debts and obligations of Borrower to the Bank and any other rights and defenses that are or may become available to Guarantor, including without limitation, under California Civil Code Sections 2787 to 2855, inclusive, and California Code of Civil Procedure Sections 580a, 580b, 580d, or 726, and any successor Sections; and acknowledges that such a waiver is intended by the Guarantor to be effective to the maximum extent permitted by California Civil Code Section 2856 and other applicable law;

(5) that the liability of the Guarantor shall be several, and not joint, with the liabilities of any other guarantors;

(6) that if Borrower or the Guarantor or any other guarantor should at any time hereafter (a) make a general assignment for the benefit of creditors, (b) commence or acquiesce to the commencement of a case under the U.S. Bankruptcy Code or a similar law, or (c) be the subject of such a case filed against it that is not dismissed within thirty (30) days after its commencement, any and all obligations of the Guarantor shall be immediately due and payable without notice;

(7) that the Bank's books and records maintained in the ordinary course showing the account between the Bank and Borrower shall be admissible in any action or proceeding, shall be binding upon the Guarantor for the purpose of establishing the items therein set forth and shall constitute conclusive proof thereof;

(8) that this Guaranty may be terminated as to the Guarantor only by giving the Bank sixty (60) days' prior written notice by registered or certified mail, and thereupon this Guaranty shall terminate with respect to Guarantor only at the expiration of said sixty (60) day period, which shall then be the effective date of termination, and that such termination shall be applicable only to transactions having their inception after the effective date of termination and shall not affect rights and obligations arising out of transactions or indebtedness or extensions or renewals thereof having their inception prior to such date, including renewals, extensions, modifications and refinancings of such prior transactions, or arising out of extensions of credit made pursuant to a commitment previously made by the Bank;

(9) that the death of Guarantor shall not effect the termination of this Guaranty as to Guarantor providing, that in any event within sixty (60) days after the death of the Guarantor, Borrower or any surviving guarantor shall provide to the Bank evidence that the estate of the Guarantor confirms its obligations to the Bank under this Guaranty;

(10) that termination, release or limitation of any guaranty of the obligations guaranteed hereby by any other guarantor shall not affect the continuing liability hereunder of the Guarantor;

(11) that nothing shall discharge or satisfy the liability of the Guarantor hereunder except the full indefeasible payment and performance of all of Borrower's debts and obligations to the Bank with applicable interest and costs of collection;

(12) that this Guaranty shall not be affected by the illegality, invalidity or unenforceability of the obligations guaranteed, by any fraudulent, illegal or improper act by Borrower, the legal

2

incapacity or any other defense of Borrower, the Guarantor or any other guarantor nor by the invalidation, by operation of law or otherwise, of all or any part of the obligations guaranteed hereby, including but not limited to any interest accruable on the obligations guaranteed hereby during the pendency of any bankruptcy or receivership proceeding of Borrower nor any mere personal disability of  Borrower though the disability be such as to make the contract void against Borrower;

(13) that any and all present and future debts and obligations of Borrower to Guarantor are hereby subordinated to the full indefeasible payment and performance of all present and future debts and obligations of Borrower to the Bank;

(14) that the  Guarantor hereby grants to the Bank a continuing lien and security interest in all deposits or other sums at any time credited by or due from the Bank to the Guarantor and any property of the Guarantor at any time in the possession of the Bank whether for safekeeping or otherwise, or in transit to or from the Bank (regardless of the reason the Bank had received the same or whether the Bank has conditionally released the same) as security for the full and punctual payment and performance of all of the obligations guaranteed hereby, and such deposits and other sums may be applied or set off against such obligations at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank;

(15) that if at any time payment of all or any part of the obligations guaranteed hereunder is rescinded or otherwise must be restored by the Bank to Borrower or to the creditors of Borrower or any representative of Borrower or representative of Borrower's creditors as a voidable preference or fraudulent transfer or conveyance upon the insolvency, bankruptcy or reorganization of Borrower or to the Guarantor, or to the creditors of the Guarantor or any representative of the Guarantor or representative of the creditors of the Guarantor upon the insolvency, bankruptcy or reorganization of the Guarantor or otherwise, this Guaranty shall continue to be effective or be reinstated, as the case may be, as though such payments had not been made, and shall survive as an obligation of the Guarantor, and shall not be discharged or satisfied by said payment or payments, notwithstanding the return of the original of this Guaranty to the Guarantor or to Borrower, or any other apparent termination of Guarantor's obligations hereunder;

(16) that any rights and remedies available to the Bank under this Guaranty are cumulative, and not exclusive of any rights and remedies otherwise available to the Bank at law or in equity;

(17) that the Bank's delay or omission in exercising any of the Bank's rights and remedies shall not constitute a waiver of these rights and remedies, nor shall the Bank's waiver of any right or remedy operate as a waiver of any other right or remedy available to the Bank.  The Bank's waiver of any right or remedy on any one occasion shall not be considered a waiver of same on any subsequent occasion, nor shall this be considered to be a continuing waiver;

(18) that this Guaranty supersedes and replaces all discussions and negotiations between the Bank and the Guarantor concerning the guaranty and indemnification provided by the undersigned hereby, and that no such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof; there are no preconditions to the effectiveness of this Guaranty and that no provision hereof may be altered, amended, waived, canceled or modified, except by a written instrument executed and acknowledged by Guarantor and the Bank's duly authorized officer; and

(19) that this Guaranty and all documents which have been or may be hereinafter furnished by the Guarantor to the Bank may be reproduced by the Bank by any photographic, photostatic, microfilm, xerographic or similar process, and that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business) .

Guarantor waives: notice of acceptance hereof, presentment and protest of any instrument and notice thereof, notice of default and all other notices to which the Guarantor might otherwise be entitled;

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 85 of 87

and any and all defenses, including without limitation, any and all defenses which Borrower or any other party may have to the fullest extent permitted by law, any defense to this Guaranty based on impairment of collateral or on suretyship defenses of every type; any right to exoneration or marshaling.

To the extent that it lawfully may, Guarantor hereby further agrees not to invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Bank's rights under this Guaranty or otherwise respecting the guaranteed obligations, and to the extent that it lawfully may do so, the Guarantor hereby irrevocably waives the benefits of all such laws. Except as otherwise provided by applicable law, the Bank shall have no duty as to the collection or protection of any collateral, if any, securing the guaranteed obligations beyond the safe custody thereof.

Guarantor will from time to time execute and deliver to the Bank, and take or cause to be taken, all such other further action as the Bank may reasonably request in order to effect and confirm or vest more securely in the Bank all the rights contemplated in this Guaranty (including, without limitation, to correct clerical errors) or respecting any of the obligations guaranteed hereby or to comply with applicable statute or law.

This Guaranty shall be governed by the laws of the State of California, shall be binding upon the heirs, executors, administrators, successors and assigns of the Guarantor and shall inure to the benefit of the Bank's successors and assigns.

If any provision of this Guaranty is found to be invalid, illegal or unenforceable, the validity of the remainder of the Guaranty shall not be affected.

Guarantor irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in California, over any suit, action or proceeding arising out of or relating to this Guaranty. Guarantor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.

THE PARTIES AGREE TO ATTEMPT IN GOOD FAITH TO RESOLVE ANY DISPUTES WHICH MAY ARISE AMONG THEM IN CONNECTION WITH THE INTERPRETATION OR ENFORCEMENT OF THE PROVISIONS OF THIS AGREEMENT, OR THE APPLICATION OR VALIDITY THEREOF. IN THE EVENT THAT ANY DISPUTE CANNOT BE SO RESOLVED, AND UNLESS THE RELIEF SOUGHT REQUIRES THE EXERCISE OF THE EQUITY POWERS OF A COURT OF COMPETENT JURISDICTION, SUCH DISPUTE SHALL BE SUBMITTED TO ARBITRATION. SUCH ARBITRATION PROCEEDINGS SHALL BE HELD IN THE COUNTY OF SANTA BARBARA, CALIFORNIA, IN ACCORDANCE WITH THE ARBITRATION PROVISIONS OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. THIS AGREEMENT TO ARBITRATE SHALL BE SPECIFICALLY ENFORCEABLE. ANY AWARD RENDERED IN ANY SUCH ARBITRATION PROCEEDINGS SHALL BE FINAL AND BINDING ON EACH OF THE PARTIES HERETO, AND JUDGMENT MAY BE ENTERED THEREON IN ANY COURT OF COMPETENT JURISDICTION. THE FOREGOING AGREEMENT TO ARBITRATE DOES NOT LIMIT THE RIGHT OF ANY PARTY TO (I) FORECLOSE AGAINST REAL OR PERSONAL PROPERTY COLLATERAL; (II) EXERCISE SELF-HELP REMEDIES RELATING TO COLLATERAL OR PROCEEDS OF COLLATERAL SUCH AS SETOFF OR REPOSSESSION; OR (III) OBTAIN PROVISIONAL OR ANCILLARY REMEDIES SUCH AS REPLEVIN, INJUNCTIVE RELIEF, ATTACHMENT OR THE APPOINTMENT OF A RECEIVER, BEFORE DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING. THIS EXCLUSION DOES NOT CONSTITUTE A WAIVER OF THE RIGHT OR OBLIGATION OF ANY PARTY TO SUBMIT ANY DISPUTE TO ARBITRATION HEREUNDER, INCLUDING THOSE ARISING FROM THE EXERCISE OF THE ACTIONS DETAILED IN THE FOREGOING CLAUSES (I), (II) AND (III).

Case: 10-51813   Doc# 61   Filed: 05/19/11   Entered: 05/19/11 13:58:56   Page 86 of 87

Executed and dated **June _____, 2011**.

Guarantor:

_____
_____, individually

Address:     _____
_____, **California**
**ZIP**